# 23-738

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT



MUHAMMAD TANVIR, JAMEEL ALGIBHAH, NAVEED SHINWARI,

*Plaintiffs-Appellants,*

AWAIS SAJJAD,

*Plaintiff,*

*(Caption Continued on the Reverse)*

*On Appeal from the United States District Court
for the Southern District of New York*

## BRIEF FOR PLAINTIFFS-APPELLANTS

Naz Ahmad
CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.
CITY UNIVERSITY OF
    NEW YORK SCHOOL OF LAW
2 Court Square
Long Island City, New York 11101
718-340-4630

Baher Azmy
Shayana D. Kadidal
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
212-614-6438

Jennifer R. Cowan
Erol N. Gulay
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, New York 10001
212-909-6000

*Attorneys for Plaintiffs-Appellants*

*v.*

"JOHN" TANZIN, SPECIAL AGENT, FBI, SANYA GARCIA, SPECIAL AGENT FBI, FRANCISCO ARTOUSA, JOHN LNU, SPECIAL AGENT, FBI, STEVEN LNU, JOHN C. HARLEY, III, MICHAEL LNU, GREGG GROSSOEHMIG, WEYSAN DUN, JAMES C. LANGENBERG, JOHN DOES, 1-6, SPECIAL AGENT FBI,

*Defendants-Appellees,*

JAMES COMEY, DIRECTOR, FEDERAL BUREAU OF INVESTIGATION, RAND BEERS, ACTING SECRETARY, DEPARTMENT OF HOMELAND SECURITY, JOHN S. PISTOLE, ADMINISTRATOR, TRANSPORTATION SECURITY ADMINISTRATION, CHRISTOPHER M. PIEHOTA, DIRECTOR, TERRORIST SCREENING CENTER, JEH CHARLES JOHNSON, MICHAEL RUTKOWSKI, WILLIAM GALE, LORETTA E. LYNCH, JEFFERSON B. SESSIONS III, JOHN DOE, 7-13, SPECIAL AGENT FBI, JOHN DOE, SPECIAL AGENT, FBI,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iv

INTRODUCTION ........................................................................1

JURISDICTION...........................................................................4

STATEMENT OF ISSUES PRESENTED...................................4

STATEMENT OF THE CASE.....................................................5

    A.  The No Fly List ............................................................7

    B.  The FBI's Abuse of No Fly Listing Authority to Pressure Plaintiffs to Become Informants ..................................8

        1.  Plaintiff Muhammad Tanvir...............................10

        2.  Plaintiff Jameel Algibhah...................................13

        3.  Plaintiff Naveed Shinwari ..................................15

    C.  Notice of Removal from the No Fly List .................18

    D.  The District Court's Decision ..................................18

SUMMARY OF ARGUMENT ...............................................20

STANDARD OF REVIEW ......................................................23

ARGUMENT ............................................................................23

    I.   THE DISTRICT COURT ERRED IN RESOLVING QUALIFIED IMMUNITY AT THE MOTION-TO-DISMISS STAGE AND COMPOUNDED ITS ERROR BY READING PLAINTIFFS' ALLEGATIONS IN A LIGHT MOST FAVORABLE TO THE INDIVIDUAL DEFENDANTS.........................23

II.  PERSISTENT, UNCHECKED LAW ENFORCEMENT
     ABUSES OF AMERICAN MUSLIMS COMPEL THIS
     COURT TO ADDRESS THE LEGALITY OF
     DEFENDANTS' CONDUCT UNDER STEP ONE OF
     *SAUCIER* ........................................................................... 28

     A.  *Pearson* Intended to Cabin Courts' Discretion, But the
         District Court Here Ignored That Guidance ........................ 30

     B.  The *Pearson* Factors Favor Deciding the Merits Question ........ 33

         1.  There Are No Realistic Alternative Pathways By
             Which The Courts Can Be Expected To Resolve The
             Legal Question ................................................................ 33

         2.  No *Pearson* Factors Arguing Against Review Are
             Present ........................................................................... 35

     C.  Absent Judicial Review, Law Enforcement Will Continue
         Its Persistent Abuses of the No Fly List Against
         American Muslims In Violation of RFRA ............................ 35

III. PLAINTIFFS PLAUSIBLY ALLEGED THAT
     DEFENDANTS VIOLATED RFRA BY SUBSTANTIALLY
     BURDENING THEIR RELIGIOUS PRACTICE WITHOUT
     COMPELLING JUSTIFICATION ............................................. 37

     A.  Plaintiffs Plausibly Allege that Defendants Substantially
         Burdened Plaintiffs' Religious Exercise ............................. 38

         1.  Plaintiffs Engaged in the "Exercise of Religion" ......... 38

         2.  Defendants' Actions Substantially Burdened
             Plaintiffs' Exercise of Religion .................................... 39

     B.  The District Court Erred in Concluding that Defendants
         Burdening of Plaintiffs' Religious Activity Was Justified ........ 43

IV. RFRA AND THE FUNDAMENTAL PRINCIPLES OF
   RELIGIOUS LIBERTY THAT RFRA PROTECTS GAVE
   FAIR WARNING TO DEFENDANTS OF THIS OBVIOUS
   VIOLATION OF PLAINTIFFS' RIGHTS..................................................44

   A. Pursuant to this Court's Decision in *Sabir*, RFRA Itself
      Gave Defendants Fair Warning of Prohibited Conduct......................47

   B. Case Law and Elementary Principles of Religious Liberty
      Gave Defendants Fair Warning That They Violated
      Plaintiffs' Right to Be Free from Government Coercion...................50

   C. It Would Be Obvious to Any Official that Law
      Enforcement Coercion Against Other Religious
      Adherents Would Violate the Law........................................53

CONCLUSION.......................................................................54

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ....................................56

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Creighton*,
   483 U.S. 645 (1983)..................................................................................45

*Brosseau v. Haugen*,
   543 U.S. 194 (2004)..................................................................................45

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014)......................................................................24, 25, 49

*Camreta v. Greene*,
   563 U.S. 692 (2011)......................................................................30, 32, 37

*Chamberlain v. City of White Plains*,
   960 F.3d 100 (2d Cir. 2020) .....................................................................24

*Chebli v. Kable*,
   No. 1:21-cv-0937 (D.D.C. May 12, 2021) ...............................................34

*County of Sacramento v. Lewis*,
   523 U.S. 833 (1998)..................................................................................32

*Cox v. Louisiana*,
   379 U.S. 559 (1965)..................................................................................52

*Cutter v. Wilkinson*,
   544 U.S. 709 (2005)..................................................................................38

*DeStefano v. Emergency Hous. Grp., Inc.*,
   247 F.3d 397 (2d Cir. 2001) .....................................................................50

*Edrei v. Maguire*,
   892 F.3d 525 (2d Cir. 2018) ..............................................22, 45, 51, 52

*El Ali v. Barr*,
   473 F. Supp. 3d 479 (D. Md. 2020)..............................................21, 40, 41, 42

iv

*Fikre v. FBI*,
   3:13-cv-00899-BR, 2019 WL 2030724 (D. Or. May 8, 2019)...........................43

*Fikre v. FBI*,
   35 F.4th 762 (9th Cir. 2022) ..................................................33, 34, 43

*Franco v. Kelly*,
   854 F.2d 584 (2d Cir. 1988) ................................................................53

*Garcia v. Does*,
   779 F.3d 84 (2d Cir. 2015) ..................................................................45

*Golodner v. Berliner*,
   770 F.3d 196 (2d Cir. 2014) ...........................................................32, 46

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
   546 U.S. 418 (2006)......................................................................24, 44

*Guan v. City of New York*,
   37 F.4th 797 (2d Cir. 2022) ...............................................................32

*Hoggard v. Rhodes*,
   141 S. Ct. 2421 (2021)......................................................................48

*Holt v. Hobbs*,
   574 U.S. 352 (2015).........................................................................39

*Hope v. Pelzer*,
   536 U.S. 730 (2002).......................................................45, 48, 51, 53

*Jolly v. Coughlin*,
   76 F.3d 468 (2d Cir. 1996) .............................................................39, 50

*Jones v. Treubig*,
   963 F.3d 214 (2d Cir. 2020) ..........................................................44, 45

*Kashem v. Barr*,
   941 F.3d 358 (9th Cir. 2019) .............................................................34

*Kovac v. Wray*,
   449 F. Supp. 3d 649 (N.D. Tex. 2020) ...............................................34

v

*Long v. Pekoske*,
   38 F.4th 417 (4th Cir. 2022) ...............................................................34

*Lynch v. City of New York*,
   952 F.3d 67 (2d Cir. 2020) ...............................................................26

*Mack v. Yost*,
   63 F.4th 211 (3d Cir. 2023) ...............................................................39

*Maniar v. Mayorkas*,
   No. 19-3826 (EGS), 2023 WL 2709040
   (D.D.C. Mar. 30, 2023)...............................................................34

*Marbury v. Madison*,
   5 U.S. 137 (1803)...............................................................37

*Martinez v. City of Clovis*,
   943 F.3d 1260 (9th Cir. 2019) ...............................................................31

*Matzell v. Annucci*,
   64 F.4th 425 (2d Cir. 2023) ...............................................................24

*McKenna v. Wright*,
   386 F.3d 432 (2d Cir. 2004) ...............................................................25

*Monell v. Dep't of Soc. Servs. of City of New York*,
   436 U.S. 658 (1978)...............................................................29, 33

*Mullinex v. Luna*,
   577 U.S. 7 (2015)...............................................................47

*Okin v. Vill. of Cornwall-On-Hudson Police Dep't*,
   577 F.3d 415 (2d Cir. 2009) ...............................................................47

*Pearson v. Callahan*,
   555 U.S. 223 (2009)...............................................................*passim*

*Plumhoff v. Rickard*,
   572 U.S. 765 (2015)...............................................................31

*Rivera v. Marko*,
   37 F.4th 909 (3d Cir. 2022) ...............................................................31

*Sabir v. Williams*,
　52 F.4th 51 (2d Cir. 2022) .......................................................................*passim*

*Salahuddin v. Goord*,
　467 F.3d 263 (2d Cir. 2006) ...............................................................28

*Saucier v. Katz*,
　533 U.S. 194 (2001).........................................................................28, 30

*Sherbert v. Verner*,
　374 U.S. 398 (1963).............................................................................39

*Tanvir v. Lynch*,
　128 F. Supp. 3d 756 (S.D.N.Y. 2015) ................................................6

*Tanvir v. Lynch*,
　No. 13-cv-06951-RA (S.D.N.Y. May 4, 2015) .................................18

*Tanvir v. Tanzin*,
　1:13-cv-06951-RA (S.D.N.Y. Apr. 22, 2014) ....................................7

*Tanvir v. Tanzin*,
　13-CV-6951 (RA), 2023 WL 2216256
　(S.D.N.Y. Feb. 24, 2023) ......................................................................4

*Tanvir v. Tanzin*,
　141 S. Ct. 486 (2020)...........................................................2, 6, 36, 54

*Tanvir v. Tanzin*,
　894 F.3d 449 (2d Cir. 2018) ................................................................6

*Taylor v. Riojas*,
　141 S. Ct. 52 (2020).................................................................45, 48, 51

*Torcivia v. Suffolk Cnty.*,
　17 F.4th 342 (2d Cir. 2021) ...............................................................28

*Trustees of Upstate New York Engineers Pension Fund
　v. Ivy Asset Management*,
　843 F.3d 561 (2d Cir. 2016) ...............................................................23

*Vega v. Semple*,
　963 F.3d 259 (2d Cir. 2020) ...............................................................23

vii

*Warsoldier v. Woodford*,
   418 F.3d 989 (9th Cir. 2005) ...............................................................42

*Washington v. Gonyea*,
   538 F. App'x 23 (2d Cir. 2013) .......................................................42, 51

*West v. Radtke*,
   48 F.4th 836 (7th Cir. 2022) ...........................................................27, 39

*Westchester Day Sch. v. Vill. of Mamaroneck*,
   504 F.3d 338 (2d Cir. 2007) ................................................................27

*Williams v. Annucci*,
   895 F.3d 180 (2d Cir. 2018) ................................................................44

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)........................................................................39, 50

*Ziglar v. Abassi*,
   137 S. Ct. 1843 (2017)..............................................................45, 47, 48

**Statutes**

28 U.S.C. § 1291 ........................................................................................4

28 U.S.C. § 1331 ........................................................................................4

42 U.S.C. § 2000bb ....................................................................................1

42 U.S.C. § 2000bb-1............................................................................2, 48

42 U.S.C. § 2000bb-1(a) ..........................................................................38

42 U.S.C. § 2000cc-5(7)(A)......................................................................38

49 U.S.C. § 114(h)(3)(A)-(B) .....................................................................8

Federal Tort Claims Act............................................................................33

Religious Freedom Restoration Act................................................*passim*

**Rules**

Federal Rules of Civil Procedure § 12(b)(6) ..........................................23

**Other Authorities**

First Amendment to the U.S. Constitution ...................................................6, 50, 53

Fourth Amendment to the U.S. Constitution .....................................................*passim*

Eighth Amendment to the U.S. Constitution .........................................................51

Fourteenth Amendment to the U.S. Constitution ...................................................52

Homa Khaleeli, *The Perils of 'Flying While Muslim*,'
   The Guardian (Aug. 8, 2016) ...............................................................................36

Janet Reitman, *I Helped Destroy People,* N.Y. Times
   (Sept 9, 2021) .......................................................................................................36

Jeremy Scahill & Ryan Devereaux, *Watch Commander:*
   *Barack Obama's Secret Terrorist-Tracking System by the Numbers* ...............37

Peter Wade, *Hacktivist Discovered U.S. No Fly List on Unsecured*
   *Airline Server*, Rolling Stone (Jan. 22, 2023).......................................................7

Shirin Sinnar, *Separate and Unequal: The Law of "Domestic" and*
   *"International" Terrorism*, 117 Mich. L. Rev. 1333 (2019) .............................36

**INTRODUCTION**

Few principles are as embedded in the fabric of American culture and constitutionalism as the importance of respecting religious liberty, including the liberty of adherents of minority faiths. To ensure that government officials observe this fundamental commitment, Congress in 1993 enacted the Religious Freedom Restoration Act (RFRA), which guarantees that no adherent should face a "substantial burden" on a sincerely held religious practice unless the United States government can demonstrate such a burden is narrowly tailored to serve a compelling government interest. 42 U.S.C. § 2000bb *et seq*. Neither RFRA, nor the profound and long-standing constitutional values RFRA elevates and protects, is opaque or obscure; they are as clearly-established, well-understood, and prominent as any legal norm in this country.

Plaintiffs-Appellants (hereinafter "Plaintiffs"), like so many law-abiding American Muslims in the post-9/11 era, found themselves in the cross-hairs of FBI agents (Defendants-Appellees here, hereinafter also referred to as "Defendants," or the "Agents" or "FBI Agents"), primed to identify potential American Muslim informants and trained in how to coerce them into becoming so. The Agents gradually escalated their leverage until the Agents settled on a particularly powerful and coercive tool—one that the FBI has unique power to control and manipulate: the No Fly List. Each of the Plaintiffs plausibly alleges that he was placed on the List

either in retaliation for his failure to inform on his religious community or to coerce his cooperation as a condition for being removed from the List. The use of a particular tactic—here the No Fly List—is not the crux of the RFRA violation, though inclusion on the List uniquely limits a person's life. The crux of the RFRA violation was the effort to use a coercive mechanism over which the FBI had control—to pressure adherents to abandon their religious commitments.

After the Supreme Court held in *Tanvir v. Tanzin*, 141 S. Ct. 486 (2020), that RFRA authorized money damages against federal officers, the District Court granted Defendants' follow-up motion to dismiss, this time elevating the Defendants' interest in qualified immunity over the important, substantive mandates of RFRA. In so doing, the District Court disregarded this Court's admonition *not* to resolve qualified immunity at the motion-to-dismiss stage and the even more fundamental admonition to credit plausible allegations in the complaint. This is particularly important here, given the burden-shifting framework of RFRA, which requires evaluating the factual sufficiency of a defendant's purported justification for a *prima facie* RFRA violation. 42 U.S.C. § 2000bb-1.

The District Court also ignored Plaintiffs' request—in line with Supreme Court and Second Circuit guidance—to address the merits of the alleged RFRA violation at Step One of the qualified immunity inquiry: whether the plaintiff has sufficiently alleged that a right was violated. Jumping ahead to Step Two of the

inquiry (whether the right at stake was clearly established at the time of the violation), the District Court applied a technical and overly deferential view of the right at issue to conclude that there was no precisely analogous decisional law specifically warning an FBI agent that they could not deploy the No Fly List to pressure American Muslims to inform on their religious communities. That framing of qualified immunity—which the District Court transported to RFRA from the intentionally deferential context of split-second Fourth Amendment excessive force claims—makes little sense in evaluating a sustained, continuing violation of one's religious rights under expressly stated directives of RFRA. The existence of RFRA, a doctrinal scaffolding for centuries of religious liberty principles, gave any reasonable agent fair warning that there are limits on their discretion to coerce individuals to forfeit their religious principles in service to law enforcement demands.

Indeed, it would have been obvious to these Defendants that they could not coerce an observant Baptist to infiltrate a Bible study group, or a Catholic to record a confession, or a Jew to inform on mourners while sitting shiva. To hold differently for American Muslims would undermine American Muslims' religious liberty and offer legal license to a damaging law enforcement practice of de-valuing the Islamic faith.

## JURISDICTION

Plaintiffs assert claims against officers and employees of the United States under 28 U.S.C. § 1331 and RFRA. Jurisdiction over Plaintiffs' appeal is based on 28 U.S.C. § 1291. This appeal is taken from the final judgment in favor of Defendants issued on February 24, 2023, terminating the action below and disposing of all claims. *Tanvir v. Tanzin*, 13-CV-6951 (RA), 2023 WL 2216256, (S.D.N.Y. Feb. 24, 2023) (JA-135-160). Plaintiffs filed their Notice of Appeal on April 25, 2023. JA-161.

## STATEMENT OF ISSUES PRESENTED

1.     Whether the District Court erred in disregarding the Second Circuit's admonition that resolution of qualified immunity, particularly for a burden-shifting statute like RFRA, should not occur at the motion-to-dismiss stage and whether it otherwise selectively mischaracterized Plaintiffs' allegations in a light highly favorable to Defendants.

2.     Whether, given the stagnation in the law related to RFRA and law enforcement practices, and the substantial, continuing abuses of American Muslim adherents' faith by federal law enforcement, this Court should exercise its discretion pursuant to *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and resolve Step One of the qualified immunity test—*i.e*., by determining whether Defendants' conduct constituted a violation of RFRA.

3.      Whether Plaintiffs' allegations that Defendants substantially burdened Plaintiffs' sincerely-held religious practice are sufficient to state a claim for a RFRA violation, particularly absent any allegations sufficient to show the Defendants satisfied their high burden under RFRA to justify their acts of religious coercion.

4.      Whether basic, historic principles of religious liberty, case law, and RFRA's direct statutory language, provided Defendants with sufficiently fair warning that using the pressure of the No Fly List to coerce Plaintiffs to become informants on their religious communities violated RFRA and thus do not entitle Defendants to qualified immunity at the pleading stage.

## STATEMENT OF THE CASE

Plaintiffs Muhammad Tanvir, Jameel Algibhah, and Naveed Shinwari—each of whom is Muslim and either a citizen or lawful permanent resident—brought this suit in 2013 to remedy violations of their constitutional and statutory rights by individual federal Defendants. Two Plaintiffs, Tanvir and Algibhah, were placed on the No Fly List after refusing requests by FBI Agents to inform on their communities and were then told by Defendants that they could get off the List if they agreed to become informants. Soon after finding himself unable to fly, Shinwari was approached by FBI Agents who told him that he would be removed from the List if he agreed to work as an FBI informant. Plaintiffs suffered tangible as well as intangible harms from being on the List; some were unable to visit beloved family

5

members who live abroad, and some were unable to pursue job opportunities requiring air travel. As the government effectively conceded when removing Plaintiffs from the List in June 2015, shortly before a hearing in this case, Plaintiffs do not pose, have never posed, and have never been accused of posing a threat to aviation safety.

Plaintiffs brought injunctive and declaratory claims concerning their placement on the List and the inadequate redress procedure. They also sought compensatory and punitive damages from individual FBI Agent Defendants in their personal capacities for violations of their rights under the First Amendment and RFRA.[1] On September 3, 2015, the District Court granted the Defendants' motion to dismiss, ruling that money damages were not available under either the First Amendment or RFRA. *Tanvir v. Lynch*, 128 F. Supp. 3d 756 (S.D.N.Y. 2015).

On appeal, this Court reversed the District Court and held that RFRA permitted claims for monetary damages. *See Tanvir v. Tanzin*, 894 F.3d 449 (2d Cir. 2018). On December 10, 2020, the Supreme Court unanimously affirmed the Second Circuit's ruling. *See Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).

---

[1]    One of the plaintiffs below, Awais Sajjad, did not bring a claim under RFRA and, therefore, did not join this or the earlier appeals. Plaintiffs' injunctive and declaratory claims were rendered moot after the government informed them that they had been removed from the List.

On remand, Defendants renewed their motion to dismiss the individual capacity claims on qualified immunity grounds, which the District Court granted after finding that there was no specific, clearly established case law that would have put Defendants on notice that their conduct violated RFRA. JA-135-160.

## A.    The No Fly List

The No Fly List is a watchlist of people who are prohibited from boarding aircraft for flights that originate from, terminate in, or pass over the United States. JA-39.  It was created and is maintained by the Terrorist Screening Center ("TSC"). JA-39 (Compl. ¶ 44).[2] Since 2009, the List has grown exponentially. JA-40 (Compl. ¶ 47).[3]

While the TSC is ostensibly independent, in practice, it operates as an arm of the FBI. JA-38 (Compl. ¶ 40). The TSC maintains and distributes the No Fly List but relies on "nominations" from agencies with investigative functions—primarily, the FBI. JA-39 (Compl. ¶ 41). Although the TSC is expected to review each nomination to ensure that the derogatory information satisfies the List's thin

---

[2]    The operative complaint in this case is the First Amended Complaint. *Tanvir v. Tanzin*, 1:13-cv-06951-RA (S.D.N.Y. Apr. 22, 2014) (ECF No. 15).

[3]    Recently, a 2019 version of the No Fly List was leaked and reportedly contained 1.5 million names. Peter Wade, *Hacktivist Discovered U.S. No Fly List on Unsecured Airline Server*, Rolling Stone (Jan. 22, 2023), https://www.rollingstone.com/politics/politics-news/no-fly-list-leaked-unsecured-airline-server-1234665941/.

placement criteria, in practice the TSC rarely rejects anyone nominated by FBI agents for the List. JA-40 (Compl. ¶ 47).

Although placement on the List results in onerous restrictions on civil liberties and freedom of movement, the standard for inclusion is opaque. The relevant statute requires that the individual "be a threat to civil aviation or national security." 49 U.S.C. § 114(h)(3)(A)-(B).

When this lawsuit was filed, procedural safeguards pertaining to the No Fly List were nonexistent. There was no notice of placement, no way to learn the factual basis for placement, no disclosure of the criteria or evidentiary standards used in the process, and no meaningful opportunity to be heard or to challenge that placement. The government refused to confirm or deny whether any individuals, even United States citizens, were on the List, leaving individuals to discover this remarkable fact only when prevented from boarding aircraft. JA-41 (Compl. ¶¶ 52-54).

## B.    The FBI's Abuse of No Fly Listing Authority to Pressure Plaintiffs to Become Informants

While the details of each Plaintiff's experiences with his placement and retention on the List are different, the broad contours are strikingly similar. Each was born into the Muslim faith abroad, where at least some of his family remains. Each immigrated legally to the United States relatively early in life, and each flew on commercial aircraft many times without incident. None poses, has ever posed, or

8

has ever been accused of posing, a threat to aviation security. *See, e.g.,* JA-45, 53, 55, 60, 63, 69 (Compl. ¶¶ 68, 108, 118, 135, 145, 166). For many years, the government refused to formally confirm that any of them were on the List, identify the reasons for this designation, or provide a meaningful opportunity to refute the purported bases for that designation.

FBI Agents sought to force Plaintiffs to serve as informants simply because they were Muslim and participated in their local Muslim communities. JA-45, 56-57, 64, 66-67 (Compl. ¶¶ 70, 120-22, 148, 156-57). The FBI has come to rely increasingly on informants in their counterterrorism operations, and considerable pressure exists within the agency to cultivate such resources. JA-37 (Compl. ¶¶ 36-37).

No Plaintiff wanted to serve as an informant, in substantial part because to inform on his religious community and reveal those religious associations and confidences would obviously violate his religious beliefs. JA-48, 56-57, 66 (Compl. ¶¶ 84, 122, 157). Rather than accepting those refusals, Defendants leveraged a variety of threats and incentives against Plaintiffs—in some instances threatening individual Plaintiffs with deportation and arrest and in other instances offering financial incentives and assistance with family members' immigration to the United States. JA-46-47, 56, 66, 67-68 (Compl. ¶¶ 74-79, 121, 156, 161).

In each instance, the Agents then turned to an intimidating tool the FBI itself largely controls, and controls in secret: placement on the No Fly List—causing each Plaintiff to be placed on the List and then either threatening to keep him on the List for refusing to accede to the FBI's demands, or offering to remove a Plaintiff from the List in exchange for services as an FBI informant.

### 1. *Plaintiff Muhammad Tanvir*

Muhammad Tanvir was first approached by Defendants Tanzin and John Doe 1 in February 2007, when they came to Tanvir's workplace to question him about an old acquaintance. JA-45 (Compl. ¶ 69). Two days later, Agent Tanzin telephoned Tanvir and asked him what he could share about the American Muslim community. JA-45 (Compl. ¶ 70).

Tanvir first experienced trouble traveling in December 2008, when he returned to New York after visiting family in Pakistan. Tanvir was detained for five hours at John F. Kennedy Airport ("JFK") and had his passport confiscated. JA-45-46 (Compl. ¶ 71). DHS gave him an appointment to pick up his passport at the end of the following month. JA-45-46 (Compl. ¶ 71).

Shortly before that appointment, Agents Tanzin and John Doe 2 arrived unannounced at Tanvir's workplace and asked Tanvir to accompany them to the FBI's Manhattan office. JA-46 (Compl. ¶ 73). The FBI Agents asked Tanvir to work as a government informant in Pakistan, and later in the same conversation, in

Afghanistan. JA-46-47 (Compl. ¶¶ 76, 78). In exchange, the FBI offered financial and immigration assistance for his family. He declined both proposals. JA-46-47 (Compl. ¶¶ 75-79). The Agents threatened him with deportation if he tried to pick up his passport as scheduled. JA-47 (Compl. ¶ 77). Nevertheless, Tanvir went to JFK and received his passport; Tanzin called the next day and told Tanvir that he authorized the passport release because Tanvir was "cooperative" with the FBI. JA-47-48 (Compl. ¶ 80-81).

Tanzin, Doe 1, and Doe 2 repeatedly called Tanvir, visited his workplace, and threatened to arrest him, seeking to pressure him into becoming an FBI informant—despite Tanvir's consistent refusals, which were made because of his sincerely held religious views. JA-48-49 (Compl. ¶¶ 82-87).

In 2010, Tanvir found work as a long-haul truck driver. JA-50 (Compl. ¶ 89). In October 2010, after a work haul, Tanvir purchased a ticket to travel home from Atlanta. JA-50 (Compl. ¶ 91). At the airport, airline officials told Tanvir that he was not allowed to fly. JA-50 (Compl. ¶ 91). Two unknown FBI agents then approached Tanvir and told him that he should contact the FBI Agents in New York with whom he had originally spoken. JA-50 (Compl. ¶ 91). On a phone call later that day, Tanzin explained that he was no longer assigned to Tanvir's case but that Tanvir would be contacted by other FBI Agents. JA-50 (Compl. ¶ 92). Tanvir took a 24-hour bus ride home to New York, and two days later, Agent Sanya Garcia called him to explain

that she could remove him from the List if he answered her questions. Tanvir declined, adding that he already answered the FBI's questions. JA-51 (Compl. ¶ 94).

In October 2011, Tanvir purchased tickets for a November 3, 2011 flight to Pakistan, so that he and his wife could visit his sick mother. JA-51 (Compl. ¶ 98). The day before the flight, Garcia called and said that Tanvir would not be allowed to fly because he had refused to speak with her 13 months earlier, and that he would be able to fly only if he answered more questions. JA-51 (Compl. ¶¶ 99-100).

Desperate to see his ailing mother, Tanvir met Garcia and John LNU and answered the same questions other FBI Agents had asked him prior. JA-51-52 (Compl. ¶ 100-101). Garcia told Tanvir that because he cooperated, she would try to obtain a one-time waiver for him to fly to Pakistan, on condition that he speak with her upon his return. JA-52 (Compl. ¶ 101-02). On the day of the flight, however, Garcia called to tell him that he could not fly that day, and her offer of a one-time waiver was now contingent a polygraph examination. JA-52 (Compl. ¶ 104). Tanvir cancelled his ticket; his wife flew to Pakistan alone. JA-52 (Compl. ¶ 104).

In November 2012, Tanvir was again denied boarding at JFK for a flight to Pakistan, and afterwards was approached by Agent Ambrisco, who told Tanvir and his counsel that he had to meet with Garcia to be removed from the List. JA-54 (Compl. ¶ 113).

With assistance of counsel, Tanvir engaged in the redress process and on March 28, 2013, he received a response to his appeal from the Department of Homeland Security[4] which did not confirm or deny his List status, but stated tersely that the government had "made updates" to its records based on his appeal. JA-54-55 (Compl. ¶ 114). Tanvir purchased another ticket from New York to Pakistan, and flew to Pakistan on June 27, 2013. JA-55 (Compl. ¶ 115).

## 2. *Plaintiff Jameel Algibhah*

Jameel Algibhah was approached by Defendants Francisco Artusa and John Doe 4 in December 2009, when they came to Algibhah's uncle's store. JA-55-56 (Compl. ¶¶ 118-119). The Agents took Algibhah to their van, where they questioned him about his Muslim acquaintances, as well as his religious practices. JA-56 (Compl. ¶ 120). The Agents asked him to work for the FBI as an informant, specifically requesting that Algibhah infiltrate a mosque in Queens, act like an "extremist" in online Islamic forums, and serve as an informant in his Bronx neighborhood. JA-56 (Compl. ¶¶ 120-21). Algibhah declined because doing so violated his sincerely held religious beliefs and would require him to act in a deceptive manner in his community. JA-56-57 (Compl. ¶¶ 121-22). Despite

---

[4]     The Department of Homeland Security manages the Traveler Redress Inquiry Program ("DHS TRIP"), which is the sole redress procedure available to individuals who experience denial of boarding and/or screening issues at airports and land borders. JA-42 (Compl. ¶ 58).

Algibhah's refusal, the Agents pressed Algibhah, offering him money and assistance with bringing his family to the United States. JA-56 (Compl. ¶ 121). Algibhah again refused. JA-56 (Compl. ¶ 121).

Following this encounter, in May 2010, in his first attempt to fly to Yemen after meeting the Agents, airline personnel refused to give him a boarding pass, and government officials approached and told him he was not permitted to fly. JA-57 (Compl. ¶ 125). Algibhah initiated the TRIP process, but was denied boarding on a September 2010 flight to Yemen and not provided information about whether or why he was on the List. JA-58 (Compl. ¶¶ 128–30).

Years passed. After Algibhah engaged with his Congressperson and Senator Charles Schumer to understand his situation, in June 2012, Agents Artusa and John Doe 5 visited him and told him that "Congressmen can't do shit for you; we're the only ones who can take you off the list." JA-59 (Compl. ¶ 131). Artusa told Algibhah that if he cooperated, he would be taken off the List. Algibhah relented and answered questions about his family, religion and politics. JA-59 (Compl. ¶ 131-132).

Once the Agents finished questioning Algibhah, they renewed their demand that he work as an informant, instructing him to go on Islamic websites and "act extremist." JA-59 (Compl. ¶ 133). Algibhah told them he needed time to consider and asked to be taken off the List. JA-59-60 (Compl. ¶ 134). Artusa later told him that he was working on removing Algibhah from the List, which he reiterated only

14

the FBI could do, but it would take a month. JA-59-60 (Compl. ¶ 134). After this recruitment attempt, Algibhah retained counsel, who contacted Artusa in June 2012; Artusa confirmed that he could remove Algibhah from the List but wanted Algibhah to go on Islamic websites to look for "extremist" discussions, and undertake more "aggressive information gathering." JA-60-61 (Compl. ¶ 136).

In May 2013, Artusa called Algibhah to ask for a meeting about getting off the List. JA-61 (Compl. ¶ 139). Algibhah directed Artusa to his counsel. After an initial exchange with counsel, Artusa did not contact either Algibhah or his counsel. JA-61-62 (Compl. ¶¶ 139-41).

### 3. *Plaintiff Naveed Shinwari*

On February 26, 2012, while in transit through Dubai, Naveed Shinwari and his mother were prevented from boarding their U.S.-bound flight and Shinwari was informed that he should contact the U.S. consulate in Dubai before he could fly. JA-63 (Compl. ¶ 146).

The next day, at the U.S. consulate, Shinwari met with Agents Steven LNU and John C. Harley III, who questioned him for over three hours. JA-63-64 (Compl. ¶¶ 147-48). Among other things, the Agents asked questions about Shinwari's mosque, religious activities, and personal background. JA-64 (Compl. ¶ 148). Concluding their interrogation, the Agents told Shinwari that they would need to speak to "higher-ups" in Washington, D.C. before allowing him to fly. JA-64-65

(Compl. ¶ 150). Agent Harley later emailed Shinwari and said that he and his mother could return to the United States, which they did on March 1, 2012 after purchasing a new ticket to Dulles Airport. JA-65 (Compl. ¶ 151).

Upon landing, Shinwari was met by FBI Agents Michael LNU and Gregg Grossoehmig, who interrogated Shinwari for two hours, seeking to "verify" everything Shinwari had just told Agents Steven LNU and Harley three days prior. JA-65 (Compl. ¶¶ 152-53). Shinwari answered the Agents' questions truthfully and was permitted to fly home to Omaha, arriving six days late. JA-66 (Compl. ¶ 154).

In mid-March 2012, Agents Michael LNU and John Doe 6 appeared at Shinwari's home and questioned him about similar topics. JA-66 (Compl. ¶ 155). During this interrogation, the Agents told Shinwari that, given his unemployment status, they were willing to pay him to be an informant for the FBI. JA-66 (Compl. ¶ 156). Shinwari declined based on his personal and religious objections to betraying his religious community. JA-66 (Compl. ¶¶ 156–57). Soon after, on March 11, 2012, Shinwari attempted to board a flight from Omaha to Orlando, where he had obtained temporary employment, but was denied a boarding pass at the airport. JA-67 (Compl. ¶ 158). Police officers approached Shinwari and said that he was on the List. JA-67 (Compl. ¶ 158).

Shinwari's placement on the No Fly List meant that he lost the job in Orlando, causing him significant financial hardship, and that he was not able to visit his family

in Afghanistan or his father in Virginia. JA-67 (Compl. ¶ 160). Greatly distressed, Shinwari emailed Agent Harley on March 12, 2012 asking for help. JA-67-68 (Compl. ¶ 161). Harley did not respond, but the next day, Agents Michael LNU and Doe 6 returned to Shinwari's home in Omaha and again asked Shinwari to become an FBI informant, offering him financial compensation and other assistance; Shinwari again declined, even though he understood the Agents to be offering to remove him from the No Fly List. JA-67-68 (Compl. ¶ 161).

In mid-March 2012, Shinwari and his counsel met with Agents Weysan Dun and James C. Langenberg at the FBI's Omaha office. JA-68 (Compl. ¶ 162). The Agents did not confirm or deny that Shinwari was on the List, or agree to remove him, but discussed the possibility of giving Shinwari a one-time emergency waiver to fly. JA-68 (Compl. ¶ 164). Shinwari truthfully answered the Agents' questions about religious sermons that Shinwari watched online. JA-68 (Compl. ¶ 163). Agent Langenberg never replied to an email Shinwari sent him on March 18, 2013, about a one-time waiver to fly to Afghanistan. JA-68 (Compl. ¶ 165).

With the assistance of counsel, Shinwari submitted two TRIP complaints, and ultimately received a response stating only that the government had "made updates" to its records. JA-69 (Compl. ¶¶ 167-68). In March 2014, Shinwari purchased a round-trip ticket to Connecticut from Omaha and flew there and back. JA-70 (Compl. ¶ 169).

## C.    Notice of Removal from the No Fly List

With the assistance of counsel, and while this action was pending, Plaintiffs reopened their DHS TRIP processes for consideration under newly revised procedures. *See* Notice of Revised Redress Procedures, *Tanvir v. Lynch*, No. 13-cv-06951-RA, (S.D.N.Y. May 4, 2015), ECF No. 85. On June 8, 2015, just four days before a hearing on the government's motion to dismiss Plaintiffs' claims for injunctive relief and damages, each Plaintiff received a letter stating that "[a]t this time, the U.S. Government knows of no reason you should be unable to fly."

## D.    The District Court's Decision

After the procedural history described above, *see* pp. 5-7, *supra*, the District Court granted Defendants' renewed motion to dismiss on grounds of qualified immunity. Contrary to this Court's admonition in *Sabir v. Williams*, 52 F.4th 51 (2d Cir. 2022), the District Court resolved the question of qualified immunity at the motion-to-dismiss stage, which *Sabir* cautioned is inappropriate in a RFRA case, since RFRA contains a burden-shifting framework that requires evaluating a fact-based defense. The District Court also did not address Plaintiffs' request—and *Sabir*'s recommendation—that, given the importance of developing law that guides and constrains government conduct, the court use its discretion under *Pearson* to address Step One of the qualified immunity inquiry and decide whether Plaintiffs plausibly stated a claim for a RFRA violation. Skipping to Step Two—the "clearly

18

established" prong of qualified immunity—the District Court concluded, again contrary to this Court's guidance in *Sabir*, that the RFRA statute itself—as well as decades of case law—did not demonstrate a clearly established right to be free from government pressure to abandon sincerely held religious beliefs.

Instead, the District Court adopted Defendants' extremely narrow and technical framing of the right: the "right not to be pressured by law enforcement to inform on members of their religious communities through the coercive or retaliatory use of the No Fly List." JA-150. Unsurprisingly, after setting the contours of the right to precisely mirror the facts of this specific case, the District Court found that the right was not "clearly established."

In distinguishing *Sabir*, the District Court focused on the Second Circuit's finding that the plaintiffs there did not allege that the defendants acted with any justification. Here, the District Court ruled that the Complaint did allege that Defendants acted with justification because—relying on two allegations out of over 200 paragraphs which state the opposite—the Complaint "acknowledges that the No Fly List existed to reduce 'significant threats to aviation safety.'" JA-159. The Court completely misread the Complaint, which plausibly shows that placement on the List was intended to coerce Plaintiffs; it was not for any security reasons related to these particular Plaintiffs' religious exercise.

# SUMMARY OF ARGUMENT

The District Court disregarded this Court's direction in *Sabir* about how to analyze a qualified immunity defense to a RFRA claim; reversed the basic presumptions of pleading law in order to prematurely credit Defendants' substantive defense to an otherwise well-pleaded RFRA claim; and operated under an overly technical and erroneous conception of what constitutes "clearly established" law.

***First***, this Court in *Sabir* specifically counseled district courts *not* to decide RFRA qualified immunity questions at the motion-to-dismiss stage, particularly because RFRA is a burden-shifting statute and claims under it can typically only be assessed after consideration of *evidence* relating to the government's narrow tailoring-compelling interest burden under RFRA. Compounding this error (and proving the wisdom of *Sabir*'s instructions) the District Court went so far as to resolve the Defendants' putative compelling-interest defense by reading two snippets of allegations—out of a 200+-paragraph Complaint—so far in the Defendant's favor to conclusively support an uncritical, talismanic justification of "national security." It did so despite all of the well-pleaded allegations which show the opposite: Plaintiffs never posed a national security threat and their placement on the List was for purposes of coercion, not any narrowly tailored security interest. This violates *Sabir*'s directive and basic rules of pleading and is reversible error.

***Second***, even though the District Court skipped ahead to decide Step Two

("clearly established") of qualified immunity, this Court should use its own discretion under *Pearson* to address Step One of the inquiry and conclude that Plaintiffs have stated a *prima facie* RFRA claim. Under guidance promulgated by *Pearson*, this case is particularly well-suited for such a Step One resolution, and this Court should do so, as counseled in *Sabir*, in order to avoid the continuing accountability Catch-22 that leaves federal officials free to abuse the religious rights of American Muslims due to the continuing absence of clear decisional law constraining their behavior.

**Third**, Plaintiffs have adequately pled that their religious beliefs have been substantially burdened, because Defendants created an untenable choice between avoiding the immense burden and stigma of the No Fly List and informing on and betraying their religious communities. Contrary to the District Court's view, the decision in *El Ali v. Barr*, 473 F. Supp. 3d 479 (D. Md. 2020), actually *supports* Plaintiffs' *prima facie* RFRA claim and no reasonable reading of Plaintiffs' allegations could support a defense under RFRA's strict-scrutiny regime.

**Fourth**, contrary to the District Court's overly technical demand for factually similar precedent demonstrating that Defendants' conduct violated clearly established law, the pleadings demonstrate that Defendants all had "fair warning" that they were substantially burdening Plaintiffs' religious freedom—indeed, that was the very point of Defendants' religiously targeted pressure campaign. As *Sabir*

21

explained, the RFRA statute—in contrast to the vague pronouncements of the Fourth Amendment—clearly outlines the Defendants' legal obligations sufficient to defeat qualified immunity. And, as this Court in *Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) reveals, a proper analysis of basic principles of religious freedom embodied in RFRA is sufficient to give Defendants "fair notice" of their illegal conduct.

***Finally***, this kind of religious pressure, had it been lodged against other faith adherents, would have seemed an obvious form of improper religious coercion. While it seemed acceptable to the District Court to dismiss this action under the unsubstantiated trope of "national security" regularly deployed against American Muslims, this calls out for reversal by this Court and reaffirmation that RFRA was designed to protect the religious liberty of all Americans, including American Muslims.

For these reasons, the Court should reverse the District Court's dismissal based on qualified immunity and remand with instructions to resolve qualified immunity at summary judgment. In the alternative, should the Court wish to affirm the District Court's grant of qualified immunity, it should nevertheless exercise its discretion under *Pearson*, address Step One of the qualified immunity analysis and hold that Plaintiffs stated a *prima facie* claim under RFRA.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court decision dismissing a complaint pursuant to Fed. R. Civ. P. 12(b)(6), "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff[s]." *Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Management*, 843 F.3d 561, 566 (2d Cir. 2016). The Court exercises plenary review over a district court's grant of qualified immunity, which is an issue of law, and must accept all inferences in a light most favorable to Plaintiffs. *See Vega v. Semple*, 963 F.3d 259, 272 (2d Cir. 2020).

## ARGUMENT

**I. THE DISTRICT COURT ERRED IN RESOLVING QUALIFIED IMMUNITY AT THE MOTION-TO-DISMISS STAGE AND COMPOUNDED ITS ERROR BY READING PLAINTIFFS' ALLEGATIONS IN A LIGHT MOST FAVORABLE TO THE INDIVIDUAL DEFENDANTS.**

The District Court rejected Plaintiffs' request—and the Second Circuit's admonition in *Sabir*—to defer its resolution of qualified immunity to summary judgment, which was particularly important here, because RFRA contains a burden-shifting framework that requires a substantive evaluation of the government's defense—a defense not typically amenable to disposition on the pleadings. *See Sabir*, 52 F.4th at 61-65. In rushing to decide qualified immunity on the pleadings, the District Court—rather than giving Plaintiffs the benefit of all factual inferences

as required—contorted the allegations to support Defendants' ultimate defense on the merits: a talismanic recitation of generalized national security interests. This error infected the District Court's entire analysis and is grounds for reversal.

Under RFRA, a plaintiff can establish a *prima facie* claim with allegations that, when accepted as true, plausibly show that the plaintiff (1) engaged in a "sincere exercise of religion," and (2) a defendant "substantially burden[ed]" that exercise. *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 428 (2006). The burden then shifts to the defendants to meet the "exceptionally demanding" requirement that such a religious burden was the "least restrictive means" of furthering a *bona fide* "compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014).

Particularly because the facts necessary to evaluate a RFRA compelling interest/narrow tailoring defense will rarely be apparent from the complaint, the Second Circuit has admonished, "advancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch." *Sabir*, 52 F.4th at 64 (quoting *Chamberlain v. City of White Plains*, 960 F.3d 100, 111 (2d Cir. 2020)). Accordingly, "a qualified immunity defense 'faces a formidable hurdle' at the motion to dismiss stage 'and is usually not successful.'" *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023) (citing *Sabir*, 52 F.4th at 64).

The District Court ignored this important admonition and in so doing revealed the danger of rushing to dismiss a fact-dependent RFRA claim. At the motion-to-dismiss stage, the District Court was, of course, "limited . . . to the allegations in the complaint," to evaluate the government's burden of persuasion. *Sabir*, 52 F.4th at 64. And, critically, when evaluating qualified immunity on the pleadings, Plaintiffs were "entitled to all reasonable inferences from the facts alleged, not only those that support [their] claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004). Yet, in concluding that Defendants (unlike the *Sabir* defendants) did not act "with no justification," JA-159 (quoting *Sabir*, 52 F.4th at 66), the District Court made two plain errors: it considerably lowered Defendants' "exceptionally demanding" burden, *Burwell*, 573 U.S. at 728, which required them to show that the placement of these Plaintiffs on the No Fly List was narrowly tailored to a compelling government interest, and it grossly distorted Plaintiffs' allegations to manufacture a factual defense for Defendants.[5]

Remarkably, the District Court stated, without citation, that these "Defendants, like the FBI and DHS more broadly, were actively engaged in an effort

---

[5]     If there were a *bona fide* national security reason to place *these* Plaintiffs on a No Fly List, in spite of the substantial burden on their religion, then Defendants plainly did not violate clearly established law; indeed, they would not have violated the statute on the merits. Yet, the District Court cannot simply assume or manufacture facts to support and resolve a purported defense at the motion-to-dismiss stage.

to gather intelligence related to national security in the aftermath of the 9/11 attacks." JA-159. Then, the District Court took snippets from two Complaint allegations out of context, from a total of 228 paragraphs, to conclude that the "Complaint itself acknowledges that the No Fly List existed to reduce 'significant threats to aviation safety,' and was maintained by the TSC with the goal of 'coordinating the government's approach to terrorism screening.'" JA-159 (citing Comp. ¶¶ 2, 20); *cf.* JA-53, 60, 69 (Compl. ¶¶ 108, 135, 166) (alleging there was no justification for Plaintiffs' placement on No Fly List). By contrast, in *Sabir,* the panel rejected far stronger documentary evidence of a purported compelling justification specific to those plaintiffs: the Wardens' actual responses to the inmate grievances, which were attached as exhibits to the complaint. *Sabir*, 52 F.4th at 60-62. The District Court's error is a reversible one. *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020) (vacating grant of motion to dismiss where the district court failed to accept the complaint's well-pleaded facts as true and did not draw all reasonable inferences in favor of plaintiff).

First, it flips the applicable pleading presumptions on their head to cherry pick two allegations out of a voluminous, detailed complaint so as to justify Defendants' conduct in this case. Second, the District Court ignored otherwise well-pled allegations that for *these Plaintiffs*, their placement on the No Fly List was not related to national security but was impermissible coercion. The District Court should have

assumed those allegations to be true and interpreted them in a light favorable to Plaintiffs. Indeed, the fact that the government removed Plaintiffs from the List days before oral argument on Defendants' first motion to dismiss demonstrates that their placement on the List was unjustified.

Finally, as necessitated by the "narrow tailoring" prong of the RFRA defense, generalized references to national security do not show that the religious freedom of *these three Plaintiffs* was lawfully burdened. *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 353 (2d Cir. 2007) (defendants "must show a compelling interest in imposing the burden on religious exercise in the particular case at hand, not a compelling interest in general."); *West v. Radtke*, 48 F.4th 836, 848 (7th Cir. 2022) (the relevant question is "whether the government's *particular* interest in burdening *this plaintiff's* particular religious exercise is justified in light of the record in this case.") (emphasis added; citations omitted). Nothing within the Complaint reflects a governmental interest—let alone a compelling one—in having these specific Plaintiffs on the No Fly List. Reading the Complaint in the District Court's reductionist manner, and affording Defendants a wildly favorable inference from these limited facts, regrettably reinforces discriminatory and conclusory tropes about American Muslims as reflexively suspicious.

While "'facts at trial' or summary judgment 'might show otherwise,'" courts "cannot manufacture such facts out of thin air." *Sabir*, 52 F.4th at 65 (quoting

*Salahuddin v. Goord*, 467 F.3d 263, 275 (2d Cir. 2006)). Accordingly, given the burden-shifting framework of RFRA and the absence of evidence or allegations supporting the government's statutory defense, "'qualified immunity is not appropriate at this stage' of the proceedings." *Id*. (quoting *Salahuddin*, 467 F.3d at 275-76.).

## II. PERSISTENT, UNCHECKED LAW ENFORCEMENT ABUSES OF AMERICAN MUSLIMS COMPEL THIS COURT TO ADDRESS THE LEGALITY OF DEFENDANTS' CONDUCT UNDER STEP ONE OF *SAUCIER*.

In determining whether officials are entitled to qualified immunity, courts consider "(1) whether the facts presented make out a violation of a constitutional [or statutory] right ["Step One"]; and (2) whether the right at issue was clearly established when it was allegedly violated ["Step Two"]." *Torcivia v. Suffolk Cnty.*, 17 F.4th 342, 367 (2d Cir. 2021) (internal citations omitted). *Saucier v. Katz*, 533 U.S. 194 (2001), mandated that courts first address Step One, in order to assure constitutional and statutory law development and set precedent relevant to informing future cases decided under Step Two. *Pearson* offered courts discretion to answer the qualified immunity questions in any order, which the District Court here exercised in skipping the merits question embedded in Step One and dismissing the case at Step Two of the inquiry, while this Court in *Sabir* urged that district courts use their discretion to reach the merits of a RFRA claim to ensure elaboration of the

law that can constrain government misconduct. *See Sabir*, 52 F.4th at 58 n.3. The District Court offered no explanation for "skipping ahead," *id.*, to Step Two.

Plaintiffs demonstrate below, *see* Section IV, *infra*, that the District Court's Step Two analysis was erroneous. Because the District Court skipped Step One and therefore failed to address important questions regarding the application of RFRA, there has not been a judicial determination regarding the lawfulness of the outrageous conduct by FBI Agents alleged here. Given the importance of assessing the legality of Defendants' conduct, this Court should exercise its independent discretion and reach Step One of the qualified immunity analysis.

First, this is not a comparatively routine Fourth Amendment excessive force or unreasonable search case, where a fulsome body of case law may already exist or where it may be possible to vindicate Fourth Amendment policy interests via alternative forums (*e.g.*, a suppression hearing, claims brought under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)). The government—as has been its habit, *see* p. 34 & n.6, *infra*—announced that Plaintiffs were off the List on the eve of a motion-to-dismiss hearing. This foreclosed merits consideration of the claims for injunctive relief and left a continuing and dangerous accountability gap in the law.

Second, that accountability gap and corresponding stagnation in development of substantive legal norms around RFRA, a landmark civil rights statute, produces

what the Court should consider to be an untenable and distortive Catch-22: by skipping over the merits question presented at Step One, no law ever will be established to permit a finding of liability—and remediation—under Step Two. This gap will enable continued targeting of American Muslims—and others—by law enforcement. If courts routinely skip Step One, there is no effective check on these repeated violations of RFRA.

## A. *Pearson* Intended to Cabin Courts' Discretion, But the District Court Here Ignored That Guidance.

While *Pearson* rejected the mandatory sequencing of *Saucier*'s two-step qualified immunity inquiry, the Court highlighted the importance of reaching Step One in certain cases. The Court noted that even "prior to *Saucier* [we] had held that 'the better approach . . . is to determine first whether the plaintiff has alleged a violation of a constitutional right at all'" in order "to support the Constitution's 'elaboration from case to case' and to prevent constitutional stagnation." *Pearson*, 555 U.S. at 232. This Court's recent discussion in *Sabir* affirmatively counsels lower courts to address the merits of a RFRA claim at Step One. 54 F.4th at 58 n.3.

In endorsing district courts' use of discretion to reach Step One, the Court set forth a number of factors to guide lower courts' decisions. *Pearson*, 555 U.S. at 236-43; *Camreta v. Greene*, 563 U.S. 692, 707 (2011) (citing *Pearson*'s list of "factors courts should consider in making this determination"). Specifically, the Court instructed lower courts to consider (1) efficiency: would the work of defining the

30

right at issue need to take place anyway before deciding if it is clearly established, *Pearson*, 555 U.S. at 236, or, conversely, is it "plain" that the asserted right is not clearly established, *id*. at 237; (2) whether there exist other avenues for the law to develop outside of damages cases (*e.g.*, in cases seeking equitable relief), *id*. at 242; (3) whether the legal inquiry was too fact-bound or idiosyncratic to advance the law by creating generally-applicable precedent for other cases, *id*. at 237; (4) whether the question of "whether there was a violation . . . depend[s] on . . . facts not yet fully developed," *id*. at 239; (5) whether the parties' incentives and circumstances ensure that briefing and judicial decisionmaking will be rigorous, *id*. at 239-40; and (6) whether another higher court is about to decide the first-prong question, *id*. at 238.

Critically, addressing the legality of a defendant's baseline conduct on the merits promotes the rule of law and aids the judiciary, as it furthers "the development of constitutional precedent." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2015); *see also Rivera v. Marko*, 37 F.4th 909, 913 (3d Cir. 2022) (using *Pearson* discretion and *de novo* review to decide whether prisoner stated a claim for access to court under Step One, so "[g]oing forward . . . there should be no doubt that such a right exists"); *Martinez v. City of Clovis*, 943 F.3d 1260, 1270 (9th Cir. 2019) ("Even in difficult cases, our court tends to address both prongs of qualified immunity where the two-step procedure promotes the development of constitutional precedent in an area where this court's guidance is . . . needed.") (internal citations omitted).

The phenomenon of "law stagnation" following *Pearson* becomes particularly acute in the context of law enforcement abuses. *See Camreta*, 563 U.S. at 706 ("our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo. . . . Qualified immunity thus may frustrate . . . the promotion of law-abiding behavior."); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("if the policy of avoidance were always followed in favor of ruling on qualified immunity . . . standards of official conduct would tend to remain uncertain"); *Guan v. City of New York*, 37 F.4th 797, 807-808 (2d Cir. 2022) (reversing district court's decision that plaintiff failed to state a false arrest claim under Step One, while affirming judgment of dismissal at Step Two); *Golodner v. Berliner*, 770 F.3d 196, 201 (2d Cir. 2014) (using *Pearson* discretion to address both prongs of qualified immunity).

This Court recently pronounced that the serious concerns about unconstrained government misconduct justify resolving Step One of a RFRA claim: "Even if it were not clearly established that the [defendant] wardens violated RFRA, we would still address the merits question first to clearly establish the law and prevent a vicious cycle of shielded misconduct." *Sabir*, 54 F.4th at 58 n.3.

**B.     The *Pearson* Factors Favor Deciding the Merits Question.**

**1.     There Are No Realistic Alternative Pathways By Which The Courts Can Be Expected To Resolve The Legal Question.**

As the *Pearson* Court noted, "[m]ost of the constitutional issues that are presented in [civil damages cases brought against individual defendants subject to a qualified immunity defense] also arise in cases in which that defense is not available, such as criminal cases and . . . [damages] cases against a municipality" brought under *Monell*, and therefore substantive law can develop in those cases. 555 U.S. at 242. However, the issue presented in this case—coercive use of watchlisting to compel actions that burden religious belief in violation of RFRA—will never arise in a *Monell* or criminal context. Likewise, there is no available state law analog to support a claim of religious burdening under the Federal Tort Claims Act.

Nor are cases seeking equitable relief likely to compel answers to the merits question under RFRA. The coercive practices here are not uncommon and similar claims have been brought in other suits, although publicly acknowledging placement on the No Fly List brings attendant stigma with it. *See, e.g.*, *Fikre v. FBI*, 35 F.4th 762, 766 (9th Cir. 2022) (describing how FBI agents interrogated Fikre overseas, informed him that he was on the No Fly List, and suggested he could be removed if he agreed to be an informant).

However, claims for equitable relief under RFRA are not likely to compel answers to the merits question. In the decade since this case was filed, the

33

government has consistently rendered equitable relief moot in similar circumstances. In several other cases, the government has evaded review of its law enforcement practices by belatedly removing an individual from the List, and then urging the courts to avoid ruling on the merits—as it did here.[6] This Court in *Sabir* underscored the importance of reaching the merits of a damages claim in part because "a prisoner's equitable claims could be mooted at any moment by his transfer to a new facility." *Sabir*, 54 F.4th at 58 n.3. Here too, absent a ruling on the merits of Plaintiffs' RFRA claims, the government can continue to avoid indefinitely a pronouncement on similarly-situated individuals' rights.

---

[6]    *See Maniar v. Mayorkas*, No. 19-3826 (EGS), 2023 WL 2709040, at *5 (D.D.C. Mar. 30, 2023) (American Muslim citizen removed from List after filing suit seeking injunctive relief); *Long v. Pekoske*, 38 F.4th 417, 422 (4th Cir. 2022) (TSA first notified plaintiff he would remain on List in 2019, but then notified him he was removed from List in late 2020, mooting most federal claims before appeals court could rule); Notice of Voluntary Dismissal, *Chebli v. Kable*, No. 1:21-cv-0937 (D.D.C. May 12, 2021) (ECF No. 4) (voluntarily dismissing declaratory and injunctive claims under RFRA after plaintiff was removed from List); *Kovac v. Wray*, 449 F. Supp. 3d 649, 654-655 (N.D. Tex. 2020) (eighteen months after Kovac filed major suit challenging his placement on the No Fly List, he was notified he had been removed from the List); *Kashem v. Barr*, 941 F.3d 358, 367 (9th Cir. 2019) (noting mid-litigation removal of numerous *Latif v. Holder* plaintiffs from the list, including two who had been coercively recruited as informers); *Fikre*, 904 F.3d at 1036 ("Defendants moved to dismiss the operative complaint and, shortly thereafter, notified Fikre that he had been removed from the No Fly List").

## 2.    No *Pearson* Factors Arguing Against Review Are Present.

Judicial efficiency will not be served by avoiding a pronouncement on the merits. The right at issue in this case is set forth in RFRA, with standards that Congress directed the courts to adjudicate. To the contrary, it would benefit courts considering RFRA claims in the future to have a judicial declaration that the statute means what it says and is violated by the grossly coercive practices at issue here.

The circumstances under which this case is litigated present no danger that briefing or judicial decisionmaking on the merits question will be lacking in quality. *Cf. Pearson*, 555 U.S. at 239-40. The parties here have litigated this case zealously. It has already traveled to the Supreme Court and attracted substantial *amici* interest at several stages. Both parties are represented by well-resourced counsel and are vigorously contesting the merits question on its own terms.

## C.    Absent Judicial Review, Law Enforcement Will Continue Its Persistent Abuses of the No Fly List Against American Muslims In Violation of RFRA.

The need for judicial guidance on the appropriate use of the List is essential given the potential for law enforcement abuse, including multiple examples of law enforcement abuses of the kind at issue in this case.

While the TSC maintains the master watchlist, of which the No Fly List is a subset, the FBI is the primary organization that adds names to it. *See* JA-34-35

(Compl. ¶¶ 19–20).[7] The lack of oversight has contributed to a culture of unaccountability, made particularly dangerous because law enforcement has consistently treated American Muslims as potential terrorists. *See* Shirin Sinnar, *Separate and Unequal: The Law of "Domestic" and "International" Terrorism*, 117 Mich. L. Rev. 1333, 1335 (2019). In turn, that encourages FBI agents to recruit informants to provide information on broad American Muslim communities, which boosts office statistics and leads to more funding. *See* Janet Reitman, *I Helped Destroy People,* N.Y. Times (Sept 9, 2021). Unsurprisingly, the FBI seems well-aware of their entitlement to impunity for coercive behavior: when Algibhah petitioned members of Congress to be taken off the List, Agents told him: "Congressmen can't do shit for you; we're the only ones who can take you off the list." JA-59 (Compl. ¶ 131).

The absence of law enforcement accountability for abuses of the No Fly List contributes to serious harm to American Muslims. *See* Homa Khaleeli, *The Perils of 'Flying While Muslim*,' The Guardian (Aug. 8, 2016) (stigmatization, separation from families, loss of business opportunities, and getting stranded in foreign countries). Collective harm includes the perpetuation of feelings of second-class

---

[7]     According to a leading scholar, the FBI has developed a "proprietary" interest over the No Fly List. *See* Brief for Jeffrey D. Kahn as Amicus Curiae Supporting Respondents at 5, *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) (No. 19-71), 2020 WL 730300.

citizenship status for American Muslims. *See* Jeremy Scahill & Ryan Devereaux, *Watch Commander: Barack Obama's Secret Terrorist-Tracking System by the Numbers*, The Intercept (Aug. 5, 2014) (quoting Executive Director of CAIR-Michigan that the targeting of Muslims and Arabs on the List "just confirms the type of engagement the government has with our community—as seeing us as perpetual suspects.").

This Court should take this opportunity to state clearly that using the List to coerce individuals to violate their religious beliefs and betray their religious communities violates RFRA, so that no future officer could plausibly claim they did not already know this elementary lesson. Otherwise, this unlawful "cycle could happen 'again, and again, and again.'" *Sabir*, 54 F.4th at 58 n.3 (quoting *Camreta*, 563 U.S. at 706). The judiciary should play its role to "say what the law is," and put a brake on the persistent violation of rights, *Marbury v. Madison*, 5 U.S. 137, 177 (1803)—here, the fundamental enjoyment of religious freedom.

## III. PLAINTIFFS PLAUSIBLY ALLEGED THAT DEFENDANTS VIOLATED RFRA BY SUBSTANTIALLY BURDENING THEIR RELIGIOUS PRACTICE WITHOUT COMPELLING JUSTIFICATION.

The District Court did not reach the question of whether the Complaint plausibly alleged a RFRA violation, instead skipping to Step Two of the *Pearson* analysis to conclude (erroneously) that such a right was not clearly established. As

argued in Section II, *supra*, this Court should exercise its own discretion to consider whether Plaintiffs adequately alleged a violation of RFRA on the merits and should conclude that they did. The Complaint plausibly alleged that Defendants violated RFRA by substantially burdening Plaintiffs' religious practice without compelling justification. And, as described in Section I, *supra*, the District Court erred in crediting Defendants' inferences from the Complaint to conclude, even on the pleadings, that Defendants' imposition of a substantial burden on these specific Plaintiffs was in service of a compelling governmental interest.

### A. Plaintiffs Plausibly Allege that Defendants Substantially Burdened Plaintiffs' Religious Exercise.

To allege a substantial burden under RFRA, Plaintiffs must allege that (1) the activities at issue were an "exercise of religion" and (2) the federal official "substantially burdened" those activities. 42 U.S.C. § 2000bb-1(a). Plaintiffs' allegations satisfy both prongs.

### 1. Plaintiffs Engaged in the "Exercise of Religion."

RFRA defines "exercise of religion" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "The term 'exercise of religion' extends beyond 'belief and profession' and encompasses 'the performance of . . . physical acts [such as] assembling with others for a worship purpose.'" *Sabir*, 52 F.4th at 59 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005)) (alterations in original). Plaintiffs' right to freely participate in their

Muslim religious communities, including by interacting with those communities through worship and fellowship and by contributing to online spaces frequented by Muslims, clearly falls within the wide scope of "exercise of religion."

### 2. Defendants' Actions Substantially Burdened Plaintiffs' Exercise of Religion.

Under RFRA, a substantial burden exists when an individual is forced to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand." *Jolly v. Coughlin*, 76 F.3d 468, 474-77 (2d Cir. 1996) (citing *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)); *see also Holt v. Hobbs*, 574 U.S. 352 (2015) (explaining how RFRA restored the *Sherbert* analysis for determining substantial burdens, as well as the "compelling interest" balancing test). A substantial burden also exists when the government places pressure on an individual to modify their religious exercise by using the threat of negative consequences, including legal action or disciplinary sanctions. *See, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972) (religious exercise is substantially burdened when the government compels individuals, "under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs."); *Mack v. Yost*, 63 F.4th 211, 233 (3d Cir. 2023) ("Whether pressure is substantial turns on '*the intensity of the coercion* applied by the government to act contrary to one's beliefs.' Both direct and indirect burdening of religion are prohibited.") (internal citation omitted); *West*, 48

F.4th at 845 ("[A] substantial burden on religious exercise occurs when a prison attaches some meaningful negative consequence to an inmate's religious exercise.").

Here, Plaintiffs were forced to choose between (i) following their religion (by refusing to secretly collect intelligence on members of their communities on behalf of the FBI) and (ii) negative consequences (being unable to fly commercially to see their families and pursue economic opportunities). The coercive leverage used by Defendants—placement on the No Fly List—readily qualifies as a "substantial burden" because it attached meaningful negative consequences to Plaintiffs' exercise of religious beliefs in refusing to cooperate with the FBI. Because some of Plaintiffs' family members lived in foreign countries that were practically only accessible by airplane, and because Plaintiffs had economic opportunities that required air travel, the negative consequences of being placed on the List were significant to them. Defendants therefore pressured Plaintiffs into an impermissible choice that violated RFRA.

The District Court, relying on the government's invocation of *El Ali*, reasoned that a request to serve as an informant, "even if accompanied by an offer of assistance" with watchlisting status, does not substantially burden religious exercise. JA-156 (quoting *El Ali*, 473 F. Supp. 3d at 527)). However, if anything, *El Ali* supports Plaintiffs' claims. The portion of the *El Ali* opinion relied on below only dismissed one specific RFRA claim asserted by only two (of 39 total) plaintiffs, who

40

had argued that merely being asked to cooperate (in exchange for the promise of removal from the Selectee List) "burden[ed] their free exercise of religion." 473 F. Supp. 3d at 527. But that particular RFRA claim—one of four advanced in *El Ali*—did not allege *a retaliatory purpose* for the watchlisting of those two plaintiffs. They were not met with any additional punishment after they declined the FBI's request to serve as informants.[8]

Claims that are substantially similar to Plaintiffs' here actually survived in *El Ali*. Sixteen plaintiffs alleged that they were singled out for persistent questioning about their Muslim faith which "place[d] pressure on [them] to modify or violate their beliefs, *id*. at 525, and "*has punitive consequences* because the 'details of Plaintiffs' adherence to the Muslim faith' [are] the reason they end on the Watchlists." *Id*. at 526 (emphasis added). The "attendant harms that flow from Watchlist placement impose[] a substantial burden on their free exercise of religion. . . . The Court *agrees*." *Id*. (emphasis added). Those claims nearly exactly parallel

---

[8] The burden placed on the *El Ali* plaintiffs was also significantly less severe than the burden applied here. Many of the *El Ali* plaintiffs were on the Selectee List, not the No Fly List. While placement on the Selectee List entails onerous conditions for flying, Selectees are still able to fly. Placement on the No Fly List, however, severely impairs civic life in a modern society: preventing visits to family, pursuit of job opportunities and carrying with it a severe stigma. *See El Ali*, 473 F. Supp. 3d at 495-97, 526-27. According to the Complaint, this was the *very point* of the FBI's strategy: the FBI shifted from financial incentives or threats about immigration status to the most punitive mechanism at their disposal to maximize their coercive leverage.

41

the RFRA claims at issue here, and it was a stark misreading of *El Ali* for the District Court to reason otherwise.

In contrast to the claims that were dismissed in *El Ali*, but like the claims that survived there, the Complaint here alleges that Plaintiffs were placed on the No Fly List for coercive purposes either *after* they declined the FBI's request to serve as informants, or for the purpose of coercing them into agreeing to such a request made after they were placed on the List. *See* JA-50-51, 56-57, 66-67 (Compl. ¶¶ 91-96, 121-125, 155-159). Defendants therefore punished Plaintiffs for exercising their religious rights. *See Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) ("[T]he conduct alleged here—that [plaintiff] was severely punished for engaging in protected activity—rises to the level of a substantial burden on the free exercise of religion."); *Warsoldier v. Woodford*, 418 F.3d 989, 995-96 (9th Cir. 2005) (plaintiff was "subjected to a series of punishments [] to coerce him into compliance" to act contrary to his religious beliefs when he refused to conform his hairstyle to prison grooming standard).

The District Court's comparison of Plaintiffs' allegations to situations where prosecutors incentivize cooperation by dropping charges against charged defendants is inapt. JA-156. An accurate analogy would be if a prosecutor asked an innocent individual to do something that violated their religious beliefs, and then knowingly filed unsubstantiated charges against them after the individual refused to comply.

42

This type of retaliatory action burdens the exercise of religion in a way that offering an indicted defendant the chance to cooperate does not. [9]

### B. The District Court Erred in Concluding that Defendants Burdening of Plaintiffs' Religious Activity Was Justified.

RFRA contains a defense pursuant to which the government will not be liable for imposing a substantial burden on religion if the burden was the least restrictive means to achieve a compelling government interest. As described in Section I, *supra*, however, the District Court committed a serious error addressing qualified immunity at the motion-to-dismiss stage. Determining whether a right was violated under RFRA requires assessing whether the governmental interest is compelling and narrowly tailored and that requires fact development. The District Court erroneously concluded that the elements of this defense had been met by two of Plaintiffs' allegations, which it took out of the context of the 58-page Complaint to find that they supported an undifferentiated interest in national security.

As detailed in Section I, *supra*, this was a serious error. First, the District Court failed to properly view Plaintiffs' voluminous, well-pleaded allegations in a favorable light. If it had done so, the allegations show that Defendants used the List

---

[9]     The District Court's citation to *Fikre v. FBI*, 3:13-cv-00899-BR, 2019 WL 2030724 at *8-9 (D. Or. May 8, 2019), is also unavailing. JA-157. The *Fikre* court rejected the RFRA claim on timeliness grounds, not the merits, and thus has no force here.

43

to coerce them into becoming informants. *See, e.g.*, JA-53, 55, 63 (Compl. ¶¶ 108, 118, 145). Second, the District Court's generalized pronouncements about "national security" are insufficiently particularized to establish that the burden placed on *these Plaintiffs* was narrowly tailored to achieve a compelling government interest. *See Gonzales*, 546 U.S. at 431 (RFRA requires courts to "look[] beyond broadly formulated interests"); *Williams v. Annucci*, 895 F.3d 180, 190 (2d Cir. 2018) ("the government must justify its conduct by demonstrating not just its general interest, but its particularized interest in *burdening the individual plaintiff* in the precise way it has chosen.") (emphasis added); *see also* JA-53, 60, 69 (Compl. ¶¶ 108, 135, 166) (alleging no justification for Plaintiffs' placement on No Fly List).

Accordingly, this Court should conclude that Plaintiffs have stated a claim under RFRA and remand to the District Court to conduct discovery and defer the qualified immunity analysis to the summary judgment phase.

## IV. RFRA AND THE FUNDAMENTAL PRINCIPLES OF RELIGIOUS LIBERTY THAT RFRA PROTECTS GAVE FAIR WARNING TO DEFENDANTS OF THIS OBVIOUS VIOLATION OF PLAINTIFFS' RIGHTS.

Qualified immunity protects government officials from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson*, 555 U.S. at 231. The focus should be on whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Jones v. Treubig*, 963

F.3d 214, 224 (2d Cir. 2020) (internal quotation marks omitted); *see also Sabir*, 52 F.4th at 63 (qualified immunity is "not available when an officers' actions are not objectively reasonable in light of clearly established law") (citing *Ziglar v. Abassi*, 137 S. Ct. 1843, 1867 (2017)). While the alleged unlawfulness "must be apparent," the Supreme Court has repeatedly stressed that this is not to say that "the very action in question has previously been held unlawful." *Anderson v. Creighton,* 483 U.S. 645, 640 (1983). Thus, "officials can still be on notice that the conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Taylor v. Riojas*, 141 S. Ct. 52 (2020) (affirming *Hope*).

Contrary to the District Court's overly technical focus on the existence of direct decisional precedent, the Supreme Court and this Court have emphasized that it is enough if the defendants had "fair warning" that such conduct would be unlawful. *Hope*, 536 U.S. at 740; *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (officers should have "fair notice" that their "conduct was unlawful"); *see also Edrei v. Maguire*, 892 F.3d 525, 540 (2d Cir. 2018) (Katzmann, C.J.) (discussing "fair notice requirement"). The same is true if, in the absence of directly similar case law, "preexisting law clearly foreshadows a particular ruling on the issue." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015).

The Complaint contains voluminous allegations showing that the Defendants engaged in a sustained, individually-targeted campaign over years to pressure

Plaintiffs to forego their religious principles, betray their communities' faith and trust, and collect intelligence for the FBI. The crux of Plaintiffs' claim does not turn on the particularities of the No Fly List as such, even as that mechanism became the ultimate escalation of leverage by Defendants and caused Plaintiffs great harm. Rather, the crux of the claim is that federal officials deployed leverage available only to them to force Plaintiffs to make an impossible choice: between being deprived of access to a basic necessity of modern life or violating their religious principles by reporting on the activities in their mosques, falsely advancing "extremist" religious viewpoints and implicating fellow adherents.

Nevertheless, the District Court granted the Defendants qualified immunity because the Court could not find a case to support the "right not to be pressured by law enforcement to inform on members of their religious communities through the *coercive or retaliatory use of the No Fly List*." JA-135 (emphasis added). By defining the right "too narrowly based on the factual scenario presented," *Golodner*, 770 F.3d at 205, and unsurprisingly, not finding a reported decision that had presaged the precise facts in this case, the District Court too quickly called the qualified immunity game in the government's favor. And, in so doing, the District Court disregarded the instructions of this Court in *Sabir*: that RFRA operates on different substantive standards than the Fourth Amendment, and that district courts

should *not* evaluate the government's defense at the motion-to-dismiss stage. *Sabir*, 52 F.4th at 64.

### A. Pursuant to this Court's Decision in *Sabir*, RFRA Itself Gave Defendants Fair Warning of Prohibited Conduct.

This Court in *Sabir* gave a clear roadmap for deferring the qualified immunity decision and for resolving it—a roadmap that the District Court largely ignored. In addition to instructing courts to defer a qualified immunity ruling to summary judgment, *Sabir* confirmed that RFRA itself is sufficient to give an officer fair warning of prohibited conduct. *See Sabir*, 52 F.4th at 65 (citing *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433-34 (2d Cir. 2009)). Nevertheless, the District Court relied heavily on Fourth Amendment qualified immunity case law in defining the contour of the right here. *See* JA-148-149 (repeatedly citing *Mullinex v. Luna*, 577 U.S. 7 (2015), a Fourth Amendment excessive force case representing the apex of defendant protections under qualified immunity as it involved split-second decision of an officer to shoot at the car of an armed and fleeing suspect).

As *Sabir* explained, however, the Fourth Amendment is necessarily more exacting on plaintiffs because the "abstract right" to be free from "unreasonable searches and seizures" can make it "difficult for an officer to know whether a search or seizure will be deemed reasonable given the precise situation encountered." *Sabir*, 52 F.4th at 65 (quoting *Abassi*, 137 S. Ct. at 1866); *see also Mullinex*, 577 U.S. at

12 ("Such specificity [in defining the contour of a right] is especially important in the Fourth Amendment context where the Court has recognized that it is sometimes difficult for an officer to determine how relevant legal doctrine . . . will apply to the factual situation the officer confronts").

RFRA's guidance, by contrast, is objective and directive and itself sets forth the contours of a plaintiff's rights. "As the text of the statute itself explains," *Sabir* emphasized, the "[g]overnment may substantially burden a person's exercise of religion *only if it demonstrates* that application of the burden to the person . . . is *in furtherance* of a compelling governmental interest." 52 F.4th at 65 (quoting 42 U.S.C. § 2000bb-1 and adding emphases).

Because of these plain statutory directives, "it is not 'difficult for an [official] to know whether'" a substantial burden (unjustified by a narrowly tailored compelling interest) "'will be deemed reasonable.'" *Id.* (quoting *Abassi*, 137 S. Ct. at 1866). At the very least, *Sabir* stands for the principle that an officer will know they are violating RFRA if they lack a governmental interest, let alone a compelling one, for imposing a substantial burden on the exercise of religion. *Sabir* is also consistent with a principle underlying cases like *Hope* and *Riojas*: where officers do not have to conform a split-second decision to a vague, open-ended constitutional pronouncement, less judicial deference may be required. *See Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (statement of Thomas, J., respecting denial of

certiorari) ("But why should university officers, who have time to make calculated choices about enacting or enforcing unconstitutional policies, receive the same protection as a police officer who makes a split-second decision to use force in a dangerous setting? We have never offered a satisfactory explanation to this question.") (citation omitted).

The District Court strained to avoid this holding by concluding that in this case, unlike in *Sabir*, there were two allegations that somehow demonstrated that the substantial burden on Plaintiffs' religious exercise was justified through a generalized interest in "national security" and "aviation safety." JA-159. However, as previously detailed, it was a fundamental error to accept a reading of the allegations so favorable to Defendants and disregard the plausible allegations in the Complaint that the List was deployed here for coercion, not for any particularized security needs relating to these Plaintiffs. *See* Section I, *supra*. Moreover, as *Sabir* specifically emphasized, reliance on general security interests is insufficient to satisfy the Defendants' burden because RFRA "requires the Government to demonstrate the compelling interest test is satisfied through application of the challenged [practice] . . to the particular claimant whose sincere exercise of religion is being substantially burdened." *Sabir*, 54 F.4th at 62 (quoting *Burwell*, 573 U.S. at 726); *see also id*. at 61 (rejecting *post-hoc* justification by senior BOP officials as

not shedding "light on the *wardens'* actual reasons for enforcing the policy against Sabir.") (emphasis added).

The District Court accordingly erred in failing to follow *Sabir* and in concluding that RFRA did not give Defendants fair notice of unlawful conduct.

**B.** **Case Law and Elementary Principles of Religious Liberty Gave Defendants Fair Warning That They Violated Plaintiffs' Right to Be Free from Government Coercion.**

RFRA and basic First Amendment jurisprudence has established the right to be free from government pressure that forces an individual to participate in behavior in a manner that is at odds with sincerely held religious beliefs. *See Jolly*, 76 F.3d at 477 ("As cases decided prior to *Smith* make clear, a substantial burden exists where the state put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs."). Pressure from government officials rises to the level of a substantial burden when it prevents an individual from participating in religious activity as a matter of a "genuine personal choice." *DeStefano v. Emergency Hous. Grp., Inc.,* 247 F.3d 397, 412 (2d Cir. 2001) (concluding that First Amendment rights were violated when atheist prisoners were pressured to attend support groups that required professing certain religious beliefs). Coercion that forces a religious adherent to be physically present in a space contrary to their beliefs has also been held unconstitutional. *See Yoder,* 406 U.S. at 218 (holding that the First Amendment protects Amish parents from being forced to send their children to school through

50

age 16); *Washington*, 538 F. App'x at 26 ("[T]he conduct alleged here—that Washington was severely punished for engaging in protected activity—rises to the level of a substantial burden on the free exercise of religion.").

The District Court went through the process of examining each of these cases to find factual differences from this case, JA-150-153, and otherwise concluded that no case had squarely held that the "coercive or retaliatory use of the No Fly List" was a violation of RFRA. JA-150. But direct factual proximity—let alone exactness—from a prior case is not required as long as officials have "fair warning" of the illegality of their conduct. *See Hope*, 536 U.S. 730, 741 (2002) (rejecting qualified immunity when general legal principles put defendants on notice that tying an incarcerated person to a hitching post for hours in the heat violates the Eighth Amendment); *Riojas*, 141 S. Ct. 52 (2020) (denying qualified immunity to prison guards who engaged in sustained and deliberate indifference to obviously egregious conditions of confinement, despite absence of direct precedent).

Chief Judge Katzmann's decision in *Edrei* is instructive. In this excessive force case, the police deployed novel and painful sound technology—a machine called "LRAD 100x"—in order to disperse protestors. This Court rejected the defendants' proposed framing of the right—namely whether officers violated the Constitution "by using the LRAD 100x to aid in moving protestors"—as too narrow.

*Edrei*, 892 F.3d at 539.[10] Instead, the Court framed the inquiry as: "would a reasonable officer have known that subjecting non-violent protestors to the point of serious injury to move them" violated the Constitution? *Id.* at 540. This Court recognized there was no direct case on point, particularly no case involving sound technology, let alone the LRAD 100x.[11] Still, this Court looked generally to "a wealth of cases [which] inform government officials that protesters enjoy robust constitutional protections," the general "constitutional command of free speech and assembly [that] is basic and fundamental and encompasses peaceful social protest," *id*. at 541 (quoting *Cox v. Louisiana*, 379 U.S. 559, 574 (1965)), and cases generally prohibiting "pain compliance techniques" in order to disperse peaceful protestors. For this Court, all of these basic strands of law put the defendants on "fair notice" that their specific conduct was proscribed—at least for purposes of a motion to

---

[10]    Consistent with the canon of viewing a complaint's allegations in the light most favorable to the Plaintiffs, which the District Court ignored here, *Edrei* rejected the defendants' attempted characterization of plaintiffs as "potentially violent," as that was belied by the complaint's allegations. 892 F.3d at 539.

[11]    The Court forcefully rejected the demand that there be prior decisional law on point when the violation is obvious and which would provide "fair notice." According to this Court: "that is like saying police officers who run over people crossing the street illegally can claim immunity simply because we have never addressed a Fourteenth Amendment claim involving jaywalkers. This would convert the fair notice requirement into a presumption against the existence of basic constitutional rights. Qualified immunity doctrine is not so stingy." *Edrei*, 892 F.3d at 539.

dismiss. Here, the doctrinal foundation supporting a right to be free from government coercion to compromise religious beliefs is just as strong—and given the existence of RFRA, possibly even stronger.[12]

### C. It Would Be Obvious to Any Official that Law Enforcement Coercion Against Other Religious Adherents Would Violate the Law.

The Defendants' conduct and the District Court's decision, on inspection, reveal a troubling subtext. Imposing this level of law enforcement coercion on adherents of other religions would plainly violate basic principles of religious freedom, and an "obvious"—albeit creative—violation of the law defeats qualified immunity. *See Hope*, 536 U.S. at 741.

It is hard to imagine any FBI agent could think they could lawfully coerce an observant Baptist to infiltrate a Bible study group, or a Catholic to record a

---

[12]    Indeed, as a general matter, any reasonable officer would understand that the use of watchlisting to coerce compliance with a request to inform on one's own religious community violates religious liberty. Like all constitutional rights, First Amendment rights would be meaningless without the right to be free from coercion when exercising them. *See Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988) ("[A]n act in retaliation for the exercise of a constitutional right is actionable . . . even if the act, when taken for different reasons, would have been proper.") (cleaned up). Given this context, the well-established prohibitions against government officials compelling speech or retaliating against the free exercise of speech reinforce how clear the violations of religious liberty here should have been to Defendants. The prohibition on coercion to enforce surrender of constitutional rights is so well-established that it beggars belief to conclude that reasonable officers might believe that their conduct—as alleged in the Complaint—was permissible.

confession, or a Jew to inform on mourners while sitting shiva by using the threat of the No Fly List. So how could that law enforcement behavior be permissible when applied to Muslim adherents? Why the seemingly differential treatment?

One might reasonably fear the possible answer: after two decades of persistent targeting, surveillance and discrimination by law enforcement against American Muslims in the post-9/11 era,[13] it has become second nature to devalue Muslim religious commitments and the desire of American Muslims to freely practice the tenets of their faith; or, as the District Court did here, to willingly accept that Muslims' religious commitments must reflexively yield to a talismanic invocation of "national security," in spite of the actual record before it. RFRA exists to ensure that the government is not permitted to degrade a religious faith so easily. It is the judiciary's role to ensure that these Plaintiffs are able to fully realize the benefits of religious freedom that RFRA confers.

## CONCLUSION

For the foregoing reasons, the Court should reverse the District Court's dismissal based on qualified immunity and remand with instructions to resolve qualified immunity at summary judgment. In the alternative, should the Court wish to affirm the District Court's grant of qualified immunity, it should nevertheless

---

[13] Brief of Muslim Advocates as Amicus Curiae Supporting Respondents at 15-19, *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020) (No. 19-71), 2020 WL 730300.

54

exercise its discretion under *Pearson*, address Step One of the qualified immunity analysis and hold that Plaintiffs stated a *prima facie* claim under RFRA.

Dated:     July 28, 2023
           New York, New York

*/s/ Baher Azmy*

Baher Azmy
Shayana D. Kadidal
**CENTER FOR CONSTITUTIONAL RIGHTS**
666 Broadway, 7th Floor
New York, New York 10012
Tel.: (212) 614-6427
Email:  bazmy@ccrjustice.org

Jennifer R. Cowan
Erol Gulay
**DEBEVOISE & PLIMPTON LLP**
66 Hudson Boulevard
New York, NY 10001
Tel.: (212) 909-7445
Email:  jrcowan@debevoise.com

Naz Ahmad
**CLEAR PROJECT**
**MAIN STREET LEGAL SERVICES, INC.**
City University of New York
School of Law
2 Court Square
Long Island City, New York 11101
Tel.: (718) 340-4630
Email: naz.ahmad@law.cuny.edu

## **Certificate of Compliance with Rule 32(a)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,228 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14-point type.

*/s/ Erol Gulay*

Erol Gulay
*Attorney for Plaintiffs-Appellants*

Dated: July 28, 2023