# 23-738

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

Muhammad Tanvir, Jameel Algibhah, Naveed Shinwari,

*Plaintiffs-Appellants,*

Awais Sajjad,

*Plaintiff,*

—against—

"John" Tanzin, Special Agent, FBI, Sanya Garcia, Special Agent FBI, Francisco Artousa, John LNU, Special Agent, FBI, Steven LNU, John C. Harley, III, Michael LNU, Gregg Grossoehmig, Weysan Dun, James C. Langenberg, John Does, 1-6, Special Agent FBI,

*Defendants-Appellees,*

(*Caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICI CURIAE* 26 RELIGIOUS ORGANIZATIONS IN SUPPORT OF PLAINTIFFS-APPELLANTS

Adeel A. Mangi
Jacob I. Chefitz
Sean M. Lau
Patterson Belknap Webb
   & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Amici Curiae*

JAMES COMEY, DIRECTOR, FEDERAL BUREAU OF INVESTIGATION, RAND BEERS, ACTING SECRETARY, DEPARTMENT OF HOMELAND SECURITY, JOHN S. PISTOLE, ADMINISTRATOR, TRANSPORTATION SECURITY ADMINISTRATION, CHRISTOPHER M. PIEHOTA, DIRECTOR, TERRORIST SCREENING CENTER, JEH CHARLES JOHNSON, MICHAEL RUTKOWSKI, WILLIAM GALE, LORETTA E. LYNCH, JEFFERSON B. SESSIONS III, JOHN DOE, 7-13, SPECIAL AGENT FBI, JOHN DOE, SPECIAL AGENT, FBI,

*Defendants.*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................... 1

INTEREST OF *AMICI CURIAE* ...................................................... 2

SUMMARY OF ARGUMENT ........................................................ 4

ARGUMENT ........................................................................ 6

   I.   CONGRESS ENACTED RFRA TO PROVIDE
       EXPANSIVE PROTECTIONS FOR THE EXERCISE
       OF RELIGIOUS FREEDOMS ................................................ 6

  II.   THE DISTRICT COURT'S APPLICATION OF
       QUALIFIED IMMUNITY IS INCONSISTENT WITH
       RFRA'S BROAD PROTECTION OF RELIGIOUS
       LIBERTY ...................................................................... 11

      A.   The District Court Defined Plaintiffs' Rights Too
          Narrowly .............................................................. 15

      B.   The District Court Should Have Considered
          Whether Plaintiffs' Rights Were Violated Before
          Considering Whether Those Rights Were Clearly
          Established ........................................................... 20

      C.   The District Court Should Not Have Decided
          Qualified Immunity at the Pleadings Stage ............... 22

CONCLUSION .................................................................... 26

CERTIFICATE OF COMPLIANCE ............................................ 27

CERTIFICATE OF SERVICE .................................................. 28

APPENDIX A ................................................................ A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baxter v. Bracey,*
140 S. Ct. 1862 (2020) ......................................................... 14

*Buckner v. Casaleggio,*
2009 WL 511142 (D. Nev. Feb. 27, 2009) .......................... 18

*Burwell v. Hobby Lobby Stores, Inc.,*
573 U.S. 682 (2014) .......................................... 6, 10, 23, 24

*Camreta v. Greene,*
563 U.S. 692 (2011) ............................................................. 21

*Castro v. United States,*
34 F.3d 106 (2d Cir. 1994) .................................................. 22

*Chamberlain v. City of White Plains,*
960 F.3d 100 (2d Cir. 2020) ......................................... 22, 23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ............................................................... 7

*City of Boerne v. Flores*
521 U.S. 507 (1997) ............................................................... 9

*Davis v. Buchanan Cty.,*
11 F.4th 604 (8th Cir. 2021) .............................................. 14

*Employment Division, Department of Human Resources v. Smith,*
494 U.S. 872 (1990) ..................................................... 4, 8, 9

*Everson v. Bd. of Ed. of Ewing Twp.,*
330 U.S. 1 (1947) ................................................................... 7

*Ghashiyah v. Wis. Dep't of Corrections,*
2006 WL 2845701 (E.D. Wis. Sept. 29, 2006) ................... 18

*Godbey v. Wilson*,
  2014 WL 794274 (E.D. Va. Feb. 26, 2014) ......................................... 18

*Gonzalez v. Litscher*,
  230 F. Supp. 2d 950 (W.D. Wis. 2002)................................................. 17

*Holt v. Hobbs*,
  574 U.S. 352 (2015).................................................................... 8, 9, 10

*Hope v. Pelzer*,
  536 U.S. 730 (2002)........................................................................ 13

*Ibrahim v. U.S. Dep't of Homeland Sec.*,
  912 F.3d 1147 (9th Cir. 2019) ........................................................ 19

*Jolly v. Coughlin*,
  76 F.3d 468 (2d Cir. 1996) ........................................................ 19, 20

*Kisela v. Hughes*,
  138 S. Ct. 1148 (2018).................................................................... 14

*McCoy v. Alamu*,
  950 F.3d 226 (5th Cir. 2020) .......................................................... 15

*McKenna v. Wright*,
  386 F.3d 432 (2d Cir. 2004) ...................................................... 22, 23

*Mullenix v. Luna*,
  577 U.S. 7 (2015)............................................................................ 15

*Njos v. Carney*,
  2017 WL 3224816 (M.D. Pa. Jun. 21, 2017)...................................... 18

*Pearson v. Callahan*,
  555 U.S. 223 (2009).................................................................. 15, 20

*Romero v. Lappin*,
  2011 WL 3422849 (E.D. Ky. Aug. 4, 2011)........................................ 17

*Sabir v. Williams*,
  52 F.4th 51 (2d Cir. 2022)....................................................... *passim*

*Sanchez v. Oliver*,
    995 F.3d 461 (5th Cir. 2021) ................................................................ 14

*Sherbert v. Verner*,
    374 U.S. 398 (1963) .......................................................................... 19

*Tanner v. McMurray*,
    989 F.3d 860 (10th Cir. 2021) ............................................................. 14

*Tanzin v. Tanvir*,
    141 S. Ct. 486 (2020) .................................................................. 10, 14

*Taylor v. Riojas*,
    141 S. Ct. 52 (2020) ................................................................... 13, 14

*Thomas v. Review Bd. Of the Indiana Employment Sec. Div.*,
    450 U.S. 707 (1981) .................................................................. 19, 20

*Zelman v. Simmons-Harris*,
    536 U.S. 639 (2002) ........................................................................... 8

## Statutes and Rules

42 U.S.C. § 1983 .................................................................................... 15

42 U.S.C. § 2000bb-1 ................................................................... 9, 10, 16

Fed. R. Civ. P. 12(b)(6) ........................................................................ 22

## Other Authorities

Akhil Reed Amar, *The Bill of Rights as a Constitution*
    *Constitution*, 100 Yale L.J. 1131 (1991) ............................................ 8

William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal.
    L. Rev. 45 (2018) ............................................................................. 14

Sahar Khan & Vignesh Ramachandran, *Post-9/11
Surveillance Has Left a Generation of Muslim Americans
in a Shadow of Distrust and Fear*, PBS News Hour (Sept.
16, 2021), https://www.pbs.org/newshour/nation/post-9-11-
surveillance-has-left-a-generation-of-muslim-americans-
in-a-shadow-of-distrust-and-fear.........................................................25

Michael W. McConnell, *The Origins and Historical
Understanding of Free Exercise of Religion*, 103 Harv. L.
Rev. 1409 (1990)......................................................................................7

S. Rep. No. 103-111, *reprinted in* 1993 U.S.C.C.A.N. 1892......................9

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* certify that none of *amici* have any parent corporations and that no publicly held company owns 10% or greater ownership in any of *amici*.

Date: August 4, 2023

/s/ Adeel A. Mangi
ADEEL A. MANGI

1

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are American religious or religiously affiliated organizations representing a wide array of faiths and denominations. Led by the Muslim Bar Association of New York, *amici* include congregations and houses of worship, as well as professional groups that work with or represent faith communities ("Religious Organizations"). As such, *amici* have an interest in ensuring that the doctrine of qualified immunity is not improperly invoked to block claims under the Religious Freedom Restoration Act of 1993 ("RFRA"). RFRA is a crucial statute that provides expansive protection to religious liberty, and *amici* have a clear interest in ensuring that those who violate RFRA are held accountable and preventing RFRA from becoming an empty promise.

*Amici* are identified here by name, with a fuller description of their identities and interests attached to this brief as Appendix A: Central Conference of American Rabbis; Council on American-Islamic Relations ("CAIR"); CAIR, New York Chapter; Congregation Beit Simchat Torah;

---

[1] Consistent with Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no counsel for a party authored this brief in whole or in part, and no person or entity, other than *amici* and their counsel, has contributed money that was intended to fund preparing or submitting this brief. All parties provided consent for *amici curiae* to file this brief.

2

Congregation Shaarei Shamayim; El Paso Monthly Meeting of the Religious Society of Friends (Quakers); Emgage Action; Faith in New Jersey; Franciscan Friars of the Province of St. Barbara; Interfaith Center of New York; Islamic Society of Central Jersey; Men of Reform Judaism; Muslim Bar Association of New York; Muslim Public Affairs Council; Muslim Urban Professionals; National Association of Muslim Lawyers; National Council of Jewish Women; NETWORK Lobby for Catholic Social Justice; New Jersey Muslim Lawyers Association; New York Disaster Interfaith Services; Society for the Advancement of Judaism; T'ruah: The Rabbinic Call for Human Rights; Union for Reform Judaism; Union Theological Seminary; Unitarian Universalist Service Committee; and Women of Reform Judaism.

## SUMMARY OF ARGUMENT

*Amici*, religious and religiously affiliated organizations of numerous faiths and denominations, have a unique appreciation of the potential dangers posed to disfavored religious groups by state officials. This danger has been ever-present throughout American history, even as the identities of the disfavored religious groups have changed over time.

Congress has recognized the vulnerability of religious adherents to government hostility, and enshrined broad protections of religious liberty by enacting RFRA. RFRA, which was enacted in response to the Supreme Court's decision in *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990), prohibits the federal government from imposing any substantial burden on the free exercise of religion unless such burden furthers "a compelling governmental interest" and is "the least restrictive means" of doing so. RFRA also allows those whose rights have been violated to seek appropriate relief, including money damages.

RFRA was designed for cases just like this one—in which the government egregiously trampled on Plaintiffs' religious freedom by repeatedly pressuring them to violate their sincerely held religious

4

beliefs.  Yet the District Court, in granting Defendants' motion to dismiss on qualified immunity grounds, undermined RFRA's protections in at least three ways.  First, the District Court defined Plaintiffs' relevant rights too narrowly.  Defining rights under RFRA at a high degree of specificity, as the District Court did here, is particularly prejudicial to religious minorities—the very groups that RFRA is intended to protect. The narrower the right, the harder it will be to show that it was "clearly established," which a plaintiff must do to overcome qualified immunity. Second, the District Court considered whether the right here was clearly established without deciding whether Defendants actually violated it. Without a court ruling that Defendants violated Plaintiffs' rights, officials can continue to engage in the challenged practice with impunity, as no precedent will have clearly established its unlawfulness.  And third, the District Court applied qualified immunity on a motion to dismiss, even though this Court has stressed that qualified immunity—an affirmative defense—should rarely be decided on the pleadings.

Through these three errors, the District Court expanded qualified immunity doctrine and effectively created a heightened pleading standard for RFRA claims.  Not only did that undermine the vast

5

protections that the statute was designed to provide for religious minorities, it bucked a recent trend by appellate courts across the country, including the Supreme Court, to curb any further extension of the defense.

For the reasons set forth herein and in Appellants' and other *amici's* briefs, *amici* urge the Court to reverse the dismissal of the District Court and remand the case for further proceedings.

## ARGUMENT

## I. CONGRESS ENACTED RFRA TO PROVIDE EXPANSIVE PROTECTIONS FOR THE EXERCISE OF RELIGIOUS FREEDOMS

"RFRA was designed to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014). RFRA's expansive protection of the free exercise of religion is deeply rooted in American history, and it can be traced to well before the founding of the country.

In the "[c]enturies immediately before and contemporaneous with the colonization of America," government-supported persecution of religious minorities was rampant: "Catholics had persecuted Protestants, Protestants had persecuted Catholics, Protestant sects had persecuted other Protestant sects, Catholics of one shade of belief had persecuted

6

Catholics of another shade of belief, and all of these had from time to time persecuted Jews." *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 8-9 (1947). Even in the new world, "many of the old world practices and persecutions" remained. *Id.* at 10. Practitioners of minority faiths "were persecuted because they steadfastly persisted in worshipping God only as their own consciences dictated." *Id.* Indeed, Rhode Island's founder, the Protestant dissenter Roger Williams, had been banished from the Massachusetts Bay Colony for his religious views. *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1424-25 (1990).

But eventually, by 1791, "[f]reedom of religion was universally said to be an unalienable right" among the states. *See* McConnell, *supra*, at 1456. With the ratification of the First Amendment's Free Exercise Clause, the government committed "itself to religious tolerance," such that "upon even slight suspicion that proposals for state intervention stem[med] from animosity to religion or distrust of its practices, all officials [would] pause to remember their own high duty to the Constitution and to the rights it secures." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993). The Framers

7

understood quite well the danger that a government can pose to disfavored religious minorities and the importance of enshrining religious liberty into law. "Indeed, [the Free Exercise Clause] was specially concerned with the plight of minority religions[.]" *Zelman v. Simmons-Harris*, 536 U.S. 639, 679 n.4 (2002) (Thomas, J., concurring) (quoting Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 Yale L.J. 1131, 1159 (1991)).

Congress enacted RFRA in 1993 to further strengthen legal protections for the free exercise of religion. The law was passed in response to *Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872 (1990), which drastically limited the scope of the First Amendment's Free Exercise Clause. Before *Smith*, the Supreme Court enforced the Free Exercise Clause through the "compelling interest" test—*i.e.*, that government may not substantially burden the exercise of religion unless "necessary to further a compelling state interest." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). But in *Smith*, the Supreme Court overturned that precedent, holding that, under the First Amendment, "neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling

8

governmental interest." *See City of Boerne v. Flores*, 521 U.S. 507, 514 (1997) (citing *Smith*, 494 U.S. at 885).

In response, "Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment." *Holt*, 574 U.S. at 357. In doing so, Congress rejected *Smith* as incompatible with the nation's long history of safeguarding religious freedom and protecting minority religions in particular. *See Smith*, 494 U.S. at 890 (acknowledging that its holding "will place at a relative disadvantage those religious practices that are not widely engaged in"); *see also* S. Rep. No. 103-111 at 8, *reprinted in* 1993 U.S.C.C.A.N. 1892, 1897 (explaining that, post-*Smith*, "[s]tate and local legislative bodies cannot be relied upon to craft exceptions from laws of general application to protect the ability of the religious minorities to practice their faith"). RFRA restored the longstanding "compelling interest test" that *Smith* largely overturned—that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the burden furthers "a compelling governmental interest" and "is the least restrictive means of" doing so. 42 U.S.C. § 2000bb-1(a), (b). This is an "exceptionally

demanding" burden for the government to meet. *Hobby Lobby*, 573 U.S. at 728. RFRA also explicitly provided that its purpose is "to guarantee [the compelling interest test's] application in *all* cases where free exercise of religion is substantially burdened," and "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b).

By providing for such claims—which include claims for money damages against officers in their individual capacities, *see Tanzin v. Tanvir*, 141 S. Ct. 486, 493 (2020)—Congress demonstrated a clear interest not only in constraining government policies prospectively, but also in vindicating the individual rights of persons whose religious freedom has been violated. As the Supreme Court has emphasized, RFRA "contemplates a more focused inquiry and requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U.S. at 363 (emphasis added) (quoting *Hobby Lobby*, 573 U.S. at 726).

10

## II.   THE   DISTRICT   COURT'S   APPLICATION   OF QUALIFIED IMMUNITY IS INCONSISTENT WITH RFRA'S BROAD PROTECTION OF RELIGIOUS LIBERTY

RFRA was designed precisely for cases like this one.  Plaintiffs are four Muslims who, as part of their religion, believe that they should be trustworthy and honest, JA-80 (Am. Compl. ¶ 208); form relationships with other Muslims based on integrity instead of deceit, JA 48 (Am. Compl. ¶ 84), JA-57 (Am. Compl. ¶ 122); not betray their religious communities by informing on them, JA-44 (Am. Compl. ¶ 65); and not conduct surveillance on innocent people, JA-56 (Am. Compl. ¶ 122), JA-66 (Am. Compl. ¶ 157).  But for over five years beginning in 2007, FBI agents targeted Plaintiffs because of their religion and repeatedly pressured Plaintiffs to become informants and spy on their Muslim communities.

To achieve this, Defendants subjected Plaintiffs—almost all of whom have never even been arrested or committed any crime, and none of whom has ever been suspected of terrorism—to outrageous and sustained harassment, including by adding them to the No Fly List. Defendants repeatedly interrogated one Plaintiff, asked what he "could share" about American Muslims, JA-45 (Am. Compl. ¶ 70), asked if he

11

was in the Taliban, JA-46 (Am. Compl. ¶ 75), threatened to deport him, JA-47 (Am. Compl. ¶ 77), harassed his sister, JA-49 (Am. Compl. ¶ 88), and refused to let him visit his sick mother abroad, JA-55 (Am. Compl. ¶ 116). Defendants asked another Plaintiff about his Muslim friends and acquaintances, JA-56 (Am. Compl. ¶ 120), demanded he "act like an extremist," JA-56 (Am. Compl. ¶ 121), and then cut him off from his wife and three daughters, JA-57 (Am. Compl. ¶ 125). A third Plaintiff, because of the travel restrictions forced on him, lost a job offer and therefore could not pay his bills, nor visit his wife, father, or extended family. JA-67 (Am. Compl. ¶ 160). A fourth Plaintiff was harassed by FBI agents in public, JA-71 (Am. Compl. ¶ 174), and was not allowed to visit his 93-year-old grandmother, JA-77 (Am. Compl. ¶ 196). Because of the harassment they suffered from government agents, Plaintiffs have, among other harms, become reluctant to mention their religious beliefs to others or attend religious services at their local mosques, JA-70 (Am. Compl. ¶ 171).

In short, government officials targeted Plaintiffs precisely because of their faith, and government officials repeatedly pressured them to violate their sincerely held religious beliefs. RFRA was enacted to

12

prevent and deter such conduct. Particularly in light of this country's deeply rooted commitment to religious liberty and RFRA's expansive protection thereof, it should have been "obvious" to government officials that coercing innocent Muslims to operate as government spies in their houses of worship and religious communities unlawfully burdened their exercise of religion. *Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Even if it had not been obvious, clearly established law gave those officials fair warning that their conduct was illegal under RFRA.

Nonetheless, the District Court dismissed Plaintiffs' RFRA claim on qualified immunity grounds. Three aspects of the District Court's ruling are especially pernicious for religious minorities and threaten to eviscerate the broad protection of religious liberty that Congress specifically enacted with RFRA: (a) the District Court defined the relevant rights too narrowly; (b) the District Court declined to decide whether Defendants actually violated Plaintiffs' rights here; and (c) the District Court decided the qualified immunity question at the pleadings stage.

13

With each error, the District Court expanded the scope of qualified immunity despite the many criticisms that qualified immunity has faced in recent years from jurists and scholars across the ideological spectrum,[2] and despite recent refusals by appellate courts across the country, including the Supreme Court, to let the defense expand any further. *See, e.g.*, *id.* (rejecting the need to find clearly established right in existing case law where "any reasonable officer" would realize the illegality of their conduct); *Sanchez v. Oliver*, 995 F.3d 461, 472 (5th Cir. 2021) (refusing to extend qualified immunity to employee of private, for-profit organization with which county contracted); *Davis v. Buchanan Cty.*, 11 F.4th 604, 622 (8th Cir. 2021) (same); *Tanner v. McMurray*, 989 F.3d 860, 870 (10th Cir. 2021) (same). Indeed, the Supreme Court, ***in this very litigation***, warned courts not to develop a "policy-based presumption against damages against individual officials." *Tanzin*, 141 S. Ct. at 493. Thus, even if qualified immunity is available as a defense to RFRA claims, "with so many voices critiquing current law as insufficiently

---

[2] *See, e.g.*, *Baxter v. Bracey*, 140 S. Ct. 1862, 1865 (2020) (Thomas, J., dissenting from the denial of certiorari); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting); William Baude*, Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018).

14

protective of constitutional rights, the last thing [a court] should be doing is recognizing an immunity defense when existing law rejects it." *McCoy v. Alamu*, 950 F.3d 226, 237 (5th Cir. 2020) (Costa, J., dissenting in part), *cert. granted, judgment vacated,* 141 S. Ct. 1364 (2021).

## A. The District Court Defined Plaintiffs' Rights Too Narrowly

Qualified immunity does not apply when an official violates a "clearly established" right. *Sabir v. Williams*, 52 F.4th 51, 58 (2d Cir. 2022). Determining whether a right was "clearly established" requires defining the right at issue. Largely in the particular context of Fourth Amendment claims under 42 U.S.C. § 1983, the Supreme Court has held that a right must be defined with specificity because "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *see also Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (observing that Fourth Amendment inquiries may be "highly idiosyncratic and heavily dependent on the facts") (internal quotation marks and citation omitted).

But as this Court has recently held, claims under RFRA do not require the same "higher degree of specificity" that has been required for

Fourth Amendment claims. *Sabir*, 52 F.4th at 65. Unlike the Fourth Amendment's "abstract" prohibition of "unreasonable searches and seizures," RFRA imposes a clear and demanding standard for officials, permitting a substantial burden on a person's exercise of religion only if the burden furthers a "compelling governmental interest." *Id.* at 65 (quoting 42 U.S.C. § 2000bb-1). Under this test, it is "not difficult for an official to know" they are violating RFRA, and there is less need to specify the RFRA right for the purposes of qualified immunity. *Id.* (cleaned up). Moreover, unlike typical Fourth Amendment claims, which involve police officers acting in exigent circumstances and making split-second decisions, RFRA claims—such as those alleged in this case—often challenge pre-meditated and carefully planned government conduct that goes on for months on end, giving officials plenty of time and opportunity to consider its legality.

Narrowly defining rights under RFRA, as the District Court did here, is particularly prejudicial to religious minorities—the very groups that RFRA is intended to protect. The narrower the right is defined, the harder it will be to find analogous precedent and thus the harder it will be to demonstrate that the right is clearly established. Examples,

16

unfortunately, abound of courts defining RFRA rights out of existence for religious minorities by incorporating gratuitous detail about specific religious practices into the definitions of those rights. For instance, in *Gonzalez v. Litscher*, 230 F. Supp. 2d 950 (W.D. Wis. 2002), the court defined the free exercise right at issue as the right for "Native American inmates held in high-security status . . . to possess a medicine bag, ceremonial drums, feathers or a smoking pipe." *Id.* at 961-62. Unsurprisingly, the court found "no precedent establishing" that specific right, and it thus applied qualified immunity to shield the defendants from liability. *Id.* at 961. Similarly, in *Romero v. Lappin*, 2011 WL 3422849 (E.D. Ky. Aug. 4, 2011), prison officials confiscated the religious items of a Native American inmate, including a string attached to an eagle feather. *See id.* at *5. The court defined the Native American's right as "his specific right not to have the green string removed from his feather"—a right so remarkably narrow that of course no previous case could clearly establish it. *Id.* at *4.

Other courts have likewise defined rights under RFRA (or analogous rights under RFRA's sister statute, the Religious Land Use and Institutionalized Persons Act, "RLUIPA") so narrowly as to make

17

them meaningless. *See, e.g.*, *Buckner v. Casaleggio*, 2009 WL 511142, at *3 (D. Nev. Feb. 27, 2009) (right of Orthodox Sunnah Muslim to worship separately from the Nation of Islam congregation not clearly established); *Godbey v. Wilson*, 2014 WL 794274, at *9 (E.D. Va. Feb. 26, 2014) (Asatru inmate's rights to use alcoholic mead or wear hlath not clearly established); *Ghashiyah v. Wis. Dep't of Corrections*, 2006 WL 2845701, at *14 (E.D. Wis. Sept. 29, 2006) (right to food prepared with special halal kitchenware not clearly established), *aff'd*, 278 Fed. App'x 654 (7th Cir. 2008); *Njos v. Carney*, 2017 WL 3224816, at *10 (M.D. Pa. Jun. 21, 2017) (right to have theologically mandated quantities of certain foods not clearly established), *report & recommendation adopted*, 2017 WL 3217690 (M.D. Pa. July 28, 2017).

Here, the District Court settled on the relevant right as the right to not "be pressured by law enforcement to inform on members of their religious communities through the coercive or retaliatory use of the No Fly List." JA-150 (Dist. Ct. Op. at 16). The District Court therefore incorporated a specific government policy, the No Fly List—which is a subset of the Terrorist Screening Database, maintained by the Terrorist Screening Center and jointly administered by various agencies including

the Departments of Homeland Security and of State, *see Ibrahim v. U.S. Dep't of Homeland Sec.*, 912 F.3d 1147, 1156-57 (9th Cir. 2019)—into the Court's definition of the right. That level of specificity was as artificial as a right defined in terms of a particular practice of a religious minority. And while the RFRA violation here should have still been clear to officials even when narrowly defining the right at issue, allowing courts to define rights under RFRA so narrowly threatens to make the statute an empty promise.

An alternative definition of the right—which would not have undermined RFRA—was available. Prior to Defendants' harassment of Plaintiffs, this Circuit had interpreted RFRA's "substantial burden" requirement as satisfied "where the state 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (quoting *Thomas v. Review Bd. Of the Indiana Employment Sec. Div.*, 450 U.S. 707, 718 (1981)) (alteration removed). As this Circuit observed, such a right has deep roots in Free Exercise jurisprudence, which recognized that there are many ways a government can burden religion without outright prohibiting it. *See id.* (citing *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)

19

and *Thomas*, 450 U.S. at 718). *Jolly* clearly established the right articulated by Plaintiffs in this litigation: "to be free from government pressure that forces an individual to violate sincerely held religious beliefs." JA-149 (Dist. Ct. Op. at 15). The District Court should have accepted that formula.[3]

### B. The District Court Should Have Considered Whether Plaintiffs' Rights Were Violated Before Considering Whether Those Rights Were Clearly Established

The qualified immunity analysis has two prongs: (i) whether the defendant violated a statutory or constitutional right and (ii) whether that right was "clearly established" at the time of the conduct at issue. *Sabir*, 52 F.4th at 58. In *Pearson*, the Supreme Court held that courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed

---

[3] Instead, the District Court limited *Jolly* to its particular facts (confining the plaintiff to a "medical keeplock" for three and a half years for refusing, on religious grounds, to take a tuberculosis test) even though *Jolly* observed that the confinement itself was not necessary to establish a RFRA violation. JA-155 (Dist. Ct. Op. at 21); *see also Jolly*, 76 F.3d at 477. Rather, ***"[t]he choice*** … presented by the state—either submitting to the test or adhering to one's belief and enduring medical keeplock— itself constitutes a substantial burden." *Id.* (emphasis added).

first in light of the circumstances in the particular case at hand." 555 U.S. at 236.

This Court explained in *Sabir* that, even though courts have discretion to ask whether a right was clearly established before determining if the right was violated, they should generally avoid doing so. The risk, the Court explained, is of "a 'repetitive cycle' in which a court repeatedly declines to address the merits because immunity exists, and the official continues to engage in the challenged practice because he will remain immune until the right is clearly established." *Sabir*, 52 F.4th at 58 n.3 (quoting *Camreta v. Greene*, 563 U.S. 692, 706 n.5 (2011)).

This concern is particularly acute for religious minorities. As discussed above, those minorities will often have few precedents to draw on to clearly establish the illegality of a practice under RFRA. So long as courts continue to consider *only* whether a right was "clearly established," without first considering whether the right was violated to begin with, religious minorities in future cases will be unable to point to precedents to demonstrate that the right at issue is clearly established.

By declining even to consider the merits of Plaintiffs' RFRA claims, the District Court therefore deprived Plaintiffs of an opportunity to

21

obtain a precedent prohibiting especially egregious government misconduct. The court skipped ahead, instead asking whether a RFRA right was clearly established. The District Court therefore exacerbated religious minorities' already constrained ability to develop useful precedents to protect their rights in the future.

## C. The District Court Should Not Have Decided Qualified Immunity at the Pleadings Stage

Under prevailing circuit law, an invocation of qualified immunity at the pleadings stage should be presumed to fail. *See, e.g.*, *Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) ("As a general rule, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion.") (cleaned up); *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal." (quoting *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring in part))). That is because "qualified immunity is an affirmative defense that a defendant has the burden of pleading in his answer." *Castro v. United States*, 34 F.3d 106, 111 (2d Cir. 1994). "Otherwise, plaintiffs alleging a violation of their constitutional rights would face a heightened pleading standard under which they must plead not only facts sufficient to make out their

22

claim but also additional facts to defeat an assertion of qualified immunity." *Chamberlain*, 960 F.3d at 111. Qualified immunity must therefore be rejected at the pleadings stage unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *McKenna*, 386 F.3d at 436.

Despite "this high bar" to invoking a qualified immunity defense on a motion to dismiss, *Chamberlain*, 960 F.3d at 111, the District Court nonetheless granted precisely such a motion here. And it did so despite Plaintiffs' detailed allegations, described above, of how officials egregiously burdened their religious freedom. *See supra* at 11-12. The result is both an unwarranted expansion of qualified immunity doctrine and a heightened pleading standard for plaintiffs. This is particularly problematic when dealing with rights under RFRA—a statute that was enacted "to provide very broad protection for religious liberty." *Hobby Lobby*, 573 U.S. at 706.

The District Court's decision illustrates the perils of adjudicating qualified immunity at the pleadings stage. Looking solely at the Complaint, the District Court determined that "even to the extent that the Complaint plausibly alleges that Defendants improperly burdened

23

religious exercise, it does not allege that they did so with no justification whatsoever." JA-159 (Dist. Ct. Op. at 25). But RFRA requires the *government* to demonstrate a *compelling interest*. *Sabir*, 52 F.4th at 65. And the government must also show that it "lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases." *Hobby Lobby*, 573 U.S. at 728. Simply invoking "effort[s] to gather intelligence related to national security in the aftermath of the 9/11 terrorist attacks," as the District Court did here, is not enough. JA-159 (Dist. Ct. Op. at 25).

Allowing such a broad and untailored invocation of national security to establish qualified immunity at the pleadings stage is especially troublesome in a RFRA case. Religious minorities—whom the statute is designed to protect—have long been targeted by governments (and have had their rights burdened) in the name of national security. Throughout the 20th century, the FBI targeted several different minority religious groups, ranging from the congregations of the Church of God in Christ during World War I, to Jews during the Cold War, to pacifist

24

Catholic priests during the Vietnam War.[4]  And in the long wake of the September 11, 2001 terrorist attacks, American Muslims, and those perceived to be Muslims, experienced a dramatic spike in unwarranted government surveillance, of which this case is just one example.[5]

Just as other faith traditions have been special targets of discrimination in decades past, each new era brings with it the risk that some other religious group will be singled out for derision and disfavor. *Amici* of all faiths thus understand that if government officials can point to vague references to national security concerns to assert qualified immunity and short-circuit a RFRA claim, then little stands in the way of continued surveillance and harassment of disfavored religious groups in the future.

---

[4] *See* Sylvester A. Johnson and Steven Weitzman, The FBI and Religion 2, 9 (2017).

[5] Sahar Khan & Vignesh Ramachandran, *Post-9/11 Surveillance Has Left a Generation of Muslim Americans in a Shadow of Distrust and Fear*, PBS News Hour (Sept. 16, 2021), https://www.pbs.org/newshour/nation/post-9-11-surveillance-has-left-a-generation-of-muslim-americans-in-a-shadow-of-distrust-and-fear.

**CONCLUSION**

For these reasons, *amici* urge the Court to reverse the District Court's dismissal of this action and remand for further proceedings.

Date: August 4, 2023

Respectfully submitted,

/s/ Adeel A. Mangi

ADEEL A. MANGI
JACOB I. CHEFITZ
SEAN M. LAU
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
aamangi@pbwt.com
jchefitz@pbwt.com
slau@pbwt.com

Counsel for *Amici* 26 Religious Organizations

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Local Rule 29.1 because it contains 4,685 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it was prepared using Microsoft Word in Century Schoolbook 14-point font, a proportionally spaced serif typeface.


Date: August 4, 2023

<div style="margin-left:40%">

Respectfully submitted,

/s/ Adeel A. Mangi

ADEEL A. MANGI
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
aamangi@pbwt.com

Counsel for *Amici* 26 Religious
Organizations

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2023, I electronically filed the foregoing Brief of *Amici Curiae* 26 Religious Organizations using the CM/ECF system, which will send notification of such filing to all parties of record.

/s/ Adeel A. Mangi

ADEEL A. MANGI
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
aamangi@pbwt.com

Counsel for *Amici* 26 Religious Organizations

# APPENDIX A

## 1.     Central Conference of American Rabbis

The Central Conference of American Rabbis, whose membership includes more than 2,000 Reform rabbis, comes to this issue out of a commitment to religious freedom.  RFRA affirms our nation's founding promise to protect the rights of religious expression from undue state interference.  Americans of all faith must be free to follow the dictates of their conscience.

## 2.     Council on American-Islamic Relations ("CAIR")

CAIR is a grassroots civil rights and advocacy group.  We are America's largest Muslim civil liberties organization with our national headquarters on Capitol Hill in Washington D.C., and regional offices nationwide.  Since CAIR's establishment in 1994, we have worked to promote a positive image of Islam and Muslims in America.  Through media relations, government relations, education and advocacy, CAIR puts forth an Islamic perspective to ensure that Muslim voices are represented.  In offering this perspective, CAIR seeks to empower the American Muslim community and encourage their participation in political and social activism.  CAIR is committed to protecting the civil rights of all Americans, regardless of faith, and supporting domestic policies that promote civil rights, diversity, and freedom of religion.  CAIR's civil rights department counsels, mediates, and advocates on behalf of Muslims and persons from other faiths who have experienced religious discrimination, defamation, or hate crimes.

## 3.     Council on American-Islamic Relations, New York Chapter ("CAIR-NY")

CAIR has worked for more than 25 years to defend the Constitution and Muslim civil rights.  The New York chapter is one of the busiest and most dynamic of CAIR's thirty-five nationwide affiliates, defending, representing, and educating nearly one million

Muslims in the New York area.  CAIR-NY fights Islamophobia and systemic discrimination in all its forms, and protects New Yorkers who have experienced discrimination, harassment, or hate crimes.

## 4.  Congregation Beit Simchat Torah ("CBST")

CBST is the world's largest synagogue serving people of all sexual orientations and gender identities.  Building on the ritual, liturgical and theological heritage of Judaism, CBST serves as a symbol for marginalized people everywhere seeking to revision traditional religious communities.  An example of religious pluralism in action, CBST offers a variety of religious experiences to meet the needs of its vibrant, inclusive community.  Because CBST works with people of all faiths to promote equality, it is committed to ensuring that all individuals have a right to freely practice their faiths without harassment.

## 5.  Congregation Shaarei Shamayim

Congregation Shaarei Shamayim is a growing, open, pluralistic congregation of 190 households located in Madison, Wisconsin.  We believe that Judaism is a means for bringing justice, holiness, and joy to our world.  We are building Jewish community rooted in creativity and authenticity, and we are reimagining the possibilities for Jewish life, identity, and community.  Working for social justice is one of our core values.  We are inspired by Jewish tradition to fight for a sustainable world, care for the vulnerable, and create racial and economic justice. We engage in programs to keep up on current issues, partner with community organizations to amplify our voices, and get involved in efforts to make our city, region, and world a better place for everyone. We believe in religious pluralism, and therefore support the rights of everyone to worship according to their own beliefs.  We have a long history of supporting prisoners, and reintegrating those released from prison into society through the participation of our members in Circles of Support.  We have filed amicus briefs before various courts across this nation in support of the religious freedoms of persecuted minorities.

**6.    El Paso Monthly Meeting of the Religious Society of Friends**

The El Paso (Texas) Monthly Meeting of the Religious Society of Friends is a Quaker religious group.  Early members of our denomination were subject to legal punishment in Britain and New England, including imprisonment, harsh physical punishments, and even state sanctioned death.  Out of these early experiences, we have developed an abiding interest in freedom of religion.

**7.    Emgage Action**

Emgage Action supports and advocates for just policies that strengthen our pluralistic democracy and protect human rights at home and abroad.

**8.    Faith in New Jersey**

Faith in New Jersey is a racially diverse, multi-faith, power-building vehicle for faith leaders, houses of worship, and spiritual communities.  By organizing individuals directly impacted by incarceration, immigration, an immoral economy, gun violence, and systemic racism, we work together to advance a social and economic justice agenda at the local, state, and federal level.  Our mission is to develop grassroots community leaders, analyze the policies that shape our communities, and mobilize faith voices and faith voters to effectively act on the prophetic call to build the Beloved Community.  As part of that mission, we support greater legal safeguards for vulnerable members of our society to ensure they can freely exercise their religious beliefs.

**9.  Franciscan Friars of the Province of St. Barbara**

The Franciscan Friars of the Province of St. Barbara, part of what is formally known as the Order of Friars Minor ("OFM"), are members of a Roman Catholic religious order of men.  From a diversity of backgrounds and cultures, they are dedicated to serving the poor and promoting justice, peace, care of creation, and reconciliation.  They do this in the joyful and prophetic spirit of St. Francis of Assisi.  The members of the Province of St. Barbara live and work in California, Arizona, Oregon, and Washington, serving communities whose profiles cross ethnic, cultural and economic boundaries.  Friars also serve in a number of Native American nations in the Southwest, as well on mission to Mexico, Russia, and the Holy Land.  Friars are strongly committed to the belief that everyone should be freely allowed to exercise their religious beliefs without any interference from state and federal officials.

**10.  Interfaith Center of New York ("ICNY")**

ICNY is a secular non-profit organization with a mission to "overcome prejudice, violence, and misunderstanding by activating the power of the city's grassroots religious and civic leaders and their communities."  Over the course of 25 years, ICNY has built the most religiously-diverse and civically-engaged network of grassroots and immigrant religious leaders across the five boroughs of Manhattan, Queens, Brooklyn, Staten Island and The Bronx.  These include Muslim, Sikh, Hindu, Buddhist, Christian, Jewish, Afro Caribbean, and Native American New Yorkers who have either attended one or more of our social justice retreats, participated in our religious diversity education programs for social workers, teachers, lawyers, and NYPD officers, or joined multi-faith advocacy work on immigration and religious freedom.  Through our advocacy work, ICNY helps New Yorkers and others build relationships of mutual respect and understanding across faith lines.  We give people the tools they need to participate in the civic life of our multicultural democracy.  Our

organization stands with efforts to ensure that federal laws protecting religious freedom, such as RFRA, are properly interpreted to allow for the maximum range of legal remedies.

## 11. Islamic Society of Central Jersey

The Islamic Society of Central Jersey ("ISCJ") is an organization of Muslim Americans that was formed in 1975 that provides religious, educational and social services to its members, as well as to the community at large. The ISCJ established a place of worship in South Brunswick, NJ in the early 1980s. The ISCJ aspires to be the anchor of a model community of practicing Muslims of diverse backgrounds, democratically governed, efficiently served, relating to one another with inclusiveness and tolerance, and interacting with neighbors and the community at large in an Islamic exemplary fashion.

## 12. Men of Reform Judaism

The Men of Reform Judaism comes to this issue out of a commitment to religious freedom. RFRA affirms our nation's founding promise to protect the rights of religious expression from undue state interference. Americans of all faith must be free to follow the dictates of their conscience.

## 13. Muslim Bar Association of New York ("MuBANY")

MuBANY is one of the nation's largest and most active professional associations for Muslim lawyers. MuBANY provides a range of services for the legal and larger Muslim community. One of MuBANY's missions is to improve the position of the Muslim community in American society. MuBANY seeks to support the Muslim community by educating the community, advancing and protecting the rights of Muslims in America, and creating an environment that helps guarantee the full, fair and equal representation of Muslims in American society.

**14.  Muslim Public Affairs Council ("MPAC")**

The MPAC is a national public affairs nonprofit organization working to promote and strengthen American pluralism by increasing understanding and improving policies that impact American Muslims. Over the past 30 years, MPAC has built a reputation for being a dynamic and trusted American Muslim voice for policymakers, opinion shapers, and community organizers across the country. We design and execute innovative and effective legislative, strategic messaging, and issue advocacy campaigns. MPAC leverages relationships with legislators, government agencies, executive departments, and thought leaders to improve policies on national security, civil liberties, immigration, public safety and religious freedom for all Americans. Over the past 15 years, we have participated as amicus curiae in cases concerning civil liberties (*Boumediene v. Bush & al-Odah v. U.S.*); immigration (*Department of Homeland Security v. Regents of the University of California, Donald Trump v. IRAP, and Arizona v. U.S.*); and religious liberties (*Tanzin v. Tanvir, Masterpiece Cakeshop v. Colorado Civil Rights Commission, and Holt v. Arkansas Dept. of Correction*).

**15.  Muslim Urban Professionals ("Muppies")**

Muppies is a nonprofit, charitable organization dedicated to empowering and advancing Muslim business professionals to be leaders in their careers and communities. Muppies consists of over 3,300 members in 33 countries and 11 active local city committees across the globe. Our desire is to live in a society that understands, respects, and includes Muslims in mainstream culture by aiding in efforts that improve the representation and inclusion of Muslims. Our mission is to create a global community of diverse individuals who will support, challenge, and inspire one another by providing a platform for networking, mentorship, and career development. We have advocated for the religious freedoms of prisoners, incarcerated persons,

immigrants, DACA recipients, the LGBTQI community, and other historically disempowered groups by joining amicus briefs filed in various courts across the country.

### 16. National Association of Muslim Lawyers ("NAML")

NAML is an association of Muslim lawyers, Muslim law students, and legal professionals in the United States. NAML provides networking and mentorship services, organizes educational programs on current legal topics of interest, supports regional Muslim bar associations, and serves the law-related needs of the general public through community service efforts. NAML has an interest in issues that affect the Muslim American community, and it seeks to ensure that the law fully and adequately protects the rights of religious minorities.

### 17. National Council of Jewish Women ("NCJW")

NCJW is a grassroots organization of 210,000 advocates who turn progressive ideals into action. Inspired by Jewish values, NCJW strives for social justice by improving the quality of life for women, children, and families and by safeguarding individual rights and freedoms. NCJW's Resolutions state that: "Religious liberty and the separation of religion and state are constitutional principles that must be protected and preserved in order to maintain our democratic society." Consistent with its Resolutions and its longstanding commitment to religious liberty, NCJW joins this brief.

### 18. NETWORK Lobby for Catholic Social Justice

NETWORK Lobby for Catholic Social Justice was founded by Catholic Sisters in 1972 and has over 100,000 members and supporters across the country. It is an inclusive, national, Catholic advocacy organization open to all who share our values, working to achieve equity and justice for everyone. NETWORK Lobby believes that

welcoming individuals of all backgrounds, including members of religious minorities, is a basic tenet of our Catholic Social Justice tradition.

## 19. New Jersey Muslim Lawyers Association ("NJMLA")

NJMLA is a volunteer association of lawyers, judges, and law students who work or reside in the New Jersey area. NJMLA works to advance the goals, needs, and interests of Muslim attorneys in New Jersey through networking, mentorship, and education. NJMLA also works to address issues affecting not only the New Jersey but also the national Muslim community. This includes ensuring that federal laws protecting the rights of Muslim Americans, such as RFRA, are properly interpreted to allow for the maximum range of remedies.

## 20. New York Disaster Interfaith Services ("NYDIS")

NYDIS is a faith-based federation of service providers and charitable organizations who provide disaster readiness, response, and recovery services to New York City. We work with all houses of worship, religious schools, and faith-based social services agencies in New York. Our mission is to connect and provide resources for faith communities serving in disaster to create an urban environment of social justice for all. NYDIS supports the rights of religious minorities and regularly partners with minority religious organizations. Consistent with this support, we joined an earlier *amicus* brief in *Tanzin v. Tanvir*, asking the U.S. Supreme Court to recognize money damages in RFRA claims against federal officials operating in their individual capacities.

## 21. Society for the Advancement of Judaism

The Society for the Advancement of Judaism is a synagogue in New York City. Founded by Rabbi Mordecai Kaplan in 1922, the Society stands for all who are oppressed and those seeking freedom and

justice, whether or not they are Jewish, of another faith or of no faith.  The synagogue recognizes our shared humanity and the basic equality, dignity and uniqueness of each soul, and actively works to prevent the destruction of human life.  Consistent with these principles, in 2020 we joined an amicus brief in this litigation urging the U.S. Supreme Court to recognize money damages for RFRA claims against federal officials in their individual capacity.

22.    **T'ruah: The Rabbinic Call for Human Rights**

T'ruah: The Rabbinic Call for Human Rights brings the Torah's ideals of human dignity, equality, and justice to life by empowering our network of 2,300 rabbis and cantors to be moral voices and to lead Jewish communities in advancing democracy and human rights for all people in the United States, Canada, Israel, and the occupied Palestinian territories.  We believe that limiting the scope of qualified immunity is essential to ensuring that religious minorities are treated with respect and dignity by the government

23.    **Union for Reform Judaism**

The Union for Reform Judaism, whose nearly 850 congregations across North America include 1.8 million Reform Jews, comes to this issue out of a commitment to religious freedom.  RFRA affirms our nation's founding promise to protect the rights of religious expression from undue state interference.  Americans of all faith must be free to follow the dictates of their conscience.

24.    **Union Theological Seminary ("UTS")**

UTS, founded in 1836 in New York City, is a globally recognized seminary and graduate school of theology where faith and scholarship meet to reimagine the work of justice.  A beacon for social justice and progressive change, Union Theological Seminary is led by a diverse group of theologians and activist leaders.  Drawing on both Christian

A-9

traditions and the insights of other faiths, the institution is focused on educating leaders who can address critical issues like racial equity, criminal justice reform, income inequality, and protecting the environment. Union is led by Rev. Dr. Serene Jones, the sixteenth President and the first woman to head the 187-year-old seminary. Consistent with the education we provide, UTS believes that religious freedom and civil rights are complementary values and legal principles necessary to sustain and advance equality for all.

## 25.    Unitarian Universalist Service Committee ("UUSC")

The UUSC is a non-sectarian human-rights organization powered by grassroots collaboration. Currently based in Cambridge, Massachusetts, UUSC began its work in 1939 when Reverend Waitstill and Martha Sharp took the extraordinary risk of traveling to Europe to help refugees escape Nazi persecution. We focus our work on intersecting roots of injustice to defend rights at risk due to criminalization and systemic oppression of people based on their identity. We collaborate closely with grassroots organizations and movements that are advancing our shared human rights goals on the ground. One of UUSC's primary human rights objectives is to end criminalization on the basis of identity. We fund organizations around the United States working to end federal immigration detention, and to document and eliminate discriminatory abuse and maltreatment in federal immigration custody. UUSC has also advocated for the humanitarian release of people held in federal prisons during the COVID-19 pandemic, and for the elimination of private prison contracts in the federal prison and immigration detention systems. We have also lobbied at the national level for a reduction in funding for federal detention facilities. UUSC strongly believes that federal officials who violate religious minorities' rights must be held accountable.

A-10

### 26.    Women of Reform Judaism

Women of Reform Judaism, which represents tens of thousands of women in hundreds of Women of Reform Judaism-affiliated women's groups and many individual members, comes to this issue out of a commitment to religious freedom.  RFRA affirms our nation's founding promise to protect the rights of religious expression from undue state interference.  Americans of all faith must be free to follow the dictates of their conscience.