# 23-738

In The

# United States Court of Appeals

### For The Second Circuit

_____

MUHAMMAD TANVIR, JAMEEL ALGIBHAH, NAVEED SHINWARI,

*Plaintiffs-Appellants,*

Awais Sajjad,

*Plaintiff,*

*(Caption Continued on the Reverse)*

_____

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF OF INSTITUTE FOR JUSTICE AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Seth M. Young
Patrick M. Jaicomo
Anya Bidwell
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Suite 900
Arlington, VA 22203
(703) 682-9320
syoung@ij.org
pjaicomo@ij.org
abidwell@ij.org

_____

v.

JOHN" TANZIN  SPECIAL AGENT, FBI, SANYA GARCIA, SPECIAL AGENT FBI, FRANCISCO ARTOUSA, JOHN LNU, SPECIAL AGENT, FBI, STEVEN LNU, JOHN C. HARLEY, III, MICHAEL LNU, GREGG GROSSOEHMIG, WEYSAN DUN, JAMES C. LANGENBERG, JOHN DOES, 1-6, SPECIAL AGENT FBI,

*Defendants-Appellees,*

JAMES COMEY, DIRECTOR, FEDERAL BUREAU OF INVESTIGATION, RAND BEERS, ACTING SECRETARY, DEPARTMENT OF HOMELAND SECURITY, JOHN S. PISTOLE, ADMINISTRATOR, TRANSPORTATION SECURITY ADMINISTRATION, CHRISTOPHER M. PIEHOTA, DIRECTOR, TERRORIST SCREENING CENTER, JEH CHARLES JOHNSON, MICHAEL RUTKOWSKI, WILLIAM GALE, LORETTA E. LYNCH, JEFFERSON B. SESSIONS III, JOHN DOE, 7-13, SPECIAL AGENT FBI,  JOHN DOE, SPECIAL AGENT, FBI,

*Defendants.*

_____

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................iii

INTEREST OF AMICUS CURIAE ......................................................... 1

INTRODUCTION ................................................................................. 1

ARGUMENT ........................................................................................ 5

I.  This court should hold that qualified immunity does not apply to the cause of action Congress created through RFRA...................... 5

    A.  Qualified immunity should not be read into the text of RFRA because it unambiguously provides a remedy and only one defense .................................................................. 6

    B.  This court has already held that RFRA overrides extratextual defenses............................................................ 9

    C.  The Supreme Court held in this case that RFRA provides a damages remedy that is not overcome by policy considerations ................................................................... 11

II.  Under *Pearson*, the Court should first address whether the FBI agents violated Plaintiffs' free exercise rights ............................. 12

    A.  If courts do not address whether plaintiffs' rights were violated, then those rights can never become "clearly established" and qualified immunity is an unbeatable defense ... 14

    B.  Courts may skip to the clearly established prong when it is impractical or pointless to decide whether plaintiff's rights were violated ...................................................................... 16

i

C.     The district court should have given a reasoned explana-
       tion under *Pearson* for why it did not decide whether Plain-
       tiffs' rights were violated ...................................................... 18

       1.     The FBI agents' egregious actions and attempts to in-
              sulate them from review demonstrate the need for
              this Court to reach the merits ..................................... 18

       2.     The district court denied Plaintiffs' much-needed le-
              gal development by skipping the merits without jus-
              tification ..................................................................... 21

D.     Plaintiffs seek vindication of important rights that are un-
       likely to arise outside the qualified immunity context ........ 23

E.     This Court and the Supreme Court regularly address the
       merits of claims to clarify the law, even when not necessary
       to case outcome..................................................................... 25

F.     *Pearson's* reasons for skipping straight to the clearly estab-
       lished prong do not apply in this case ................................. 28

CONCLUSION .......................................................................................... 31

CERTIFICATE OF COMPLIANCE........................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Creighton,*
    483 U.S. 635 (1987)........................................................................ 10, 14

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
    501 U.S. 104 (1991).............................................................................. 10

*BedRoc Ltd., LLC v. United States,*
    541 U.S. 176 (2004)................................................................................ 6

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014).............................................................................. 19

*Camreta v. Greene,*
    563 U.S. 692 (2011)................................................ 3, 13, 15, 25, 30

*Carter v. United States,*
    530 U.S. 255 (2000)................................................................................ 5

*Costello v. City of Burlington,*
    632 F.3d 41 (2d Cir. 2011) ................................................................. 28

*Fed. Bureau of Investigation v. Fazaga,*
    142 S. Ct. 1051 (2022)................................................................... 24, 30

*Francis v. Fiacco,*
    942 F.3d 126 (2d Cir. 2019) .............................................................. 23

*Gallardo By & Through Vassallo v. Marstiller,*
    142 S. Ct. 1751 (2022)........................................................................... 8

*Groff v. DeJoy,*
    143 S. Ct. 2279 (2023)......................................................................... 12

iii

*Hankins v. Lyght,*
    441 F.3d 96 (2d Cir. 2006) .................................................... 2, 3, 5, 9, 10

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ................................................................. 3, 10, 14

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ............................................................................. 14

*Jolly v. Coughlin,*
    76 F.3d 468 (1996) .............................................................................. 29

*Kelsey v. Cnty. of Schoharie,*
    567 F.3d 54 (2d Cir. 2009) ................................................................. 27

*Lane v. Franks,*
    573 U.S. 228 (2014) ............................................................................ 26

*Lombardo v. City of St. Louis, Missouri,*
    141 S. Ct. 2239 (2021) ........................................................................ 27

*Martin v. Hunter's Lessee,*
    14 U.S. 304 (1816) ................................................................................ 6

*Oklahoma v. Castro-Huerta,*
    142 S. Ct. 2486 (2022) .......................................................................... 6

*Park S. Hotel Corp. v. New York Hotel Trades Council,*
851 F.2d 578 (2d Cir. 1988) .................................................................... 8

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ................................................................... *passim*

*Plumhoff v. Rickard,*
    572 U.S. 765 (2014) ............................................................................ 26

*Rehberg v. Paulk,*
    566 U.S. 356 (2012) ............................................................................ 11

iv

*S. Pac. Terminal Co. v. Interstate Com. Comm'n,*
219 U.S. 498 (1911) ................................................................ 24–25

*Sabir v. Williams,*
52 F.4th 51 (2d Cir. 2022) ...................................................... 8

*Saucier v. Katz,*
533 U.S. 194 (2001) .................................................... *passim*

*Simmons v. Himmelreich,*
578 U.S. 621 (2016) ............................................................ 2, 6

*Sims v. City of Madisonville,*
894 F.3d 632 (5th Cir. 2018) ............................................... 24

*Tanvir v. Lynch,*
128 F. Supp. 3d 756 (S.D.N.Y. 2015) ................................. 20

*Tanvir v. Tanzin,*
894 F.3d 449 (2d Cir. 2018) ........................................... 19, 20

*Tanvir v. Tanzin,*
No. 13-CV-6951, 2023 WL 2216256,
(S.D.N.Y. Feb. 24, 2023) ........................................... 13, 20, 21

*Tanzin v. Tanvir,*
141 S. Ct. 486 (2020) ................................................... *passim*

*Torres v. Madrid,*
141 S. Ct. 989 (2021) ........................................................ 27

*Wilson v. Layne,*
526 U.S. 603 (1999) ........................................................ 24

*Zadeh v. Robinson,*
928 F.3d 457 (5th Cir. 2019) ........................................... 15

v

*Ziglar v. Abbasi,*
    582 U.S. 120 (2017) ................................................................ 10

**Statutes**

42 U.S.C. § 2000bb-1(a) ................................................... 5, 7, 29

42 U.S.C. § 2000bb-1(b) ................................................ 2, 5, 7, 8

42 U.S.C. § 2000bb-1(c) .............................................. 2, 5, 7, 12

42 U.S.C. § 2000cc-5(7)(A) .................................................. 20

42 U.S.C. § 621 et seq ...................................................... 9, 10

**Other Authorities**

Antonin Scalia & Bryan A. Garner,
    *Reading Law: The Interpretation of Legal Texts* 63 (2012) .............. 6, 9

Aaron L. Nielson & Christopher J. Walker,
    *The New Qualified Immunity*, 89 S. Cal. L. Rev. 1 (2015) ........... 15, 22

## INTEREST OF AMICUS CURIAE

The Institute for Justice (IJ) is a nonprofit public-interest law firm dedicated to supporting judicial protection of individual rights and defending the foundations of a free society. One such foundation is the American people's ability to hold the government and its officials accountable. For this reason, IJ seeks to remove procedural barriers to individuals' enforcement of their constitutional rights. The district court's decision below dismissed Plaintiffs' Religious Freedom Restoration Act (RFRA) claim on qualified immunity grounds without deciding whether their rights to free exercise of religion were violated. Because this insulates from judicial review an important right protected by statute, IJ has an interest in the Court's review of the district court's decision.[1]

## INTRODUCTION

Defendant FBI agents placed Muslim Plaintiffs on the No Fly List when they refused to inform on other Muslims because their religious

---

[1] No party or its counsel authored any of this brief, and no person other than the Institute for Justice, its members, or its counsel contributed monetarily to this brief. The undersigned contacted every parties' counsel of record with timely notice that IJ was filing this brief in support of Petitioner.

1

beliefs forbade it. *Tanzin v. Tanvir*, 141 S. Ct. 486, 489 (2020) (*Tanvir III*). For ten years, the judge-made defense of qualified immunity has frustrated Plaintiffs' best efforts to vindicate their rights to be free from retaliation for adhering to their sincerely held religious beliefs. This Court should reverse the district court's dismissal of Plaintiffs' Religious Freedom Restoration Act suit and hold that qualified immunity does not apply to RFRA because it is not in the statutory text. Or, if the Court disagrees, it should decide whether Defendant FBI agents violated Plaintiffs' rights and direct lower courts to give reasons when they skip this question and decide a qualified immunity defense on the "clearly established" prong.

RFRA allows a plaintiff to "obtain appropriate relief" from a government official that substantially burdens their free exercise of religion. 42 U.S.C. § 2000bb-1(c). It provides one defense, and that defense is not qualified immunity. *Id.* § 2000bb-1(b). Aside from the fact that RFRA's text is unambiguous and should be followed, *see Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016) ("Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says."), this Court in *Hankins v. Lyght* held that RFRA replaces

extratextual defenses like qualified immunity because "RFRA must be deemed the full expression of Congress's intent . . . and displace[s] earlier judge-made doctrines . . . ." 441 F.3d 96, 102 (2d Cir. 2006). The Supreme Court in this case unanimously rejected the FBI agents' prior policy-based defense, *Tanvir III*, 141 S. Ct. at 493, and this Court should reject the application of qualified immunity to RFRA for the same reasons.

If this Court disagrees and believes that qualified immunity should be available in a RFRA action, it should still decide whether Defendant FBI agents violated Plaintiffs' free exercise rights to develop precedent, especially because that issue is unlikely to arise outside the qualified immunity context. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Qualified immunity, when available, requires courts to dismiss cases unless the plaintiff can show: (1) they have a right that was violated; and (2) that right was "clearly established." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *Pearson* gives courts "discretion" to skip the merits and dismiss cases simply because the right in question is not "clearly established." 555 U.S. at 236. But courts that do this both insulate government agents from liability and "leave standards of official conduct permanently in limbo," *Camreta v. Greene*, 563 U.S. 692, 706 (2011), because a plaintiff

3

can never show that his right is clearly established if a court never decides he has that right in the first place. Qualified immunity becomes, by operation, an unbeatable defense.

Because of this dilemma, courts should decide qualified immunity claims solely on the "clearly established" prong only when first deciding whether the right exists would be impractical or pointless. *Pearson*, 555 U.S. at 236–37. But here, the FBI agents spent years trying to coerce Plaintiffs into violating their religious beliefs, and then years more evading accountability. Plaintiffs' allegations of egregious violations of their free exercise rights call for a judicial determination, and those rights are unlikely to arise outside the qualified immunity context. This Court should remove the parties from limbo and decide whether the FBI agents violated Plaintiffs' rights. Additionally, it should give guidance to lower courts when they can skip the merits and decide qualified immunity claims on the clearly established prong and direct them to always provide reasons when they do so.

# ARGUMENT

## I. This Court should hold that qualified immunity does not apply to the cause of action Congress created through RFRA.

"In analyzing a statute, we begin by examining the text . . . ." *Carter v. United States*, 530 U.S. 255, 271 (2000). RFRA forbids the government from placing a "substantial[] burden" on the free exercise of religion and says anyone whose free exercise is abridged "may . . . obtain appropriate relief" from the violating official. 42 U.S.C. § 2000bb-1(a), (c). RFRA provides only one defense, and it is not qualified immunity. *Id.* § 2000bb-1(b). And in *Hankins v. Lyght*, this Court precluded the application of extratextual defenses to RFRA, stating that "RFRA must be deemed the full expression of Congress's intent . . . and displace earlier judge-made doctrines . . . ." 441 F.3d at 102. The Supreme Court's decision in this very case unanimously rejected a policy-based defense to Plaintiffs' damages action. *Tanvir III*, 141 S. Ct. at 493. This Court should follow the Supreme Court's lead and hold that qualified immunity is not a defense to a RFRA claim because it is not in the text of the statute and is unavailable under *Hankins*.

5

A. *Qualified immunity should not be read into the text of RFRA because it unambiguously provides a remedy and only one defense.*

This Court should start its analysis of RFRA's meaning by looking at the text, and where unambiguous, the analysis should stop there. *Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016) ("Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says."); *see also Martin v. Hunter's Lessee*, 14 U.S. 304, 338–39 (1816) ("If the text be clear and distinct, no restriction upon its plain and obvious import ought to be admitted, unless the inference be irresistible."). This is the "preeminent" canon of statutory interpretation. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Policy or extratextual considerations should not overcome the legal effect of unambiguous text. *See Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022) ("As this Court has repeatedly stated, the text of a law controls over purported legislative intentions unmoored from any statutory text."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 63 (2012) (there is a presumption of statutory effectiveness stemming from the facts that interpretation depends on context, context includes a purpose, and purpose requires

effectiveness). The best way to know the legal effect of a statute is to read it and stop there if it can be understood.

RFRA should also only be interpreted according to its unambiguous text. *Tanvir III*, 141 S. Ct. at 489. The section of RFRA in question here has three parts. First, subsection (a) states that "Government shall not substantially burden a person's exercise of religion . . . except as provided in subsection (b)." 42 U.S.C. § 2000bb-1(a). Subsection (b) says "Government may substantially burden a person's exercise of religion" if the burden advances a compelling governmental interest and it is the least restrictive means of furthering that interest. *Id.* § 2000bb-1(b). Finally, and most important here, subsection (c) states that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* § 2000bb-1(c). RFRA is unambiguous. If the government substantially burdens an individual's free exercise rights, that person "may . . . obtain appropriate relief." *Id.*

RFRA does provide the government with one defense. It exempts from liability government conduct (1) "in furtherance of a compelling governmental interest," (2) that "is the least restrictive means of furthering"

7

that interest. *Id*. at § 2000bb-1(b). RFRA does not say "subject to qualified immunity," or use any other language to indicate that qualified immunity is part of the analysis. Therefore, it is not. The parties conceded that qualified immunity applies, *Tanvir III*, 141 S. Ct. at 492, n*, and this Court has already applied it to RFRA. *Sabir v. Williams*, 52 F.4th 51, 58 (2d Cir. 2022). But "[t]he parties cannot by agreement change or eliminate any liability that federal law imposes . . . ." *Park S. Hotel Corp. v. New York Hotel Trades Council*, 851 F.2d 578, 583 (2d Cir. 1988). And to the extent *Sabir* reads qualified immunity into RFRA, it is inconsistent with RFRA's text. If the Court disagrees and applies qualified immunity in this case, it should make clear it is doing so because the parties conceded the matter, not because it holds that qualified immunity applies to RFRA.

By providing a defense, Congress showed it knew how to do so and anticipated possible defenses. And Congress could have provided the defense of qualified immunity in as few as four words—"subject to qualified immunity." But Congress did not, and this Court should not read a defense into RFRA that is not provided by Congress. *See Gallardo By & Through Vassallo v. Marstiller*, 142 S. Ct. 1751, 1759 (2022) ("we must

8

give effect to, not nullify, Congress's choice to include limiting language in some provisions but not others"); *see also* Scalia & Garner, *supra*, at 93 ("Nor should the judge elaborate unprovided-for exceptions to a text . . . ."). The text of RFRA provides a remedy and does not allow for a qualified immunity defense. This Court should hold that qualified immunity is not available as a defense to a RFRA suit.

B. *This Court has already held that RFRA overrides extratextual defenses.*

Even if this Court believes that extratextual defenses can apply to statutory causes of action, it has already held that RFRA overrides them. In *Hankins v. Lyght*, the district court held that the common law "ministerial exception" was a defense to an Age Discrimination in Employment Act (ADEA) challenge to a church employment dispute. 441 F.3d at 100. This Court disagreed, holding that the ministerial exception did not apply to the ADEA because "RFRA must be deemed the full expression of Congress's intent with regard to the religion-related issues before us and displace earlier judge-made doctrines that might have been used to ameliorate the ADEA's impact on religious organizations and activities." *Id.* at 102. This is definitive. If RFRA is the "full expression of Congress's intent" with respect to religious liberty and "displace[s] earlier judge-

9

made" defenses to an ADEA claim, then it must displace qualified immunity as a defense to RFRA itself.

It is true that "where a common-law principle is well established, . . . the courts may take it as given that Congress has legislated with an expectation that the principle will apply . . . ." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Despite this, there are three reasons qualified immunity does not apply to RFRA. The first two are explained above. First, the text of RFRA provides a remedy with only one defense, and Congress does not need to "state precisely any intention to overcome the presumption's application to a given statutory scheme." *Id.* at 108. Second, this Court held that RFRA "displace[s] earlier judge-made doctrines." *Hankins*, 441 F.3d at 102. The third reason that qualified immunity does not apply to RFRA as a background common-mon-law principle is that it is not a common-law principle. The opinion reinvigorating qualified immunity in American law, *Harlow v. Fitzgerald*, "completely reformulated qualified immunity along principles not at all embodied in the common law." *Anderson v. Creighton*, 483 U.S. 635, 645 (1987); *see also Ziglar v. Abbasi*, 582 U.S. 120, 159–160 (2017) (Thomas, J., concurring in part and in judgment) ("Our qualified

immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." (quoting *Rehberg v. Paulk*, 566 U.S. 356, 363 (2012)). This Court should hold that qualified immunity does not apply to RFRA because the text, this Court's precedent, and the fact that qualified immunity is not a common law principle each say it does not apply.

C. *The Supreme Court held in this case that RFRA provides a damages remedy that is not overcome by policy considerations.*

The Supreme Court already unanimously held that in this case "RFRA's express remedies provision permits litigants . . . to obtain money damages against federal officials." *Tanvir III*, 141 S. Ct. at 493. The Court rejected the FBI agents' policy-based arguments and declined to place them beyond the reach of the statue, because "[t]o the extent the Government asks us to create a new policy-based presumption against damages against individual officials, we are not at liberty to do so. Congress is best suited to create such a policy." *Id.* Because money damages "has coexisted with our constitutional system since the dawn of the Republic" and the text of RFRA plainly made them available, the Court was unwilling to create an extratextual, policy-based barrier to Plaintiffs' recovery. *Id.* This Court should heed the Supreme Court's unanimous

11

decision and its implication that policy should not bar the remedy Congress expressly provided.

In sum, when Congress statutorily extends new rights to individuals, courts should look to the text of the statute for the burden of proof, and stop there if it is clear. *See Groff v. DeJoy*, 143 S. Ct. 2279, 2294 (2023) ("As we have explained, we do not write on a blank slate in determining what an employer must prove to defend a denial of a religious accommodation, but we think it reasonable to begin with Title VII's text."). RFRA protects the free exercise of religion and allows plaintiffs whose free exercise rights have been substantially burdened to "obtain appropriate relief," which includes monetary relief. 42 U.S.C. § 2000bb-1(c); *Tanvir III*, 141 S. Ct. at 493. Qualified immunity is an extratextual, judge-made, and policy-based defense. This Court should hold that is not available in a RFRA action and reverse the district court's judgment granting it to the FBI agents.

## II. Under *Pearson*, the Court should first address whether the FBI agents violated Plaintiffs' free exercise rights.

If this Court concludes that qualified immunity applies to RFRA despite its unambiguous text, it should decide whether Plaintiffs' rights were violated before deciding whether they were "clearly established."

The Supreme Court's *Pearson v. Callahan* decision gives lower courts discretion to dismiss a case on qualified immunity grounds because the plaintiff's right is not "clearly established," without considering whether plaintiff's right was violated in the first place. 555 U.S. at 236. But courts should not do this when there is a need to develop precedent, particularly on an issue unlikely to arise outside the qualified immunity context. *Id.* Otherwise, qualified immunity becomes an unbeatable defense because individual rights can never become clearly established. *Camreta*, 563 U.S. at 706. The district court in this case dismissed Plaintiffs' claims because they were not clearly established and gave no explanation why it would not address whether the FBI agents' conduct was illegal. *Tanvir v. Tanzin*, No. 13-CV-6951, 2023 WL 2216256, at *8 (S.D.N.Y. Feb. 24, 2023) (*Tanvir IV*). This Court should decide the merits of Plaintiffs' claim to develop precedent on this issue that is unlikely to arise outside the qualified immunity context, and it should direct lower courts to always give reasons for choosing to decide cases only on the "clearly established" ground.

13

A. *If courts do not address whether plaintiffs' rights were violated, then those rights can never become "clearly established" and qualified immunity is an unbeatable defense.*

Qualified immunity is an immunity from suit that bars damages actions against government officials in their personal capacities unless plaintiffs can show that: (1) an official violated their right; and (2) that right was "clearly established." *Harlow*, 457 U.S. at 818. Whether a plaintiff's right was violated is a normal, self-explanatory judicial inquiry. But for a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. The purpose of the "clearly established" test is to give government officials notice their conduct is unlawful before they are sued. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). In other words, under qualified immunity, a suit against a government official will be dismissed unless "in the light of pre-existing law the unlawfulness [was] apparent." *Anderson*, 483 U.S. at 640.

But unless courts consider whether official conduct violates individual rights, those rights can never become clearly established and qualified immunity will require the dismissal of all suits against government officials before their conduct can be examined or plaintiffs can recover.

14

*See Camreta*, 563 U.S. at 706 ("Another plaintiff brings suit, and another court both awards immunity and bypasses the claim. And again, and again, and again. So the moment of decision does not arrive."). This form of qualified immunity is a forever-unbeatable obstacle to civil rights plaintiffs, insulating government agents from liability and "leav[ing] standards of official conduct permanently in limbo." *Id*. at 706; *see also Zadeh v. Robinson*, 928 F.3d 457, 479 (5th Cir. 2019) ( Willett, J., concurring) ("Forgoing a knotty constitutional inquiry makes for easier sledding, no doubt. But the inexorable result is 'constitutional stagnation'— fewer courts establishing law at all, much less *clearly* doing so.") (footnote omitted). Concerns over "law stagnation" are not limited to the Supreme Court but resound across the legal landscape. *See* Aaron L. Nielson & Christopher J. Walker, *The New Qualified Immunity*, 89 S. Cal. L. Rev. 1, 23–24, 34 (2015) (gathering authorities sounding the alarm that rights will be underdeveloped where courts are not required to follow the *Saucier* procedure). It is common sense that where courts do not have to decide whether plaintiff's rights were violated, they will decline to do so in many instances, the law will not become clearly established, and abusive government officials will avoid liability.

In 2001, the Supreme Court's *Saucier v. Katz* decision sought to solve this legal-limbo dilemma. The Court made it mandatory for courts address the qualified immunity prongs in order: (1) whether plaintiff's right was violated; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court established this rule because when examining whether a plaintiff's rights were violated, "a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established." *Id.* To the Court, that "is the process for the law's elaboration from case to case," and if courts were to skip the analysis of whether a right exists, "[t]he law might be deprived of this explanation." *Id.* This "*Saucier* procedure" stimulated consistent legal development and solved the legal-limbo dilemma by prohibiting courts from dismissing civil rights cases on the "clearly established" prong without first deciding whether plaintiff's rights were violated.

B. *Courts may skip to the clearly established prong when it is impractical or pointless to decide whether plaintiff's rights were violated.*

Eight years after *Saucier*, the Supreme Court held in *Pearson v. Callahan* that the *Saucier* procedure, while "often appropriate, [] should no longer be regarded as mandatory." 555 U.S. at 236. *Pearson* gave

16

courts "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* But the Court "recognize[d] that [the *Saucier* procedure] is often beneficial," because it "promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.*

The Court's explanation of when and why the *Saucier* procedure should be ignored was conditional and hesitant. The Court "relax[ed] *Saucier's* mandate," *id.* at 243, because it "sometimes" expends limited judicial resources on questions not affecting a case's outcome, *id.* at 236, "often" fails to develop the law in factbound cases, *id.* at 237, "may" entail difficult to identify facts at the pleading stage, *id.* at 239, and "sometimes" involves poor briefing on constitutional issues, *id.* In short, the Court said that specific factors "sometimes," "may," or "often" make the *Saucier* procedure impractical, holding that lower courts now have "discretion to decide whether that procedure is worthwhile" based on those factors. *Id.* at 242.

17

Thus, *Pearson* did not abolish the *Saucier* procedure; it recognized that the *Saucier* procedure is "often appropriate" and "often beneficial" because it "promotes the development of constitutional precedent." *Id.* at 236. *Pearson* simply gave lower courts "sound discretion" to decide some cases on only the "clearly established" prong of the qualified immunity test because "rigid *Saucier* procedure comes with a price." *Id.* The opinion's language, by its own terms, still favors the *Saucier* procedure and courts should follow it unless the case presents a good reason not to.

C. *The district court should have given a reasoned explanation under* Pearson *for why it did not decide whether Plaintiffs' rights were violated.*

    1.   <u>The FBI agents' egregious actions and attempts to insulate them from review demonstrate the need for this Court to reach the merits.</u>

Defendant FBI agents conducted a years-long effort to coerce Plaintiffs into violating their religious beliefs. The egregious facts of the case demonstrate why it is so important for this Court to decide whether the FBI agents violated Plaintiffs' free exercise rights.

Plaintiffs are Muslims who refused FBI requests to spy on fellow Muslims and were placed on a No Fly List in retaliation. *Tanvir III*, 141 S. Ct. at 489. This Court previously treated Plaintiff Muhammad Tanvir's

story as illustrative of Plaintiffs' plight. *Tanvir v. Tanzin*, 894 F.3d 449, 454 (2d Cir. 2018) (*Tanvir II*). In 2008, when Mr. Tanvir reentered the United States after a visit to see family in Pakistan, the government detained and questioned him at the airport for five hours and held his passport for six months. *Id.* at 455. During those months, the FBI agents asked Mr. Tanvir to work as an informant and spy on other Muslims. *Id.* When he refused because it is against his religious beliefs, the FBI agents threatened to keep his passport and deport him, even though he was legally in the United States. *Id.* After his passport was returned six months later, the FBI agents coerced him into answering their questions again by threatening to prevent him from flying. *Id.* Even though he met with them and answered their questions, they told him he could not fly. *Id.* He was forced to cancel his flight. *Id.* Mr. Tanvir was denied boarding and told he was on the No Fly List on three more occasions. *Id.* at 455–56. The FBI agents repeatedly contacted Mr. Tanvir and told him they would have him removed from the No Fly List if he became an informant. *Id.* at 456. He still refused. *Id.*[2]

---

[2] Plaintiffs do not have to show that their religion in fact forbids such behavior, only that their belief is "sincerely held." *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014) (RFRA covers "any

Further demonstrating the FBI agents' brazen coercion, one told a Plaintiff that "we're the only ones who can take you off the list." *Tanvir IV*, 2023 WL 2216256, at *4. The FBI agents' actions kept Plaintiffs from seeing family. *Tanvir II*, 894 F.3d at 453. It forced them to change jobs because they could not fly for over five years. *Id.* at 456. They had to hire lawyers to seek removal from the No Fly List and then file this lawsuit. *Id.*

Plaintiffs sued the FBI agents almost a decade ago for violating their free exercise rights protected by RFRA. *Tanvir III*, 141 S. Ct. at 489; *see also Tanvir v. Lynch*, 128 F. Supp. 3d 756, 764 (S.D.N.Y. 2015) (*Tanvir I*) ("Plaintiffs brought this action on October 1, 2013 . . . ."). Since filing, the FBI agents have successfully gamed the system and insulated their abuse from review, leaving Plaintiffs in limbo. The FBI agents first did this by arguing that official capacity claims should be stayed because Plaintiffs had not exhausted administrative remedies for removal from the No Fly List. *Tanvir I*, 128 F. Supp. 3d at 764–65. Then, the government removed Plaintiffs from the No Fly List, successfully mooting their

---

exercise of religion, whether or not compelled by, or central to, a system of religious belief." (quoting 42 U.S.C. § 2000cc-5(7)(A))).

claims for injunctive relief. *See Tanvir III*, 141 S. Ct. at 489 ("More than a year after respondents sued, the Department of Homeland Security informed them that they could now fly, thus mooting the claims for injunctive relief."). And until the district court's opinion that is the subject of this appeal, the primary dispute in this case was whether money damages are "appropriate relief" under RFRA. *Tanvir III*, 141 S. Ct. at 489.

The Supreme Court unanimously concluded that money damages are "appropriate relief" under RFRA and remanded the case for consideration of qualified immunity, *id.* at 493, noting that "the Government and respondents agree that government officials are entitled to assert a qualified immunity defense when sued in their individual capacities for money damages under RFRA." *Id.* at 492, n\*.

> 2.    The district court denied Plaintiffs' much-needed legal development by skipping the merits without justification.

On remand, not only did the district court grant the FBI agents qualified immunity, it did so without considering whether Plaintiffs' rights were violated—skipping to the clearly established test. *Tanvir IV*, 2023 WL 2216256, at *8. The district court provided no reason for departing from the *Saucier* procedure:

21

Although the Supreme Court previously required courts to consider the two prongs sequentially in all circumstances, courts are now free to use "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Thus, where "prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages."

*Id.* at *8 (internal citations omitted). Despite the clear importance of the merits in this case—whether the widespread coercion of Muslims via weaponization of the No Fly List violates RFRA—the district court did not examine the circumstances of this case, consider whether the law needed to be developed, or elaborate on the practical implications of following the default *Saucier* procedure. The court simply noted its discretion and exercised it.

Reason giving for any judicial decision is important. It encourages rational decisionmaking, constrains discretion, facilitates further judicial review, lends legitimacy to the decision, and helps develop workable standards. Nielson & Walker, *The New Qualified Immunity*, *supra*, at 56–60. But, regrettably, fewer than one in ten post-*Pearson* decisions that depart from the *Saucier* procedure and skip to the clearly established prong gives a reason for doing so. *Id.* at 49. The district court here was in the ninety-plus percent of courts that provide no reason for skipping the

22

merits and resolving plaintiffs' claims on clearly established grounds. The Court should, at a minimum, establish a rule that when courts in this jurisdiction depart from the *Saucier* procedure, they must explain their reasons for doing so.

D. *Plaintiffs seek vindication of important rights that are unlikely to arise outside the qualified immunity context.*

*Pearson* recognized two overlapping situations when courts should follow the *Saucier* procedure and address the merits. The *Saucier* procedure should be followed when it would "promote[] the development of constitutional precedent, [] especially [] with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Pearson*, 555 U.S. at 236.

The Court should address the merits of Plaintiffs' free exercise claims to develop precedent. *See Francis v. Fiacco*, 942 F.3d 126, 141 (2d Cir. 2019) (addressing plaintiff's due process claim even though the case could have been settled on the clearly established prong because otherwise government officials "could continue to withhold those procedural protections—and thus continue to violate the Constitution—*ad infinitum*."). The FBI agents' violation here was coercive, long-running, and unique enough to not yet be "clearly established." But sadly, this

23

situation is not a one-off. *See Fed. Bureau of Investigation v. Fazaga*, 142 S. Ct. 1051, 1058 (2022) (suit against the FBI by Muslims for using a mosque-goer to spy on them). The Court should "promote[] clarity in the legal standards for official conduct, to the benefit of both the officers and the general public" and decide whether the FBI agents' conduct violated Plaintiffs' free exercise rights. *Wilson v. Layne*, 526 U.S. 603, 609 (1999).

Furthermore, Plaintiffs' free exercise rights are unlikely to arise outside the qualified immunity context. Free exercise rights do not arise in criminal litigation, and a government official sued for damages will almost always have immunity. *See Sims v. City of Madisonville*, 894 F.3d 632, 639 (5th Cir. 2018) ("First Amendment retaliation claims do not arise in criminal litigation, . . . and this issue of individual liability would not arise in other civil suits, such as those against a municipality, in which qualified immunity does not apply."). Furthermore, the FBI agents here have successfully gamed the system, notably by mooting injunctive relief. *See supra* Section II.C.1. If injunctive relief is mooted and damages claims are dismissed because the violation is not clearly established, Plaintiffs' free exercise rights are essentially "capable of repetition yet evading review." *See S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219

24

U.S. 498, 515 (1911) (introducing that test into mootness doctrine). While not a doctrine explicitly recognized in the qualified immunity context, the ability to game the judicial system to place rights violations beyond the reach of courts relaxes normal Article III concerns, as it did in mootness doctrine. *Id.* Plaintiffs' free exercise rights are unlikely to arise outside the qualified immunity context and are at the mercy of the government's legal gamesmanship. The Court should eliminate the legal limbo and decide whether the FBI agents violated Plaintiffs' rights.

### E. This Court and the Supreme Court regularly address the merits of claims to clarify the law, even when not necessary to case outcome.

The Supreme Court itself often chooses to follow the *Saucier* procedure and conduct the merits analysis first, pointing to the importance of the right and unlikeliness that it will arise outside the qualified immunity context. In *Camreta v. Greene*, the Ninth Circuit held that the government official defendants had violated plaintiff's rights, but that those rights were not clearly established. 563 U.S. at 697–98. The Supreme Court granted review to address the constitutional issues, even though doing so did not change the outcome of the case. *Id.* at 703. This was because, in their words, "[t]his Court, needless to say, also plays a role in clarifying rights." *Id.* at 708. Even though the Ninth Circuit had followed

25

the *Saucier* procedure and already addressed the merits, the Supreme Court saw clarifying the law as an important enough issue for it to grant review and hear the case. *See also Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (affirming a grant of qualified immunity but still addressing the constitutional issues because the Court "believe[d], [it would] be 'beneficial' in 'develop[ing] constitutional precedent' in an area that courts typically consider in cases in which the defendant asserts a qualified immunity defense." (quoting *Pearson*, 555 U.S. at 236)).

Similarly, in *Lane v. Franks*, the Supreme Court granted review just to examine a plaintiff's constitutional claim. 573 U.S. 228, 246 (2014). The Court reversed the Eleventh Circuit's holding that the government employer had not retaliated against the employee plaintiff for his protected speech, but affirmed the judgment because the constitutional violation was not clearly established. *Id.* In other words, where important First Amendment rights are at issue, the Supreme Court chooses to expend judicial resources, avoid avoidance, and examine those issues because it was important to do so even when it does not change the outcome of the case.

26

The Supreme Court is even willing to examine constitutional issues just to clarify the applicable test, without finally deciding the constitutional issue. In both *Lombardo v. City of St. Louis* and *Torres v. Madrid*, the circuit court had found no constitutional violation, but the Supreme Court granted review, clarified the constitutional test, and remanded without expressing a view of whether the Constitution was violated. *Lombardo*, 141 S. Ct. 2239, 2242 (2021); *Torres*, 141 S. Ct. 989, 1003 (2021). The Court could have found the right not to be clearly established, but clarifying the law was so important to the Court that it chose not to take the easy way out and addressed the underlying test even when that did not require reversing the lower court.

This Court does the same, recognizing that departing from the *Saucier* procedure too frequently prevents rights from ever becoming clearly established and choosing to develop precedent so that important rights can become clearly established. *Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 61–62 (2d Cir. 2009). In *Kelsey*, this Court addressed the constitutionality of prison strip search and clothing exchange procedures even though doing so was not necessary to the outcome of the case. *Id.* It did so because: (1) the constitutional question was unanswered, (2) the

27

precedent "may never be developed if this Court were to dispose of all challenges relating to the procedures simply because the procedure is not 'clearly established,'" (3) avoiding the question could draw out the litigation further, and (4) answering the question "may also serve to clarify official conduct standards." *Id.*

Establishing important rights and providing guidance for official conduct are paramount values in this Circuit. Faced with a street preacher's challenge to a noise ordinance and a concurrence urging the Court to affirm a grant of qualified immunity on "clearly established" grounds, this Court addressed the constitutionality of the noise ordinance because "[t]his is not a case in which prudence counsels kicking the can down the road." *Costello v. City of Burlington*, 632 F.3d 41, 47 (2d Cir. 2011). This Court values tackling important legal questions to provide guidance to affected parties, and it should not allow discretionary legal hurdles or the FBI agents' gamesmanship to frustrate that important duty.

F. Pearson's *reasons for skipping straight to the clearly established prong do not apply in this case.*

The reasons *Pearson* gave to depart from the *Saucier* procedure and go straight to whether a right is clearly established range from entirely

inapplicable to simply unpersuasive when applied to this case. While de-
ciding the merits may require expending judicial resources and may not
change the outcome of the case, *see Pearson*, 555 U.S. at 236–37 (giving
that as a reason to go straight to the clearly established prong), important
rights are at stake in this case and the law needs development. The cost
of addressing the merits in this case is minimal in comparison to the ben-
efits it would bring to religious Americans and the law enforcement agen-
cies tasked to protect them. *See supra* Section II.C.1. And in this case,
whether Plaintiffs' rights were violated is not a particularly difficult
question. *See Pearson*, 555 U.S. at 237 (allowing courts to skip to the
clearly established prong where that question is easy, but determining
the existence of a right is difficult). RFRA forbids the government to "sub-
stantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(a).
The FBI agents substantially burdened Plaintiffs' free exercise of religion
by retaliating against them for refusing to violate their religious beliefs.
*See Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) ("As cases decided
prior to *Smith* make clear, a substantial burden exists where the state
'put[s] substantial pressure on an adherent to modify his behavior and to
violate his beliefs.'" (citation omitted)). As already discussed, precedent

is needed to guide officials and individuals in similar scenarios. *See Fazaga*, 142 S. Ct. at 1058 (suit against the FBI by Muslims for using a mosque-goer to spy on them); *see also supra* Section II.D. Counsel's briefing is perfectly adequate to assist this Court, which should be known to this Court given their success here and at the Supreme Court. *See Pearson*, 555 U.S. at 239 (allowing courts to skip the merits where briefing is inadequate). Finally, "constitutional avoidance" is of no concern here, both because this is a statutory claim and because the Supreme Court has come out in favor of "avoid[ing] avoidance" in qualified immunity cases since *Pearson. Camreta*, 563 U.S. at 706.

To sum up, this is a long-running, well-developed case, important enough for the Supreme Court to have reviewed. Plaintiffs' free exercise rights need to be decided in this case because they are not likely to arise outside the qualified immunity context. If Plaintiffs' claims are not addressed, their rights will never be "clearly established" and the law will stagnate. Despite all this, the district court simply skipped over the merits of Plaintiffs' claims without explanation. This Court should provide much-needed guidance and address whether the FBI agents violated Plaintiffs' free exercise rights. If the Court declines to do so, it should at

least explain its reasons why and instruct courts in the Second Circuit to provide reasons for departing from the *Saucier* procedure.

## CONCLUSION

Plaintiffs are before this Court because FBI agents violated RFRA by retaliating against them for practicing their religion. Unfortunately, the district court did not think Plaintiffs' rights worth considering or establishing. So, in two sentences, it chose to skip straight to the clearly established prong of the qualified immunity test and dismissed the case on that basis. Qualified immunity does not apply to RFRA claims because it is not in the text, and because this Court has held that RFRA overrides extratextual defenses. This court should reverse the district court's dismissal of this case and hold that qualified immunity is not available in a RFRA suit. If the court disagrees and believes that qualified immunity is applicable to RFRA, it has discretion to develop the law and address Plaintiffs' claims that are unlikely to arise outside the qualified immunity context. Because of this, the Court should decide whether the FBI agents violated Plaintiffs' rights, give guidance to lower courts on when they can skip straight to the "clearly established" prong, and direct them to give reasons when doing so.

Date: August 4, 2023                    Respectfully submitted,

                                     /s/Seth M. Young
                                     Seth M. Young
                                     Patrick M. Jaicomo
                                     Anya Bidwell
                                     INSTITUTE FOR JUSTICE
                                     901 N. Glebe Rd., Suite 900
                                     Arlington, VA 22203
                                     (703) 682-9320
                                     syoung@ij.org
                                     pjaicomo@ij.org
                                     abidwell@ij.org

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Local Rule 29.1(c) because it contains 6,506 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

Date: August 4, 2023                    /s/ Seth M. Young
                                        Seth M. Young