# 23-738

## United States Court of Appeals
## for the Second Circuit

MUHAMMAD TANVIR, JAMEEL ALGIBHAH, NAVEED SHINWARI,

*Plaintiffs-Appellants*,

AWAIS SAJJAD,

*Plaintiff*,

v.

"JOHN" TANZIN, SPECIAL AGENT, FBI, SANYA GARCIA, SPECIAL AGENT, FBI, FRANCISCO ARTOUSA, JOHN LNU, SPECIAL AGENT, FBI, STEVEN LNU, JOHN C. HARLEY, III, MICHAEL LNU, GREGG GROSSOEHMIG, WEYSAN DUN, JAMES C. LANGENBERG, JOHN DOES, 1-6, SPECIAL AGENT, FBI,

*Defendants-Appellees*,

JAMES COMEY, DIRECTOR, FEDERAL BUREAU OF INVESTIGATION, RAND BEERS, ACTING SECRETARY, DEPARTMENT OF HOMELAND SECURITY, JOHN S. PISTOLE, ADMINISTRATOR, TRANSPORTATION SECURITY ADMINISTRATION, CHRISTOPHER M. PIEHOTA, DIRECTOR, TERRORIST SCREENING CENTER, JEH CHARLES JOHNSON, MICHAEL RUTKOWSKI, WILLIAM GALE, LORETTA E. LYNCH, JEFFERSON B. SESSIONS, III, JOHN DOES, 7-13, SPECIAL AGENT, FBI, JOHN DOE, SPECIAL AGENT, FBI,

*Defendants*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF MUSLIM ADVOCATES AND RELIGIOUS, CIVIL RIGHTS, AND GRASSROOTS ORGANIZATIONAL PARTNERS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Naomi Tsu
Reem Subei
MUSLIM ADVOCATES
P.O. Box 34440
Washington, D.C. 20043
(202) 897-1892

Ali I. Alsarraf
Adam M. Abdel-Mageed
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7285

Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW, Ste. 900
Washington, DC 20001
(202) 639-6000

*Counsel for* Amici Curiae

## RULE 26.1 DISCLOSURE STATEMENT

The *amici* are all nonprofit organizations that have no parent corporations and are not owned in whole or in part by any publicly held corporation.

# TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ...................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT ......................................................................................................2

I.    Law Enforcement Agencies Have Engaged in Suspicionless Spying on Muslims for Decades, Justifying It by Framing Muslim Identity as a Proxy for Criminality. ........................................2

II.    Suspicionless Watchlisting Has Become an Especially Powerful Threat to Coerce Muslims into Informing on Their Neighbors, Burdening Their Religious Exercise. .................................................5

III.    Individual Religious Exercise and Religious Communities Are Severely Harmed by Identity-Based Policing and Suspicionless Watchlisting .............................................................................................8

    A.    Identity-Based Policing Causes Substantial Religious Harms, Tearing Apart Religious Communities and Communal Practices. ....................................................................8

    B.    The Harms of Being Placed on the No Fly List Are Far-Reaching ...........................................................................10

        1.    *Travel restrictions* ............................................................10

        2.    *Law enforcement interactions* ........................................11

        3.    *Employment impacts* ........................................................12

        4.    *Stigmatic harms* ..............................................................12

IV.    Appellees Violated Clearly Established Law Under RFRA, and "National Security" Assertions Are Not an Exception to RFRA. ......14

V.    This Court Should Hold That Defendants' Conduct Clearly Violated Appellants' Rights. ...............................................................21

CONCLUSION ..................................................................................................25

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Air Force Officer v. Austin*,
    588 F. Supp. 3d 1338 (M.D. Ga. 2022) ............................................................18

*Ajala v. West*,
    106 F. Supp. 3d 976 (W.D. Wis. 2015) ............................................................15

*Ballentine v. Tucker*,
    28 F.4th 54 (9th Cir. 2022) ...................................................................................20

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ...............................................................................................19

*Cnty. of Erie v. Colgan Air, Inc.*,
    711 F.3d 147 (2d Cir. 2013) ................................................................................14

*Cole v. Carson*,
    935 F.3d 444 (5th Cir. 2019), *as revised* (Aug. 21, 2019) ..........................23, 24

*Crooker v. TSA*,
    323 F. Supp. 3d 148 (D. Mass. 2018) ................................................................12

*Elhady v. Kable*,
    391 F. Supp. 3d 562 (E.D. Va. 2019) ................................................................10

*Elhady v. Kable*,
    993 F.3d 208 (4th Cir. 2021) ..............................................................................10

*Eves v. LePage*,
    927 F.3d 575 (1st Cir. 2019) ...............................................................................24

*Fazaga v. FBI*,
    884 F. Supp. 2d 1022 ..............................................................................................5

*Floyd v. City of New York*,
    283 F.R.D. 153 (S.D.N.Y. May 16, 2012) ..........................................................4

*Hassan v. City of New York*,
    804 F.3d 277 (3d Cir. 2015) ..........................................................................1, 17

*Ibrahim v. DHS*,
 912 F.3d 1147 (9th Cir. 2012) ................................................................6

*Kennedy v. City of Villa Hills*,
 635 F.3d 210 (6th Cir. 2011) ................................................................21

*Latif v. Holder*,
 28 F. Supp. 3d 1134 (D. Or. 2014) ....................................................11

*Mohamed v. Holder*,
 No. 1:11–cv–50, 2015 WL 4394958 (E.D. Va. July 16, 2015)........................12

*Parhat v. Gates*,
 532 F.3d 834 (D.C. Cir. 2008)..............................................................19

*Patterson v. United States*,
 999 F. Supp. 2d 300 (D.D.C. 2013)....................................................21

*Pearson v. Callahan*,
 555 U.S. 223 (2009)........................................................22, 24, 25

*Pourkavoos v. Town of Avon*,
 823 F. App'x 53 (2d Cir. 2020) ........................................................20

*Rigdon v. Perry*,
 962 F. Supp. 150 (D.D.C. 1997)................................................18, 19

*Sabir v. Williams*,
 52 F.4th 51 (2d Cir. 2022) ........................................................*passim*

*Saucier v. Katz*,
 533 U.S. 194 (2001)..............................................................22

*Singh v. Berger*,
 56 F.4th 88 (D.C. Cir. 2022)..............................................................18

*Sloley v. VanBramer*,
 945 F.3d 30 (2d Cir. 2019) ................................................................22

*Tanvir v. Tanzin*,
 No. 13-CV-6951 (RA), 2023 WL 2216256 (S.D.N.Y. Feb. 24, 2023) ................................................................15, 16

*United States v. Jones*,
 565 U.S. 400 (2012) (Sotomayor, J., concurring) ...............................................8

**Statutes**

42 U.S.C. § 2000bb-1(b) ..........................................................................14

49 C.F.R. §§ 1520.7, 1520.11 ................................................................12

**Legislative Materials**

*The Terrorist Screening System and the Watchlist Process: Hearing
 Before the H. Comm. on Homeland Sec.*, 110th Cong. (2007) (state-
 ment of Glenn A. Fine, Inspector General, Department of Justice) ....................6

Staff of S. Select Comm. to Study Governmental Operations with Re-
 spect to Intelligence Activities, Intelligence Activities and the
 Rights of Americans, S. Rep. No. 94-755 (1976) .................................................2

**Other Authorities**

Alyssa E. Rippy & Elana Newman, *Perceived Religious Discrimina-
 tion and Its Relationship to Anxiety and Paranoia Among Muslim
 Americans*, J. Muslim Mental Health, 2006, at 1 ...............................................13

Civil Rights Div., U.S. Dep't of Justice, Guidance Regarding the Use
 of Race by Federal Law Enforcement Agencies (2003),
 https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/
 guidance_on_race.pdf ..........................................................................3

Council on Am. Islamic Relations, Twenty Years Too Many, A Call
 to Stop the FBI's Secret Watchlist (2023),
 https://www.cair.com/wp-content/uploads/2023/06/watchlistreport-
 1.pdf?emci=f6e48068-6209-ee11-907c-
 00224832eb73&emdi=fe302ef8-6509-ee11-907c-
 00224832eb73&ceid=47717 ..............................................................7

Decl. of Craig Monteilh at 6, *Fazaga v. FBI*,
 884 F. Supp. 2d 1022 (No. 8:11-cv-00301-CJC(VBKx)) (ECF 66) ..................5

Eric Lichtblau, *F.B.I. Tells Offices to Count Local Muslims and Mosques*, N.Y. Times (Jan. 28, 2003), https://www.ny-times.com/2003/01/28/us/threats-responses-american-muslims-fbi-tells-offices-count-local-muslims-mosques.html. ) ...............................................4

Gary Fields & Noreen Nasir, *Muslims Recall Questionable Detentions That Followed 9/11*, Assoc. Press (Oct. 4, 2021), https://ap-news.com/article/immigration-africa-canada-religion-asia-bf725e0016e88eef2abc73bedd0c5718 ...................................................3

Ghulam M. Haniff, *The Muslim Community in America: A Brief Profile*, 23 J. Muslim Minority Affairs 303 (2003) ....................................8

Goleen Samari, *Islamophobia and Public Health in the United States*, 106 Am. J. Public Health 1920 (2016) ..................................................13

Janet Reitman, *'I Helped Destroy People,'* N.Y. Times Mag. (Sept. 1, 2021), https://www.nytimes.com/2021/09/01/magazine/fbi-terror-ism-terry-albury.html. ................................................................4

Jeremy Scahill & Ryan Devereaux, *The Secret Government Rulebook for Labeling You a Terrorist*, Intercept (July 23, 2014), https://the-intercept.com/2014/07/23/blacklisted/.................................................6

Maria L. La Ganga, *FBI Documents Reveal Profiling of N. California Muslims*, L.A. Times (Mar. 28, 2012), https://www.latimes.com/lo-cal/la-xpm-2012-mar-28-la-me-fbi-california-mosques-20120328-story.html............................................................................4

*Michigan Muslim Group Says FBI Asking People to Spy*, Assoc. Press (Apr. 16, 2009), https://www.mlive.com/news/2009/04/michi-gan_muslim_group_says_fbi.html.......................................................4

Murtaza Hussain & Pedro Armando Aparicio, *One Man's No-Fly List Nightmare*, Intercept (May 30, 2021), https://theinter-cept.com/2021/05/30/no-fly-list-terrorism-watchlist/ ........................................11

Murtaza Hussain, *Local Cops Harassed and Threatened U.S. Veteran Because of Terror Watchlist, Lawsuit Says*, Intercept (Jan. 26, 2023), https://theintercept.com/2023/01/26/terror-watchlist-police-harassment/..........................................................................11

vi

Muslim Advocates, Losing Liberty: The State of Freedom 10 Years After the Patriot Act (2011), Losing_Liberty_The_State_of_Freedom_10_Years_After_the_PATRIOT_Act.pdf .....................................................9

Muslim Amer. Civil Libs. Coal. et al., Mapping Muslims: NYPD Spying and Its Impact on American Muslims (2013), http://www.law.cuny.edu/academics/clinics/immigration/clear/Mapping-Muslims.pdf .........................................................9

National Counterterrorism Center, 2013 Watchlist Guidance (2013), https://www.documentcloud.org/documents/1227228-2013-watchlist-guidance# .................................................................6

New York City Profiling Collaborative et al., In Our Own Words: Narratives of South Asian New Yorkers Affected by Racial and Religious Profiling 21 (2012), https://saalt.org/wp-content/uploads/2012/12/In-Our-Own-Words-Web-FINAL_Media-Kit_Publlications.pdf ...................................................9

Nusrat Choudhury, *FBI FOIA Docs Show Use of 'Mosque Outreach' for Illegal Intel Gathering*, ACLU (Mar 27, 2012), https://www.aclu.org/news/national-security/fbi-foia-docs-show-use-mosque-outreach-illegal-intel ..............................................4

Office of the Inspector General, U.S. Dep't of Justice, Audit Report 09-25, The Federal Bureau of Investigation's Terrorist Watchlist Nomination Practices 1–2 (2009) ...........................................11

Office of the Inspector General, U.S. Dep't of Justice, The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connections with the Investigation of the September 11 Attacks (2003), https://oig.justice.gov/sites/default/files/legacy/special/0306/full.pdf ..............................................3

Peter Wade, *Hacktivist Discovered U.S. No Fly List on Unsecured Airline Server*, Rolling Stone (Jan. 22, 2023), https://www.rollingstone.com/politics/politics-news/no-fly-list-leaked-unsecured-airline-server-1234665941/...................................................7

Rebecca A. Clay, *Muslims in America, Post 9/11*, Am. Psych. Assoc. (Sept. 2011), https://www.apa.org/monitor/2011/09/muslims ...........................13

Reginald C. Wisenbaker, Jr., *Muslim Community Reparations*, 2 Savannah L. Rev. 391 (2015) ............................................................... 13

Rose S. Aslan, *The Significance of Friday Prayers in Islam*, Sojourners (Mar. 19, 2019), https://sojo.net/articles/significance-friday-prayers-islam. ........................................................................................... 8

Susan Bendlin, *Qualified Immunity: Protecting "All but the Plainly Incompetent" (and Maybe Some of Them, Too)*, 45 J. Marshall L. Rev. 1023, 1041 (2012) ...................................................................... 23

Teresa Watanabe & Paloma Esquivel, *L.A. Area Muslims Say FBI Surveillance Has a Chilling Effect on Their Free Speech and Religious Practices*, L.A. Times (Mar. 1, 2009), http://articles.latimes.com/2009/mar/01/local/ me-muslim1 ............................... 9

*The Convert*, This American Life (Dec. 3, 2021), https://www.thisamericanlife.org/755/the-convert. ............................... 4

Trevor Aaronson, *Spy in Disguise*, Intercept (Sept. 12, 2021), https://theintercept.com/2021/09/12/fbi-informant-surveillance-muslims-supreme-court-911/ ................................................................. 4

Willard Shepard, *American Airlines Employee Was Put on No Fly List*, NBC Miami (Nov. 13, 2012), https://www.nbcmiami.com/news/local/american-airlines-employee-was-put-on-no-fly-list/1912730/ .................................................................................. 12

# INTERESTS OF *AMICI CURIAE*[1]

*Amici* are religious, civil rights, and grassroots organizations that share a commitment to fighting discrimination and preserving our nation's fundamental constitutional protections. They believe that all religious groups—especially those that are most vulnerable—should be able to worship freely and safely. *Amici* therefore oppose Appellees' attempt to escape accountability for their grave violations of Appellants' religious rights. *Amici* believe that all Americans, including Muslim Americans, should be afforded the same basic protections against discriminatory government coercion and unwarranted, punitive retaliation for exercising their sincerely held religious beliefs.

The *amici* are:

- Muslim Advocates;

- American-Arab Anti-Defamation Committee;

- American Muslim Bar Association;

- Asian American Legal Defense and Education Fund;

- Asian Americans Advancing Justice - Asian Law Caucus;

- Desis Rising Up & Moving;

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief.

- Muslim Bar Association of Chicago; and

- Project South.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Lead Appellant Muhammad Tanvir is a Muslim lawful permanent resident whom the FBI sought to recruit as an informant on others in his faith community. When he declined to do so, the FBI retaliated by seizing his passport, threatening to deport him, threatening to arrest him, and putting him on the No Fly List. Mr. Tanvir has never posed, nor been accused of posing, a threat to aviation safety.

The FBI's targeting of Mr. Tanvir and the other Appellants, despite the lack of evidence that they pose a threat to national security, is part of a larger history of law enforcement targeting Muslims based on unfounded assumptions about Muslims as dangerous "others" undeserving of the full complement of otherwise cherished constitutional protections. Such unchecked conduct violates the rule of law and the Religious Freedom and Restoration Act's requirement that the executive narrowly tailor actions burdening religious faith.

The FBI's conduct here was profoundly damaging. There are few injuries as severe and as inconsistent with the Nation's constitutional fabric as having one's religious obligations overborne by discriminatory government conduct. This case is significant not just for American Muslim communities, whose safety from unjustifiable retaliation is at stake; it is also significant to members of all faiths, as our Nation's commitment to liberty and justice for all crumbles with each discriminatory carve out.

This Court should hold that the law does not allow government agents to engage in retaliatory coercion when an individual declines to become an informant on his faith community, and that such law was clearly established at the time of Appellees' conduct. Retaliating against a person by putting him on a government watchlist that severely restricts his liberty for refusing to become a government informant is conduct one would expect from a repressive, authoritarian regime, and any American law enforcement officer should have known better.

## ARGUMENT

### I. Law Enforcement Agencies Have Engaged in Suspicionless Spying on Muslims for Decades, Justifying It by Framing Muslim Identity as a Proxy for Criminality.

Government profiling of Muslim communities in the United States has been commonplace for decades. From 1952 to 1969, the FBI employed considerable measures, including wiretaps and informants, to surveil the Nation of Islam "despite the lack of any evidence to justify federal prosecution or other legal action."[2]

In the aftermath of September 11, 2001, matters became exponentially worse. After the attacks, under pressure to marshal a response to an unprecedented event, federal law enforcement agencies leveraged crude stereotypes about Muslims to cast Muslim identity as presumptively threatening. Eager to show quick results, the

---

[2] Staff of S. Select Comm. to Study Governmental Operations with Respect to Intelligence Activities, Book III: Intelligence Activities and the Rights of Americans, S. Rep. No. 94-755, at 454 (1976); *see also id.* at 452–453; *id.* Book II, at 63, 244.

Department of Justice swept up more than 1,000 noncitizen men into detention, often based on tips from a public that had become suspicious of their neighbors overnight.[3] Imposing on Muslim communities what the agency itself describes as the "terrible cost"[4] of discriminatory policing, the Department of Justice stretched material witness and immigrant detention laws to detain hundreds of apparently Muslim and Arab men for weeks or months in abuse-ridden, high security jails.[5]

Government intrusions extended into sacred spaces. Like a church or a synagogue, a mosque is a place for congregate prayer, community gatherings and fellowship, counseling, and education. But especially following 9/11, Muslims found their places of worship under intrusive government surveillance.

For example, in 2003, the FBI directed its 56 field offices to count the mosques and Muslims within their jurisdictions, explaining that these numbers would be used as a yardstick for how many terror investigations would be expected

---

[3] Gary Fields & Noreen Nasir, *Muslims Recall Questionable Detentions That Followed 9/11*, Assoc. Press (Oct. 4, 2021), https://apnews.com/article/immigration-africa-canada-religion-asia-bf725e0016e88eef2abc73bedd0c5718.

[4] Civil Rights Div., U.S. Dep't of Justice, Guidance Regarding the Use of Race by Federal Law Enforcement Agencies, at 1 (2003), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/guidance_on_race.pdf ("The use of race as the basis for law enforcement decision-making clearly has a terrible cost, both to the individuals who suffer invidious discrimination and to the Nation . . . .").

[5] Office of the Inspector General, U.S. Dep't of Justice, The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connections with the Investigation of the September 11 Attacks, at 16, 145, 197, 204 (2003), https://oig.justice.gov/sites/default/files/legacy/special/0306/full.pdf.

from each office—that is to say, quotas of a sort found unconstitutional in other areas[6]—telling agents: "If the numbers don't compute . . . that will trigger an automatic inspection from headquarters."[7]

"Convinced," in the words of a former FBI agent, "that there is a terrorist in every mosque,"[8] the FBI illegally recorded information during community outreach[9] and sent paid informants into mosques to record conversations and hide recording devices.[10] In one widely reported instance in which the FBI sent an informant into Orange County, California mosques,[11] the informant reported that the FBI gave him no specific targets, instead telling him "to gather as much information on as many

---

[6] *See, e.g.*, *Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. May 16, 2012).

[7] Eric Lichtblau, *F.B.I. Tells Offices to Count Local Muslims and Mosques*, N.Y. Times (Jan. 28, 2003), https://www.nytimes.com/2003/01/28/us/threats-responses-american-muslims-fbi-tells-offices-count-local-muslims-mosques.html.

[8] Janet Reitman, *'I Helped Destroy People*,*'* N.Y. Times Mag. (Sept. 1, 2021), https://www.nytimes.com/2021/09/01/magazine/fbi-terrorism-terry-albury.html.

[9] Maria L. La Ganga, *FBI Documents Reveal Profiling of N. California Muslims*, L.A. Times (Mar. 28, 2012), https://www.latimes.com/local/la-xpm-2012-mar-28-la-me-fbi-california-mosques-20120328-story.html; *see also* Nusrat Choudhury, *FBI FOIA Docs Show Use of 'Mosque Outreach' for Illegal Intel Gathering*, ACLU (Mar 27, 2012), https://www.aclu.org/news/national-security/fbi-foia-docs-show-use-mosque-outreach-illegal-intel.

[10] Trevor Aaronson, *Spy in Disguise*, Intercept (Sept. 12, 2021), https://theintercept.com/2021/09/12/fbi-informant-surveillance-muslims-supreme-court-911/; *cf. Michigan Muslim Group Says FBI Asking People to Spy*, Assoc. Press (Apr. 16, 2009), https://www.mlive.com/news/2009/04/michigan_muslim_group_says_fbi.html (reporting that in 2009, Muslim community groups in Michigan revealed that FBI agents had pressured congregants to record information about other congregants).

[11] *See, e.g.*, *The Convert*, This American Life (Dec. 3, 2021), https://www.thisamericanlife.org/755/the-convert.

people in the Muslim community as possible,"[12] which the FBI used to build files on "every person" the informant contacted.[13]

Each of these initiatives was patently discriminatory and unwarranted even at their inception, but they long ago exhausted any security justification that could have once merited deference. That is obvious, just as it is obvious that no exigent circumstances would justify years-long, blanket targeting of Christian or Jewish communities either.

## II. Suspicionless Watchlisting Has Become an Especially Powerful Threat to Coerce Muslims into Informing on Their Neighbors, Burdening Their Religious Exercise.

Among the strategies deployed by law enforcement to target Muslim communities, the use of "watchlists" has been particularly pernicious due to their secrecy and far-reaching effects. On September 12, 2001, the FBI first began developing a watchlist "designed to identify potential hijackers and other individuals who might be planning additional terrorist acts once air travel resumed."[14] This Terrorist Screening Database ("TSDB" or "Watchlist") quickly ballooned and proved unmanageable: by 2003, it had grown to approximately 150,000 records; by 2007, it held 724,442 records related to approximately 300,000 individuals; and by

---

[12] Decl. of Craig Monteilh at 6, *Fazaga v. FBI*, 884 F. Supp. 2d 1022 (No. 8:11-cv-00301-CJC(VBKx)) (ECF 66).
[13] *Id.* at 8.
[14] *See* Office of the Inspector General, *supra* note 5, at 11.

2019, a subset of the Watchlist contained more than 1.5 million names.[15]

The standards for labeling someone a potential terrorist are hopelessly permissive, requiring neither "concrete facts" nor "irrefutable evidence."[16] The FBI need meet only the elastic standard of "reasonable suspicion,"[17] which itself may be "inferred" from information, such as a relationship with someone on the Watchlist.[18] The DOJ Inspector General has pointed to "deficiencies in the terrorist watchlisting process" as a basis for TSD's "high rate of error."[19] Yet removal from the Watchlist is much harder to achieve than addition to the list; even when it becomes undeniably clear to the government that a certain individual was added in error, achieving removal from the list has been called by a federal appellate court a "Kafkaesque" process of surmounting governmental "intransigence."[20]

The government's refusal to tolerate even minimal oversight of the Watchlist and its subset "No Fly List" had long made it impossible for the public to assess

---

[15] *The Terrorist Screening System and the Watchlist Process: Hearing Before the H. Comm. on Homeland Sec.*, 110th Cong. 4 (2007) (statement of Glenn A. Fine, Inspector General, Department of Justice) [hereinafter "DOJ Inspector General Statement"].

[16] National Counterterrorism Center, 2013 Watchlist Guidance 34 (2013), https://www.documentcloud.org/documents/1227228-2013-watchlist-guidance#; *see also* Jeremy Scahill & Ryan Devereaux, *The Secret Government Rulebook for Labeling You a Terrorist*, Intercept (July 23, 2014), https://theintercept.com/2014/07/23/blacklisted/.

[17] National Counterterrorism Center, *supra* note 16, at 12.

[18] *Id.* at 39.

[19] DOJ Inspector General Statement, *supra* note 15.

[20] *Ibrahim v. DHS*, 912 F.3d 1147, 1177 (9th Cir. 2012).

whether the Watchlist zeroed-in on Muslim identity above all else. However, a recent unauthorized release of the "2019 version of the federal no fly list" by a Swiss cybersecurity researcher[21] has finally confirmed what Muslim communities have long feared to be true. An analysis of the list, which contains more than 1.5 million names, revealed that over 98% of names on the No Fly List, or over 1.47 million, are Muslim and Arab names.[22] In fact, more than 350,000 entries contain one of three common male Muslim names: Mohamed, Ali, or Mahmoud.[23]

Despite the Watchlist's alarming error rate and loose standards, the FBI also disseminates it to multiple other federal agencies, local law enforcement, and even foreign governments,[24] leading to potentially dangerous downstream consequences for listees. *See infra* Section III.B.

---

[21] Peter Wade, *Hacktivist Discovered U.S. No Fly List on Unsecured Airline Server*, Rolling Stone (Jan. 22, 2023), https://www.rollingstone.com/politics/politics-news/no-fly-list-leaked-unsecured-airline-server-1234665941/.

[22] Council on Am. Islamic Relations, Twenty Years Too Many, A Call to Stop the FBI's Secret Watchlist 2 (2023), https://www.cair.com/wp-content/up-loads/2023/06/watchlistreport-1.pdf?emci=f6e48068-6209-ee11-907c-00224832eb73&emdi=fe302ef8-6509-ee11-907c-00224832eb73&ceid=47717.

[23] *Id.* at 2.

[24] DOJ Inspector General Statement, *supra* note 15.

### III. Individual Religious Exercise and Religious Communities Are Severely Harmed by Identity-Based Policing and Suspicionless Watchlisting.

#### A. Identity-Based Policing Causes Substantial Religious Harms, Tearing Apart Religious Communities and Communal Practices.

Decades on from September 11, 2001, the legacy of identity-based policing of Muslim communities persists, producing a myriad of predictably severe harms that follow the stigmatization of a faith as innately threatening.

As with many religious traditions, including Christianity and Judaism, intra-communal practices are a core tenet of Muslim religious practice. Just as many Jews gather at synagogue on Saturdays and Christians gather for church on Sundays, Muslims gather at the mosque on Fridays for prescribed congregate prayer.[25] These communal practices, among others, play a central role in nurturing a sense of identity, belonging, and solidarity among adherents. Government targeting of individuals based on their religious beliefs disrupts these crucial communal practices, undermining the cohesiveness of religious communities.

The knowledge of government surveillance chills the right to practice one's faith, inhibiting associational and expressive freedoms.[26] The prevailing notion that

---

[25] Ghulam M. Haniff, *The Muslim Community in America: A Brief Profile*, 23 J. Muslim Minority Affairs 303 (2003); Rose S Aslan, *The Significance of Friday Prayers in Islam*, Sojourners (Mar. 19, 2019), https://sojo.net/articles/significance-friday-prayers-islam.

[26] *United States v. Jones*, 565 U.S. 400, 416 (2012) (Sotomayor, J., concurring).

being Muslim or practicing Islam will increase one's chance of being spied on, watchlisted, or asked to become an informant, drives Muslims away from engaging in activities like wearing religious attire,[27] attending mosques,[28] or participating in public religious events.[29] This avoidance breaks down the bonds of local Muslim communities across the country and feeds fears of associating with one another in collaborative or congregational religious practices.[30]

---

[27] New York City Profiling Collaborative et al., In Our Own Words: Narratives of South Asian New Yorkers Affected by Racial and Religious Profiling 21 (2012), https://saalt.org/wp-content/uploads/2012/12/In-Our-Own-Words-Web-FI-NAL_Media-Kit_Publlications.pdf ("After [being subjected to questioning about my personal life and my husband after traveling while wearing a hijab], the next time [I] traveled, [I] did not wear the hijab. [I] was not asked for further screening or questioning. [I] was approached very politely. [I] had mixed feelings; [I] didn't know whether to feel happy or sad. It felt nice to be treated like everyone else, but, then again, it was upsetting to feel [I] was mistreated just because [I] wore a hijab.").

[28] Muslim Advocates, Losing Liberty: The State of Freedom 10 Years After the Patriot Act 14 (2011), Losing_Liberty_The_State_of_Freedom_10_Years_After_the_PATRIOT_Act.pdf (d3n8a8pro7vhmx.cloudfront.net) ("As a result of [the FBI's] policies and practices, individuals feel chilled from speaking and worshipping freely because they are afraid that their mosques or other community gatherings and members are under surveillance and that their speech or religious practices may be the basis for government scrutiny.").

[29] Muslim Amer. Civil Libs. Coal. et al., Mapping Muslims: NYPD Spying and Its Impact on American Muslims 17 (2013), http://www.law.cuny.edu/academics/clinics/immigration/clear/Mapping-Muslims.pdf (reporting that suspicionless surveillance of Muslims by law enforcement and "scrutiny of outward manifestations of 'Muslim' characteristics [such as wearing a head scarf, a hijab, or a full beard] led some interviewees or their friends to change their appearance and practice of religion").

[30] Muslim Advocates, *supra* note 28; *see also* Teresa Watanabe & Paloma Esquivel, *L.A. Area Muslims Say FBI Surveillance Has a Chilling Effect on Their Free Speech*

**B. The Harms of Being Placed on the No Fly List Are Far-Reaching.**

Inclusion on the No Fly List, in particular, is a draconian sanction: it severely burdens an individual's ability to travel; it restricts one's ability to associate with family, friends, and social or professional organizations; it stigmatizes an individual as a potential terrorist, even though watchlisted individuals overwhelmingly have never been charged with any crime; by extension, it exposes their coreligionists to disfavor; and it has devastating consequences for an individual's personal, professional, and religious life.

### 1. *Travel restrictions*

Individuals on the No Fly List face acute restrictions on their ability to travel, including being barred from boarding flights and, if they are a foreign national, being denied admission to the United States. Some individuals "have been forcibly arrested (often at gunpoint) and detained for long hours in front of their family."[31] Many now avoid certain travel altogether, even domestically, due to their experiences and the associated "psychological trauma."[32] Moreover, because the government shares No

---

*and Religious Practices*, L.A. Times (Mar. 1, 2009), http://articles.latimes.eom/2009/mar/01/local/ me-muslim1.

[31] *Elhady v. Kable*, 391 F. Supp. 3d 562, 572 (E.D. Va. 2019), *rev'd on other grounds*, *Elhady v. Kable*, 993 F.3d 208 (4th Cir. 2021).

[32] *Id.* at 578–79. As described *supra* in Section III.A and *infra* in Section III.B.3, preemptive withdrawal from society in order to avoid unwarranted scrutiny and the shame it produces is a predictable byproduct of identity-based targeting.

Fly List information and other related intelligence with foreign governments, individuals traveling overseas may face "extensive detention and interrogation at the hands of foreign authorities" as a result of being listed.[33]

## 2. *Law enforcement interactions*

The direct harms of watchlisting go well beyond these heavy burdens on travel. Most immediately, the wide dissemination of No Fly List information to "federal, state, local, and tribal law enforcement agencies" ensures that an individual's No Fly List status has the potential to impact any interaction that they may have with law enforcement, at all levels of government, including traffic stops, permit applications, or background checks.[34] To illustrate the point, in 2022, Saadiq Long, a U.S. Air Force veteran, was stopped on three occasions—including once at gunpoint— by Oklahoma City police officers who eventually told that his traffic stops were the result of his vehicle being listed on the "terrorist watchlist."[35]

---

[33] *Latif v. Holder*, 28 F. Supp. 3d 1134, 1149 (D. Or. 2014); *see also* Murtaza Hussain & Pedro Armando Aparicio, *One Man's No-Fly List Nightmare*, Intercept (May 30, 2021), https://theintercept.com/2021/05/30/no-fly-list-terrorism-watchlist/ (describing the days-long interrogation by the infamous Pakistani Inter-Services Intelligence agency of a U.S. citizen placed on, then removed from, the watchlist).

[34] Office of the Inspector General, U.S. Dep't of Justice, Audit Report 09-25, The Federal Bureau of Investigation's Terrorist Watchlist Nomination Practices 1–2 (2009).

[35] Murtaza Hussain, *Local Cops Harassed and Threatened U.S. Veteran Because of Terror Watchlist, Lawsuit Says*, Intercept (Jan. 26, 2023), https://theintercept.com/2023/01/26/terror-watchlist-police-harassment/.

11

### 3. *Employment impacts*

Watchlisting also impacts an individual's employment prospects. No Fly List information is used extensively to screen government employees and contractors.[36] No Fly List and related information is further provided to hundreds of private entities and used to screen employees of certain large government contractors, as well as private sector employees with transportation and infrastructure functions.[37] In 2012, a veteran American Airlines gate agent who was placed on the No Fly List was barred from working for two months and informed he may lose his job permanently, before being cleared to return to work.[38] And whether or not a private employer has direct access to the No Fly List, a listee's employment may be impacted if the job requires any type of travel.[39]

### 4. *Stigmatic harms*

Government surveillance chills the freedom of expression and freedom of association for American Muslims, and the stigma of being a suspect community has direct impact on the ability of Muslims to exist in the United States as their full

---

[36] *See Crooker v. TSA*, 323 F. Supp. 3d 148, 151 (D. Mass. 2018).

[37] 49 C.F.R. §§ 1520.7, 1520.11; *see also Crooker*, 323 F. Supp. 3d at 153.

[38] Willard Shepard, *American Airlines Employee Was Put on No Fly List*, NBC Miami (Nov. 13, 2012), https://www.nbcmiami.com/news/local/american-airlines-employee-was-put-on-no-fly-list/1912730/.

[39] *See Mohamed v. Holder*, No. 1:11–cv–50 (AJT/MSN), 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015).

selves. From September 11 onwards, individuals in America who identify as Muslims or are perceived to be Muslim have experienced the weight of a stigmatizing stereotype that fosters a public perception of them being inherently "foreign" and "imminently threatening" to the country.[40]

Research confirms that stigmatization from the use of religious stereotypes inevitably leads to psychological harm, including to the American Muslim population. "A stigmatized status affects health by undermining or exacerbating several processes—such as stress, the availability of resources, social relationships, and psychological and behavioral responses—that can lead to adverse health outcomes."[41] "What they've found is anxiety, depression and even post-traumatic stress disorder among a population some call doubly traumatized − first by the [9/11] attacks themselves and then by the finger-pointing that followed."[42] A different study revealed that religious discrimination is associated with higher levels of paranoia among Muslim men.[43]

---

[40] Reginald C. Wisenbaker, Jr., *Muslim Community Reparations*, 2 Savannah L. Rev. 391, 392 (2015).

[41] Goleen Samari, *Islamophobia and Public Health in the United States*, 106 Am. J. Public Health 1920, 1921 (2016).

[42] Rebecca A. Clay, *Muslims in America, Post 9/11*, Am. Psych. Assoc. (Sept. 2011), https://www.apa.org/monitor/2011/09/muslims (describing mental health studies of American Muslims post 9/11).

[43] Alyssa E. Rippy & Elana Newman, *Perceived Religious Discrimination and Its Relationship to Anxiety and Paranoia Among Muslim Americans*, J. Muslim Mental Health, 2006, at 1, 1.

**IV.  Appellees Violated Clearly Established Law Under RFRA, and "National Security" Assertions Are Not an Exception to RFRA.**

In granting qualified immunity to Appellees, the District Court below held there was no clearly established law prohibiting the government from retaliating against individuals for their religious exercise. This was error.

Under RFRA's clearly established law, a government actor is prohibited from substantially burdening a party's exercise of religion unless it is in furtherance of a compelling government interest, and the least restrictive means is used.[44] Taking Appellants' allegations in their First Amended Complaint as true—as the Court must at this stage of the case, *Cnty. of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 149 (2d Cir. 2013)—Appellees violated RFRA's clearly established law by substantially burdening Appellants' exercise of their religion without sufficient justification, and certainly without using the least restrictive means. Appellees targeted members of a religious community on the basis of their religion and attempted to coerce them to violate their sincerely held religious belief against becoming informants in their religious communities. First Am. Compl. ¶¶ 4, 8, 14, 65. When Appellants refused, Appellees retaliated and punished Appellants without justification, placing them on the No Fly List even though they posed no threat to aviation safety. *Id.* ¶¶ 8–9.

Below, Appellants cited *Sabir v. Williams*, 52 F.4th 51 (2d Cir. 2022), for the

---

[44] *See* 42 U.S.C. § 2000bb-1(b).

proposition that the language of RFRA, itself, provided clear notice to agents that their retaliatory and plainly *unjustified* substantial burdening of Appellants' religious exercise violated clearly established law. The District Court, however, concluded that Appellees could not have known that their conduct toward Appellants violated RFRA because they had a justification: they sought "to gather intelligence related to national security in the aftermath of the 9/11 terrorist attacks." *Tanvir v. Tanzin*, No. 13-CV-6951 (RA), 2023 WL 2216256, at *13 (S.D.N.Y. Feb. 24, 2023). But there is no national security exception to RFRA. While national security in the abstract may be a compelling government interest, the government must show that it used the least restrictive means to achieve that interest. This rigorous analysis under RFRA must be applied no matter the justification advanced by the government. National security is not a mantra that allows the government to bypass the stringency of RFRA.[45]

Here, the Court impermissibly gave credence to a blanket "national security"

---

[45] Courts have wrestled with similar questions in the prison context where deference to wardens' invocations of security interests must be balanced in RFRA cases with the access of imprisoned persons to abide by their religious obligations. Courts have proven themselves capable of pressing on asserted security concerns under RFRA's demanding analysis to give a fair hearing to faith practitioners' claims while protecting *bona fide* security needs in tailored ways. *See, e.g.*, *Sabir v. Williams*, 52 F.4th 51 (2d Cir. 2022); *Ajala v. West*, 106 F. Supp. 3d 976, 983 (W.D. Wis. 2015).

justification—not supported by the allegations in the Complaint—to hold that Appellees did not violate clearly established law under RFRA.[46] *See Tanvir*, 2023 WL 2216256, at *13. Considering the rights at stake, the District Court should have further examined the asserted justification for Appellees' conduct toward Appellants, and in particular whether retaliation was a permissible means of achieving the government's broad interest. On the facts alleged in Appellants' First Amended Complaint—which, again, were to be taken as true—there was no manifest reason for discriminately targeting Appellants, whom Appellees harassed, then attempted to coerce into violating a sincerely held religious belief, and then retaliated against when they refused. The District Court failed to explain how the numerous, specific allegations of religiously motivated misconduct were sufficiently justified—by facts contained in the Complaint—nor why the retaliatory and unjustified placement of Appellants on the No Fly List advanced the government's national security interest. Indeed, retaliating against people by placing them, without justification, on the No Fly List *hinders* the government's ability to identify veritable targets by bloating the

---

[46] The District Court briefly referred to the purported purpose of the No Fly List, namely "to reduce 'significant threats to aviation safety'" and help "coordinat[e] the government's approach to terrorism screening." *Id.* at *13. But these should have been irrelevant to the District Court's discussion, as the allegations in the Complaint are clear that Petitioners did not pose any threat, but instead were placed on the No Fly List solely in retaliation for their refusal to deceive members of their faith community by informing on them, in violation of their sincerely held religious beliefs. *See* First Am. Compl. ¶¶ 8–9, 14.

16

list with people who pose no national security risk. The government has no national security interest in an overbroad watchlist that sweeps in innocent individuals who have done nothing other than exercise their constitutional right to decline to become informants on their religious communities.

The District Court's reliance on a blanket national security justification is doubly inappropriate at this stage of the case on a motion to dismiss. Circuit courts have been clear that where, as here, "heightened scrutiny applies," the defendants have "the burden of producing evidence to overcome heightened scrutiny's presumption of unconstitutionality," which "must be met *after* [defendants'] Motion to Dismiss." *Hassan v. City of New York*, 804 F.3d 277, 306 (3d Cir. 2015), *as amended* (Feb. 2, 2016) (emphasis in original). Given that the Court is "limited here to the allegations in the complaint and the evidence in the attachments to it," the lack of evidence of any justification in those materials dooms any assertion of qualified immunity for violating RFRA. *Sabir*, 52 F.4th 51, 64–65.

In addition, the need for the Court's strict scrutiny of the government's actions in this case is underscored by a pattern of conduct in which the FBI has targeted Muslim communities on the basis of their religion, including enforcing quotas of terror investigations tethered to the number of mosques in the area, and using the No Fly List in a discriminatory manner. *See supra* Sections I, II.

Case law confirms that the Court must hold the government to RFRA's strict scrutiny test even when the government invokes national security interests. In *Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022), the D.C. Circuit reversed a district court's denial of a preliminary injunction to plaintiff Sikh members of defendant U.S. Marine Corps in their challenge to the Corps' rule regarding uniform and grooming requirements during boot camp, finding that plaintiffs "demonstrated not just a likely, but an overwhelming, prospect of success on the merits of their RFRA claim" despite the Corps' professed "military readiness" and "national security" justifications. In *Air Force Officer v. Austin*, 588 F. Supp. 3d 1338 (M.D. Ga. 2022), the district court granted a preliminary injunction to plaintiff U.S. Air Force officer who challenged the Air Force's mandate requiring COVID-19 vaccination, which plaintiff claimed violated her "devout Christian" beliefs condemning "a vaccine that was derived from or tested on aborted fetal tissue." The court found that plaintiff's RFRA claim was likely to succeed on the merits despite the Air Force's professed "national security and military readiness" justifications. And in *Rigdon v. Perry*, 962 F. Supp. 150 (D.D.C. 1997), the district court ruled in favor of plaintiff military chaplains' challenge to a joint U.S. armed forces' directive that was cited to prohibit chaplains' efforts to rally support among troops for federal antiabortion legislation. The district court held that such a prohibition violated plaintiffs' rights under RFRA, and that

defendants' concern that plaintiffs' conduct "could severely undermine military discipline, cohesion, and readiness to the serious detriment of the National Security" was an unpersuasive justification. *Id.* at 162. RFRA sets an appropriately high bar for officials who place a substantial burden on the exercise of someone's religion, and it has done so since it was enacted in 1993.

Courts have also not hesitated to reject blanket national security justifications in other contexts where, as here, important individual rights are at stake.[47] For example, in *Rasul v. Bush*, the U.S. Supreme Court rejected the government's assertion that giving detainees at Guantanamo access to habeas and counsel would undermine "the military's ability to win the war." Brief for Respondent at 43, 542 U.S. 466 (2004) (Nos. 03-334, 03-343), 2004 WL 425739; *see also* 542 U.S. 466, 474–79 (2004). In the face of this maximalist national security justification, the Court upheld the detainees' rights to habeas and counsel. 542 U.S. at 485. In *Hamdi v. Rumsfeld*, the Supreme Court likewise rejected the government's claim that its detention decisions are left completely to executive discretion, explaining that war is not a presidential "blank check," and courts must "exercise their own time-honored and

---

[47] *See Boumediene v. Bush*, 553 U.S. 723 (2008) (rejecting government's claim to make detention decisions free from judicial scrutiny); *Parhat v. Gates*, 532 F.3d 834, 849 (D.C. Cir. 2008) (ordering the government to provide Guantanamo detainees new hearings or release them where it found the evidence insufficient to justify their classification as enemy combatants).

constitutionally mandated roles of reviewing and resolving claims [of individual rights] like those presented here." 542 U.S. 507, 535–36 (2004).

That the District Court should have probed[48] the purported national security justification for Defendants' retaliatory action is also clear from cases involving retaliatory arrests for the exercise of free speech, where courts reject qualified immunity assertions *unless* the retaliatory arrest was supported by probable cause (*i.e.*, sufficient justification). In *Reichle v. Howards*, the U.S. Supreme Court held that there is no clearly established right to be free from a retaliatory arrest *that is supported by probable cause*. 566 U.S. 658, 666 (2012). As a result, in cases dealing with First Amendment retaliatory arrest claims, courts assess whether probable cause existed for the arrest; if not, a claim of retaliatory arrest for the exercise of free speech can be stated against the government official, who is not entitled to qualified immunity. *See, e.g.*, *Pourkavoos v. Town of Avon*, 823 F. App'x 53 (2d Cir. 2020). Courts accordingly go to great lengths to analyze whether probable cause existed for the arrest; not infrequently, this rigorous analysis leads courts to see past a poor justification for an arrest and determine that a government actor did not enjoy qualified

---

[48] Because the case was at the motion to dismiss stage, moreover, the District Court's inquiry should have been limited only to potential justifications *contained in the allegations in the complaint*, *see Sabir*, 52 F.4th 51, 64–65, and for the *limited purpose* of assessing whether the text of RFRA itself provided sufficient notice that Appellees' conduct violated Appellants' rights. *See id.*

immunity.[49]

The similarities between a classic First Amendment retaliatory arrest case and the one at hand are obvious. In both instances, individuals are punished and their liberties trodden in retaliation for the exercise of their protected rights of free expression. Strict scrutiny under RFRA, as under the First Amendment, requires the government to have a compelling government interest and use the least restrictive means in order for the conduct to be deemed lawful. The District Court failed to engage in this rigorous analysis under RFRA. If it had, the analysis would show that Appellees substantially burdened Appellants' exercise of their religion without sufficient justification and failed to use the least restrictive means, violating clearly established law.

## V.    This Court Should Hold That Defendants' Conduct Clearly Violated Appellants' Rights.

Regardless of whether the Court finds the law was clearly established at the time that Appellees violated RFRA (as required under prong two of the qualified

---

[49] *See, e.g.*, *Ballentine v. Tucker*, 28 F.4th 54 (9th Cir. 2022) (reversing lower court's determination at summary judgment that defendant police officer enjoyed qualified immunity after arresting plaintiffs in retaliation for chalking anti-police messages on sidewalks); *Patterson v. United States*, 999 F. Supp. 2d 300, 315–17 (D.D.C. 2013) (denying defendant police officers' motion to dismiss plaintiff's First Amendment retaliatory arrest claim, holding that officers did not enjoy qualified immunity because they lacked probable cause to arrest plaintiff); *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 216–19 (6th Cir. 2011) (affirming lower court's denial of qualified immunity to appellant police officer after arresting appellee-plaintiff in retaliation for insult, holding that officer lacked probable cause).

immunity test), it is critically important that the Court decide the first prong of the qualified immunity test (whether Appellees' actions violated RFRA) to make unmistakably clear that similar conduct violates RFRA. A ruling in Appellees' favor on prong two combined with a failure to reach prong one will give government actors carte blanche to continue violating parties' religious rights in the same egregious manner that Appellants' were violated. The Court must take this opportunity to guide officers' conduct accordingly.

As this Court is well aware, courts often look to precedent establishing a particular right to satisfy the second prong of the qualified immunity test. *See Sloley v. VanBramer*, 945 F.3d 30, 40 (2d Cir. 2019). But the U.S. Supreme Court's 2009 decision in *Pearson v. Callahan*, 555 U.S. 223 (2009), has made finding such authority more difficult. In *Pearson*, the Court relieved courts of the obligation to follow the "rigid" two-step qualified immunity test mandated by *Saucier v. Katz*, 533 U.S. 194 (2001), and held that courts may now "exercise their sound discretion in deciding which of the two prongs . . . should be addressed first." *Pearson*, 555 U.S. at 236. Naturally, if a court skips to prong two and determines that a right has not been clearly established, it need not address prong one. But the Court in *Pearson* recognized that even under that circumstance, reaching the first prong "is often beneficial" to provide guidance to the government going forward and to develop the law. *Id.*

Unfortunately, after *Pearson*, many courts end their analysis after determining that a right is not clearly established. *See, e.g.*, Karen M. Blum, *Section 1983 Litigation: The Maze, the Mud, and the Madness*, 23 Wm. & Mary Bill of Rights J. 913, 934 n.135 (2015) (collecting cases). "Encouraged by the Supreme Court to exercise the discretion afforded by *Pearson*, many lower courts are eschewing tough constitutional questions, instead disposing of cases on the ground that . . . the defendant prevails on qualified immunity because the right was not clearly established at the time." *Id.* at 933–34; *see also* Susan Bendlin, *Qualified Immunity: Protecting "All but the Plainly Incompetent" (and Maybe Some of Them, Too)*, 45 J. Marshall L. Rev. 1023, 1041 (2012) ("Although the Supreme Court held in *Pearson* that the prongs could be addressed in either order, the reality is that the first prong is not currently being addressed at all in most cases.").

The result is a dearth of recent case law recognizing important constitutional and statutory rights in novel scenarios. This, in turn, creates unbreakable feedback loops. By failing to reach prong one, courts simply lay the path for future government abuses, as agents can continue to claim that the law remains unclear. As Judge Willett succinctly described in his recent dissent in *Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019), *as revised* (Aug. 21, 2019): "[I]t's all a bit recursive. There's no earlier similar case declaring a constitutional violation because no earlier plaintiff could find an earlier similar case declaring a constitutional violation." *Id.* at 471

(Willett, J., dissenting). Judge Willett continued: "Plaintiffs must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because no one's answered them before. Courts then rely on that judicial silence to conclude there's no equivalent case on the books." *Id.* at 472.

The First Circuit echoed Judge Willett's criticisms in a 2019 concurring opinion: "[R]eflexively granting qualified immunity without first deciding whether the complained-of conduct offends the Constitution (i.e., resolving cases solely at step (2)) results in fewer and fewer courts establishing 'constitutional precedent,' let alone the kind of clearly-established precedent needed to overcome a qualified-immunity claim — a phenomenon known as 'constitutional stagnation.'" *Eves v. LePage*, 927 F.3d 575, 591 (1st Cir. 2019) (Thompson, Torruella, and Barron, JJ., concurring).

And most recently in *Sabir*, this Court expressed the same concerns, stating that "[e]ven if it were not clearly established that [the defendants] violated RFRA," the Court would "still address the merits question first to clearly establish the law and prevent a vicious cycle of shielded misconduct." 52 F.4th 51, 58 n.3.

The Court itself in *Pearson* recognized the importance of "promot[ing] the development of . . . precedent." *Pearson*, 555 U.S. at 236. It also explicitly identified examples of circumstances similar to the case at bar where addressing both prongs of the *Saucier* test would be beneficial. For example, the Court noted "it often may

be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." *Id.* Here, identifying the contours of the right that Appellees violated in this case would provide clarity to whether that right was clearly established at the time. The *Pearson* Court also concluded that the two-step procedure "is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* That, too, applies to this case.

This Court has the opportunity and the responsibility to develop precedent in this area of the law, and it should fulfill it by addressing prong one. Doing so will ensure that, in the future, officers cannot claim uncertainty about what the law requires: targeting members of a religious community for information in violation of their religious exercise and retaliating against them in an effort to coerce their cooperation will not be protected government conduct. Subjecting innocent individuals to retaliatory government coercion because they refuse to become informants is a tactic out of a repressive dictatorship, and is anathema to the basic principles of our constitutional democracy. This Court should make that unmistakably clear.

## CONCLUSION

For the foregoing reasons, the District Court's decision should be reversed.

Dated: August 4, 2023                  Respectfully submitted,

                                                  */s/ Matthew E. Price*
                                                  *Counsel for* Amici Curiae

25

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Local Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,281 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14-point font.

Dated: August 4, 2023    By: *Ali I. Alsarraf*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2023, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated: August 4, 2023                By: *Ali I. Alsarraf*